**INTERBOROUGH NEWS COMPANY,**
Plaintiff,

v.

The **CURTIS PUBLISHING COMPANY,** Curtis Circulation Company, Triangle Publications, Inc., S-M News Company, Inc., McCall Corporation, Popular Science Publishing Company, Inc., Meredith Publishing Company, Reader's Digest Association, Inc., Hearst Magazines, Inc., Fawcett Publications, Inc., Macfadden Publications, Inc., Hillman Periodicals, Inc., National Comics Publications, Inc., Independent News Co., Inc., Publishers Distributing Corporation, Field Enterprises, Inc., Pocket Books, Inc., Walter D. Fuller, Benjamin Allen, Ray C. McLarty, Victor E. Lance, Marvin Pierce, William A. Rogers, Robert E. Haig, Roscoe Fawcett, Allan Adams, O. J. Elder, Sol N. Himmelman, Alexander L. Hillman, Philip Keenan, Paul H. Sampliner, Harry Donenfeld, Irving S. Manheimer, Robert F. De-Graff, Wallis E. Howe, Jr., S. O. Shapiro and George B. Davis, Defendants, and Jules Stolz, Almond E. Booth, George P. Booth, and Herbert Meyer, Additional Defendants to the Counterclaims of Defendants Curtis Circulation Company, Triangle Publications, Inc., and Fawcett Publications, Inc.

United States District Court,
S. D. New York.

Sept. 8, 1954.

Supplemental Opinion Nov. 22, 1954.

See also, 108 F.Supp. 768; 14 F.R.D. 408.

Webster, Sheffield & Chrystie, New York City, for plaintiff, and additional defendants to the counterclaims Jules Stolz, Almond E. Booth, George P. Booth, and Herbert Meyer; Bethuel M. Webster, John V. Lindsay, and Denis R. Sheil, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendants The Curtis Publishing Co., Curtis Circulation Co., Walter D. Fuller, Benjamin Allen, and Victor E. Lance; Albert R. Connelly, Edward C. Perkins, and Justin S. Colin, New York City, of counsel.

Whitman, Ransom & Coulson, New York City, for defendants S-M News Co., Inc., McCall Corp., Meredith Publishing Co., Popular Science Publishing Co., Inc., William A. Rogers and Marvin Pierce; Forbes D. Shaw, E. Kendall Gillett, Jr., and Daniel F. Callahan, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant Reader's Digest Association, Inc.; Thomas F. Daly, and John W. Castles, III, New York City, of counsel.

McCauley & Henry, New York City, for defendants Hearst Magazines, Inc. and Robert E. Haig; Thomas A. Brennan, and Clarence J. Shearn, New York City, of counsel.

DeWitt, Van Aken & Nast, New York City, for defendant Fawcett Publications, Inc.; C. Coudert Nast, and William R. Lonergan, New York City, of counsel.

Joseph Schultz, New York City, for defendants Macfadden Publications, Inc., O. J. Elder, Sol N. Himmelman and S. O. Shapiro; Joseph Schultz, and Joseph E. Ginn, New York City, of counsel.

Herman H. Solnit, New York City, for defendants Hillman Periodicals, Inc., Alexander L. Hillman and Philip Keenan; Thomas A. Brennan, of counsel.

Weil, Gotshal & Manges, New York City, for defendants National Comics Publications, Inc., Independent News Co., Inc., Paul H. Sampliner and Harry Donenfeld; Horace S. Manges, and Edward C. Wallace, New York City, of counsel.

Benjamin E. Winston, New York City, for defendants Publishers Distributing

Corp., Irving S. Manheimer and George B. Davis.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Field Enterprises, Inc., Pocket Books, Inc., and Robert F. DeGraff; Samuel J. Silverman, and Jay H. Topkis, New York City, of counsel.

SUGARMAN, District Judge.

The defendants' motions to dismiss the complaint are granted.

In this opinion and appendix a number in parentheses ( ) denotes the page number of the printed trial record whereon testimony concerning the subject matter appears and a description and number in brackets [ ] denotes the identification mark of an exhibit received in evidence wherein the subject matter appears.

On December 13, 1949 Interborough News Company (hereinafter Interborough) filed its complaint against Curtis Publishing Company, Curtis Circulation Company (Curtis), Triangle Publications, Inc., (Triangle), S-M News Company (S–M), McCall Corporation, Popular Science Publishing Co., Inc., Meredith Publishing Company, Reader's Digest Association, Inc., Hearst Magazines, Inc. (Hearst), Fawcett Publications, Inc. (Fawcett), Macfadden Publications, Inc. (Macfadden), Hillman Periodicals, Inc. (Hillman), National Comics Publications, Inc., Independent News Company (Independent), Publishers Distributing Corporation (PDC), Field Enterprises, Inc., Pocket Books, Inc. (Pocket Books), Walter D. Fuller, Benjamin Allen, Ray C. McLarty, Victor E. Lance, Marvin Pierce, William A. Rogers, Robert E. Haig, Roscoe Fawcett, Jr., Allan Adams, O. J. Elder, Sol N. Himmelman, Alexander L. Hillman, Philip Keenan, Paul H. Sampliner, Harry Donenfeld, Irving S. Manheimer, Robert F. DeGraff, Wallis E. Howe, Jr., S. O. Shapiro and George B. Davis.

All said defendants were served with the summons and complaint or appeared herein except defendants Roscoe Fawcett, Allan Adams and Wallis E. Howe, Jr. (4). The defendant Ray C. McLarty died before trial and his estate has not been substituted herein (4). Independent News Co., Inc., appeared in place and stead of Independent News Company, and S-M News Company, Inc., filed an answer for S-M News Company.

The first amended answer of Curtis and the answers of Triangle and Fawcett each pleaded a counterclaim against the plaintiff and Jules Stolz, Alfred E. Booth, George P. Booth and Herbert Meyer, who were impleaded as additional defendants to the said counterclaims and who, with plaintiff replied thereto.

After the other defendants answered, plaintiff filed an amended complaint to which defendants answered, Curtis, Triangle and Fawcett reasserting their several counterclaims against the plaintiff and the additional defendants and Independent asserting a counterclaim against only the plaintiff which it subsequently during trial voluntarily dismissed (2731).

By stipulation filed herein on August 7, 1951, the plaintiff "discontinued" its action against defendant Triangle Publications, Inc., which in turn "discontinued" its counterclaim against the plaintiff and the said additional defendants. Thereupon some of the defendants filed supplemental answers asserting that the voluntary dismissal by the plaintiff of its suit against Triangle constituted a bar to the suit against said other defendants. The answers of the remaining defendants were, by a later pre-trial order deemed similarly amended.

After other intermediate proceedings, including the filing of further amended pleadings, motions addressed thereto and interrogatories, depositions and production of documents, the parties came to pre-trial.

When the pre-trial order was entered on August 13, 1953 the pleadings stood as follows: The complaint asserted a "first separate claim" against all defendants for $4,860,000 ($1,620,000 trebled) "for injury to its business and property by reason of the defendants' violation of *Section 1* of the Sherman Act (15

U.S.C. § 1), and for the cost of the action, including a reasonable attorney's fee" (emphasis supplied) and a "second separate claim" against all defendants, except S-M and certain other corporate and individual defendants connected with it, for $57,102 ($19,034 trebled), costs and attorney's fee upon the same grounds as those of the "first separate claim" and finally it sought a permanent injunction against the continuance of the acts alleged in the first and second claims.

The answers denied the allegations of wrongdoing in the complaint, set up certain separate defenses and in the cases of Curtis, Fawcett and Independent asserted the counterclaims as aforesaid.

During the trial of the plaintiff's case its complaint was finally amended (2413) to plead in its first claim $5,996,556 ($1,998,852 trebled) damages "by reason of the defendants' violation of *Sections 1 and 2* of the Sherman Act (15 U.S.C. §§ 1, 2)" (emphasis supplied) and to plead in its second claim $38,070 ($12,690 trebled) damages upon the same grounds as those of the amended first claim.

The earlier pre-trial hearings resulted in the order, filed as aforesaid on August 13, 1953, wherein the issues to be tried were formulated by Judge Conger. Because of the plaintiff's amendment of its complaint during trial it became necessary to amend the pretrial order appropriately and that was done (2486) so that the issues were finally formulated as follows:

"8. The issues to be tried are formulated by the Court as follows:

"(a) With respect to the First Claim of the Amended Complaint:

"1. Whether, in or about 1947, defendants, or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to withdraw from plaintiff, and transfer to others, the wholesale distribution of magazines, periodicals and reprints in the Greater New York Area;

"2. Whether, in or about 1947, defendants, or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to monopolize, or monopolized, or attempted to monopolize, the wholesale distribution of magazines, periodicals and reprints in the Greater New York Area;

"3. If so, whether any such combination or conspiracy, monopolization, or attempt to monopolize, was

(a) a violation of Section 1 of the Sherman Act, or

(b) a violation of Section 2 of the Sherman Act, or

(c) a violation of both said Sections.

"4. If there was such a violation;

(a) Which defendants were parties thereto;

(b) Was plaintiff injured in its business or property by reason thereof; and

(c) What, if any, damages were sustained by plaintiff by reason thereof.

"(b) With respect to the Second Claim of the Amended Complaint:

"1. Whether, during the period 1946 through 1949, any of the defendants (other than S-M News Company, Inc., McCall Corporation, Popular Science Publishing Company, Inc., Reader's Digest Association, Inc., Meredith Publishing Company, Marvin Pierce and William A. Rogers), or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to withdraw from plaintiff the galley distribution of magazines and reprints in Ohio, Pennsylvania, New York, Massachusetts, Maine, Vermont, or New Hampshire;

"2. Whether, in or about 1947, defendants, or any of them, entered into and carried out, by the means alleged, a combination or conspiracy

to monopolize, or monopolized, or attempted to monopolize, the galley distribution of magazines, periodicals and reprints in Ohio, Pennsylvania, New York, Massachusetts, Maine, Vermont, or New Hampshire;

"3. If so, whether any such combination or conspiracy, monopolization, or attempt to monopolize, was

(a) a violation of Section 1 of the Sherman Act, or

(b) a violation of Section 2 of the Sherman Act, or

(c) a violation of both said Sections.

"4. If there was such a violation;

(a) Which defendants were parties thereto;

(b) Was plaintiff injured in its business or property by reason thereof; and

(c) What, if any, damages were sustained by plaintiff by reason thereof."

Later in the trial plaintiff's counsel conceded that plaintiff under its second claim had "not put in evidence in respect of the galley situation except in the case of Ohio" (2655).

The following facts concerning the present corporate parties to the suit, the substance of which is alleged in the complaint, are admitted by the answers.

(In those instances where an allegation directly concerns one defendant and is admitted by that defendant, even though the other defendants deny or deny knowledge or information sufficient to form a belief as to that allegation it has been deemed to have been admitted by all defendants.)

Plaintiff Interborough News Company is a New York corporation.

Defendant The Curtis Publishing Company is a Pennsylvania corporation, qualified to do business in New York with a regular and established place of business in the Southern District of New York.

Defendant Curtis Circulation Company, a wholly-owned subsidiary of defendant The Curtis Publishing Company, is a Delaware corporation, qualified to do business in New York with a regular and established place of business in the Southern District of New York.

Defendant S-M News Company, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York; is owned by defendants McCall Corporation, Popular Science Publishing Company, Inc., Meredith Publishing Company, The Reader's Digest Association, Inc. and one other corporation, all of which publish magazines and periodicals of which defendant S-M News Company, Inc., is the national distributor together with publications of other publishers who are not defendants.

Defendant McCall Corporation is a Delaware corporation, qualified to do business in New York, with a regular and established place of business in the Southern District of New York.

Defendant Popular Science Publishing, Company, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Meredith Publishing Company is an Iowa corporation, with a regular and established place of business in the Southern District of New York.

Defendant Reader's Digest Association, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Hearst Magazines, Inc., is a Delaware corporation, qualified to do business in New York, with a regular and established place of business in the Southern District of New York.

Defendant Fawcett Publications, Inc., is a Delaware corporation, qualified to do business in New York, with a regular and established place of business in the Southern District of New York.

292

Defendant Macfadden Publications, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Hillman Periodicals, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant National Comics Publications, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Independent News Co., Inc., a wholly-owned subsidary of defendant National Comics Publications, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Publishers Distributing Corporation is a New York corporation, with a regular and established place of business in the Southern District of New York.

Defendant Field Enterprises, Inc., is a Delaware corporation.

Defendant Pocket Books, Inc., a wholly-owned subsidiary of defendant Field Enterprises, Inc., is a New York corporation, with a regular and established place of business in the Southern District of New York.

When this suit was commenced the status of the individual defendants was admitted by the answers to have been as follows:

Walter D. Fuller was President of The Curtis Publishing Company;

Benjamin Allen was Director and President of Curtis Circulation Company;

Ray C. McLarty was Director, Vice President and Director of Sales of Curtis Circulation Company;

Victor E. Lance was District Sales Manager for New York of Curtis Circulation Company;

Marvin Pierce was Chairman of the Board of Directors of S-M News Company, Inc., and President of McCall Corporation;

William A. Rogers was Director, Vice President and General Manager of S-M News Company, Inc.;

Robert E. Haig was General Manager of International Circulation Division, Hearst Magazines, Inc., and Vice President and Circulation Director of Hearst Magazines, Inc.;

O. J. Elder was President of Macfadden Publications, Inc.;

Sol N. Himmelman was Vice President and Circulation Director of Macfadden Publications, Inc.;

Alexander L. Hillman was Director and President of Hillman Periodicals, Inc.;

Philip Keenan was Director, Vice President and Circulation Director of Hillman Periodicals, Inc.;

Paul H. Sampliner was Director and President of Independent News Co., Inc.;

Harry Donenfeld was Director and Vice President of Independent News Co., Inc.;

Irving S. Manheimer was Director and President of Publishers Distributing Corporation;

Robert F. De Graff was Director and President of Pocket Books, Inc.;

S. O. Shapiro was, until November, 1948, Vice President and Director of Circulation of Macfadden Publications, Inc.; and

George B. Davis was, until May 6, 1949, Director of Sales of Publishers Distributing Corporation.

When this suit was commenced the status of the additional defendants was admitted by the replies to have been as follows:

Jules Stolz had been President of Interborough until January 29, 1949 and thereafter vice chairman of the board of directors of Interborough;

Almond E. Booth was a Vice President and a director of Interborough;

George P. Booth was a Vice President and a director of Interborough;

Herbert Meyer was Treasurer and a director of Interborough.

The pleadings establish that the publication and distribution in interstate commerce of magazines, other periodicals and paper bound reprints is a large and important industry. The corporate defendants are publishers or distributors of both of such publications.

The pleadings further establish that as to some of the corporate defendants their dealings with Interborough were as follows:

### Curtis

Curtis' publishers severally shipped their publications to Interborough's New York offices in bulk in accordance with instructions from Curtis where, until June, 1947, Interborough distributed said publications to and in the New York counties of New York, Bronx, Queens, Kings, Richmond, Westchester, Nassau and Suffolk and to and in Hudson and Bergen Counties, New Jersey, by trucks owned and operated by Interborough; and to and in and throughout the New England States, Pennsylvania, Delaware, Maryland, Ohio and in a few places in New Jersey and Westchester and Suffolk Counties, New York, by mail and express, a method known as "galley distribution." Interborough's interstate distribution for Curtis included among other services, promotion of its publications, checking of sales, collections and the pickup and return of unsold copies. In April, 1947, Curtis transferred, effective thereafter, its distribution in areas in New York and New Jersey served by Interborough's trucks to other distributing agencies made up in part by former employees of Interborough and Curtis who were encouraged and assisted in organization and financing by Curtis. On May 19, 1947 Curtis notified Pilgrim News Company that it would after June 21, 1947 cease using the wholesale distribution facilities of Pilgrim News Company. In October, 1947 Curtis ceased to do galley business. with Interborough with respect to the State of Ohio.

### S-M

Until about August, 1948, Interborough was wholesale distributor to retail outlets in the New York counties of New York, Bronx, Queens, Kings, Richmond and in parts of the New York counties of Westchester, Nassau and Suffolk and in the New Jersey counties of Hudson and Bergen of publications of which S-M was national distributor which publications were delivered to Interborough in New York for such distribution. In August of 1948 said distribution was transferred by S-M from Interborough to thirteen wholesale distributors.

### Hearst

Between April, 1932, and July, 1948, Interborough distributed by truck in the New York area, pursuant to agreements with Hearst and its predecessors or affiliates, magazines distributed but not published by Hearst and between April, 1946 and July, 1948 Interborough distributed by truck in the New York area, pursuant to agreements with Hearst and its predecessors or affiliates magazines published and distributed by Hearst. Since April, 1946 Interborough has distributed for Hearst and its predecessors and affiliates on galley by mail and express to out-of-town places not served by truck. In July, 1948 Hearst transferred its truck distribution from Interborough to other wholesalers and in January, 1949 it retransferred 50% of its truck distribution from the competing wholesalers back to Interborough and in June, 1949 retransferred said 50% of its truck distribution from Interborough back to the competing wholesalers. The magazines distributed by Interborough for Hearst were in the greater part shipped in bulk to Interborough's New York offices from out-of-state places and then distributed by Interborough. Interborough's agreements with Hearst and its predecessors and affiliates required that Interborough, in addition to distribution render other. services including checking on sales, making collections and picking up and returning unsold copies. In September, 1947 and in the summer of 1948 Hearst terminated. its contracts with Pilgrim. News Company and Long Island News. Company respectively.

## Fawcett

Interborough built up, maintained and operated facilities for the distribution of the publications of Fawcett and others in the New England States, New York, New Jersey, Pennsylvania, Delaware, Maryland and Ohio. Some, but not all of the publications which Interborough thus distributed for Fawcett were shipped in bulk to Interborough's New York offices and thereafter distributed by Interborough. Interborough's distribution for Fawcett was by truck in the counties of New York, Bronx, Queens, Kings, Richmond, Westchester, Nassau, Suffolk, Hudson and Bergen. Interborough's distribution for Fawcett was by mail and express, *i. e.*, galley, in the New England States, other parts of New York and New Jersey and Pennsylvania, Delaware, Maryland and Ohio. Interborough also performed other services for Fawcett including promotion of Fawcett's publications, checking of sales, collections, and the pickup and return of unsold publications. In October, 1948 Fawcett withdrew from Interborough distribution in certain areas, part of which was shortly thereafter, for a period of time, returned to Interborough. Distribution, when withdrawn from Interborough by Fawcett, was turned over to other agencies in the same area. On February 10, 1948 and on September 10, 1948 Fawcett gave notice to Interborough of cancellation of contracts covering North Wilbraham, Massachusetts and Riverhead, L. I., respectively.

## Macfadden

For many years Interborough distributed for Macfadden, its publications and others which were shipped to Interborough in bulk. Interborough's interstate distribution for Macfadden included among other services, promotion of its publications, checking of sales, collections and the pickup and return of unsold copies. About October, 1948 Macfadden ceased to do business with Interborough in certain areas and transferred that business to distributing agencies serving Curtis.

## Independent

For many years Interborough was a distributor for Independent. Interborough distributed in the New York counties of New York, Bronx, Queens, Kings, Richmond, Westchester, Nassau and Suffolk and in the New Jersey counties of Hudson and Bergen all of the publications of which Independent was the distributor. Interborough's distribution in interstate commerce included among other services, the promotion of Independent's publications, the checking of sales, collections, and the pickup and return to Independent of unsold publications. In September, 1947 Independent withdrew its business from Pilgrim News Company. In November, 1948, May, 1949 and July, 1949 Independent cancelled certain distribution contracts between it and Interborough.

## Pocket Books

For many years Interborough was a distributor for Pocket Books in portions of the New England States, New York, New Jersey, Pennsylvania, Delaware, Maryland and Ohio. Interborough distributed Pocket Books' publications by trucks owned and operated by Interborough to and in the New York counties of New York, Bronx, Kings, Queens, Richmond, Westchester, Nassau and Suffolk and to and in the New Jersey counties of Hudson and Bergen. Interborough distributed Pocket Books' publications by mail and express, a method known as galley distribution to parts of New Jersey, New York, the New England States, Pennsylvania, Delaware, Maryland and Ohio. In 1947 Pocket Books withdrew galley business from Interborough in Ohio. Between May, 1947 and May, 1948 Pocket Books withdrew its truck distribution from Pilgrim News Company, a Massachusetts subsidiary of Interborough and, in the summer of 1948, withdrew its truck distribution from Long Island News Company, a Suffolk County subsidiary of Interborough. In September, 1948 Pocket Books withdrew its Greater New York truck distribution service from Interbor-

ough and turned over most of that business to other wholesale distributors.

## PDC

For a number of years Interborough was a distributor of magazines distributed by PDC and built up, maintained and operated facilities for distribution of PDC's publications in the New England States, New York, New Jersey, Pennsylvania, Delaware, Maryland and Ohio. Some of PDC's magazines were shipped in bulk to Interborough's New York offices and thereafter distributed by Interborough to and in said places. Interborough distributed PDC's publications by truck to various places in the counties of New York, Bronx, Queens, Kings, Richmond, Westchester, Nassau and Suffolk and in Hudson and Bergen counties, New Jersey. Interborough distributed PDC's publications by the mail and express method of galley distribution to places in New Jersey, New York, the New England States, Pennsylvania, Delaware, Maryland and Ohio. Interborough, when it distributed PDC's publications performed for PDC certain services including the promotion of PDC's publications, the checking of sales, collections and the pickup and return of unsold publications of PDC. Effective October 1, 1948, January 1, 1949 and April 1, 1949, PDC withdrew from Interborough certain distribution business in New York and New Jersey and transferred same to other distribution agencies operated in those areas. PDC in September 1948 notified Interborough of cancellation of their contract for Riverhead, Long Island, i. e., Long Island News Company. PDC notified Interborough of the transfer of distribution in the North Wilbraham, Massachusetts area to other wholesalers.

## Hillman

Interborough distributed magazines for Hillman for a considerable period of time prior to the commencement of this action in the New England States, New York, New Jersey, Pennsylvania, Delaware, Maryland and Ohio. In some of these places distribution was by galley.

In connection with Interborough's distribution for Hillman, Interborough was required to promote sales, check sales and collections and pick up and return unsold magazines. On August 9, 1948 Hillman notified Interborough that distribution of Hillman's magazines would be handled by other distributors. Prior to commencement of this action Hillman withdrew its business from Long Island News Company and Pilgrim News Company.

The defendants are unanimous in resisting Paragraph 22 of the complaint which charges "each of said individual defendants participated in the conspiracy herein alleged"; and those paragraphs of the first separate claim of the complaint, as finally amended, which charge:

in Paragraph 23 that "this is an action authorized by Section 4 of the Clayton Act (15 U.S.C. § 15) for threefold the damages sustained by the plaintiff for injury to its business and property by reason of the defendants' violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and for the cost of the action, including a reasonable attorney's fee";

in Paragraph 28 that "[i]n or about 1947 the defendants entered into, and at all times since 1947 have maintained, continued and carried out, a contract, combination, and conspiracy in restraint of, and they have monopolized, attempted to monopolize, and combined and conspired to monopolize, the trade and commerce among the several states in the distribution of magazines, other periodicals, and paper-bound reprints described herein";

in Paragraph 29 that "[t]he conspiracy and monopolization alleged consisted in a continuing agreement and concert of action among the defendants to boycott Interborough, to cancel defendants' contracts with and to withdraw their business from Interborough, to induce and conspire with Interborough's employees to leave its employ and to organize new distribution agencies supported by defendants, to disparage and slander In-

terborough, its distribution facilities and services, and to monopolize independent wholesale distribution of magazines, other periodicals, and paper-bound reprints in the Greater New York area and in other areas served by Interborough, and thus to destroy Interborough's business and property; and the defendants did monopolize the independent wholesale distribution herein described.";

in Paragraph 35 that "[b]y reason of the conspiracy and monopolization described in this first claim Interborough has been injured in its property in the sum of $1,998,852." Curtis denies also Paragraph 32 which charges that "[a]t or about the time of said withdrawals and during the period thereof the Curtis Company engaged in a campaign to disparage and slander and to spread false rumors concerning Interborough, its facilities and services, and thus to injure Interborough's reputation, credit, and business."

The defendants (other than S–M News Company, Inc., McCall Corporation, Popular Science Publishing Company, Inc., Meredith Publishing Company, Reader's Digest Association, Inc., Marvin Pierce and William A. Rogers who are excepted therefrom) also deny those paragraphs of the second separate claim of the complaint, as finally amended, which charge:

in Paragraph 36 that "[i]n or about the years 1946 through 1949 the defendants * * * in combination and by unlawful agreement among themselves, withdrew galley business from Interborough in Ohio * * * [t]hese withdrawals were made in the same pattern as that of the conspiracy and monopolization against Interborough and its subsidiaries set forth in the first claim herein and in accordance with practices of long standing established by the defendants to control distributors and distribution generally in the United States, and to restrain and monopolize interstate trade and commerce in the distribution of magazines and paperbound reprints";

in Paragraph 37 that "[b]y reason of the conspiracy and monopolization described in this second claim Interborough has been injured in its galley business and property in the sum of $12,-690."

At pre-trial Interborough withdrew a third separate claim based upon the New York General Business and Stock Corporation Laws.

As hereinabove indicated, the defendants, in addition to their admissions and denials aforesaid, set forth specific defenses in their answers (other than that predicated upon the voluntary dismissal of the suit against Triangle) but no purpose will be served in analysing them or the two surviving counterclaims of Curtis and Fawcett and replies thereto in this decision on defendants' motions to dismiss the complaint made at the end of the plaintiff's case.

From the foregoing it appears that plaintiff's claims against the defendants may be briefly summarized as follows:

### The First Claim

1. Defendants agreed between and among themselves to unlawfully restrain the interstate distribution of magazines, periodicals and paper-bound reprints from defendant independent national distributors to retailers in the Greater New York area by eliminating Interborough as an independent wholesaler thereof. Plaintiff was so eliminated through a boycott, expressly or tacitly agreed on by defendants, resulting in the destruction of plaintiff's City Department.

2. Defendants acquired or attempted to acquire a monopoly in the same interstate activity of distributing magazines, periodicals and paper-bound reprints in the Greater New York area by agreeing between and among themselves to exclude plaintiff from any opportunity to compete with the thirteen newly organized independent wholesalers, on any terms, for the defendants' business. This monopoly resulted from the same concerted action claimed to sustain the charge of restraint of trade in 1. above.

### The Second Claim

Plaintiff makes similar charges with respect to the destruction of its Ohio galley business.

■ The parties went to trial to the court, a previously demanded jury having been waived and Interborough put in its proof. Thereupon all defendants moved to dismiss Interborough's complaint. The issue on such motion is—has plaintiff proven by a fair preponderance* of the evidence that such an agreement was made and (a) that it was a contract, combination or conspiracy in restraint of trade or commerce within the meaning of that phrase in the Sherman Act and hence a conspiracy condemned by Section 1 of that Act or (b) that it was an agreement resulting in a monopoly or attempt to monopolize within the meaning of Section 2 thereof or (c) that it was both.

The existence or not of an agreement between or among the defendants amounting to a contract, combination or conspiracy in restraint of trade or resulting in a monopoly or attempt to monopolize can be resolved only by detailed analysis of the plaintiff's proof oral and documentary and such has been attempted in the appendix annexed. Based thereon I conclude that plaintiff has failed to prove by a fair preponderance of the credible evidence the existence of such an agreement and for that reason grant the defendants' motions to dismiss the complaint.

\*　　\*　　\*　　\*　　\*

■ The Sherman Act is designed to assure to the public at large the benefits which accrue from the flow of commerce and trade unrestricted by unreasonable restraints thereon. The public interest is sought to be protected; private interests are only incidentally within its protective force in that private rights encroached upon by violations of the Act may be vindicated through the processes of Sections 4 and 16 of the Clayton Act in order to protect the paramount public interest.[1]

■ To establish a violation of the Sherman Act, a plaintiff must prove conduct of defendants resulting in or at least tending toward the regulation by defendants, directly or indirectly, of interstate commerce, the regulation of such commerce by private parties being unlawful by reason of the constitutional reservation of that power exclusively to the Congress.[2]

■ Absent proof of such effect on the commerce among the states, a plaintiff cannot prevail. There is nothing in the statute or the cases which indicates that Congress in enacting the Sherman Act, intended to condemn by Federal legislation practices that do not adversely affect interstate commerce by regulation of such commerce either (a) through concerted action resulting in a restraint of trade, or (b) monopolistic practices.

■ It must be kept in mind that the Sherman Act guarantees to the plaintiff no more than the right to compete on equal terms with its competitors for so much of the distribution market as it can capture and hold by legitimate business means. It does not guarantee to any person an unchanging status quo, *i. e.,* the enjoyment of a trade built up over the years despite changing conditions.

■ The acts of defendants in this case, allegedly constituting the claimed conspiracy are, of course, to be considered in the light of all the surrounding circumstances, including the condition of the industry at the time and the forces bearing on the parties, to determine the true meaning to be attributed

---

\* The plaintiff urges that the defendants' motions must be denied if plaintiff has presented a *prima facie* case. This is not the law. Moore's Fed. Prac., 2nd Ed., Vol. 5, p. 1044, para. 41.13[4].

1. Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 239; Associated Press v. United States, 326 U.S. 1, 17 note 16, 65 S.Ct. 1416, 89 L.Ed. 2013.

2. Addyston Pipe & Steel Co. v. U. S., 175 U.S. 211, 223, 228, 20 S.Ct. 96, 44 L.Ed. 136.

to the defendants' conduct and to ascertain the probable effects of the defendants' acts on free competition in that industry. In other words, the alleged conspiracy is to be judged by viewing it as a whole, not by dismembering it and viewing its separate parts.[3]

The interstate trade or commerce which plaintiff accuses defendants of conspiring to restrain and monopolize and in fact restraining and monopolizing is the wholesale independent distribution of magazines, periodicals, etc., *i. e.*, the distribution thereof from defendants or other publishers to the retailers.

### The First Separate Claim—Interborough's City Department

 Treating first the charge of monopoly,[4] it must be kept in mind that the defendants as independent national distributors were not engaged in the business, wholesale distribution from distributors to retailers, which plaintiff claims was the object of the conspiracy to monopolize.[5] Plaintiff's new competitors, the thirteen so-called Curtis wholesalers, were.[6] Therefore, the gravamen of plaintiff's charges in this respect must be that the defendants sought to perfect a monopoly of that business for those new competitors of plaintiff. This allegation is not sustained by the evidence. The evidence fails to show an intent on the part of any defendant to monopolize, nor does it show the

creation of a monopoly of such business. The defendants were not interested in the gathering of that business for the new wholesalers to the exclusion of substantially all other competitors, actual and potential. The evidence does show at most a bare refusal by defendants to deal with one competitor of the Curtis-sponsored newcomers, namely, Interborough, because of Interborough's real or imagined deficiencies in operation. This exclusion of a single person from competition is not monopoly. The essence of monopoly is power to effect the exclusion of competition generally in a field for the benefit of a particular person or class.[7]

Neither Curtis nor any other defendant had the intent or the power to garner for the thirteen new so-called Curtis wholesalers a monopoly of any segment of the wholesale business in the area served by plaintiff's City Department in the anti-trust sense of the word "monopoly." Of course, in the word-root meaning of monopoly, each new wholesaler was a monopolist, *i. e.*, the "only seller" of the various publications of a defendant in his particular district. But this is necessary for the financially successful distribution of each of the defendants' publications and the distribution agreements entered into between defendants and the new wholesalers are clearly the " 'normal and usual agreements in aid of trade and commerce

---

3. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333.

4. The Sherman Act's §§ 1 and 2 are neither mutually exclusive nor mutually comprehensive, but to some extent at least overlap in the sense that conduct constituting a violation of § 2 is a species of restraint of trade under § 1. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, footnote 59, at pages 224, 226, 60 S.Ct. 811, 84 L.Ed. 1129.

5. Defendants did not intend nor did they accomplish a suppression of competition among themselves and on the contrary it appears that competition was and is keen among defendants. Defendants are competitors .each with the other in publishing and/or distributing on a nation-

wide scale their respective publications. Their prior rivalry was unaffected by the acts alleged in the complaint.

6. That defendants were not competitors of plaintiff does not, of itself, preclude guilt of a charge of monopoly under § 2. Patterson v. United States, 6 Cir., 222 F. 599, 620; United States v. Patten, 226 U.S. 525, 541, 33 S.Ct. 141, 57 L.Ed. 333.

7. American Tobacco Co. v. United States, 328 U.S. 781, 784–787, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Associated Press, D.C., 52 F.Supp. 362, 369, affirmed 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013, rehearing denied 326 U.S. 802, 66 S.Ct. 6, 90 L.Ed. 489; Patterson v. United States, 6 Cir., 222 F. 599, 620, 621.

which may be found not to be within the * * * Act.' " [8]

The fact that Curtis actively and aggressively sought the other defendants' patronage for its subsidized wholesalers was not unusual under the circumstances presented. Curtis was no mere interloper intruding into plaintiff's field of endeavor for nefarious purposes, particularly after it gave plaintiff the opportunity of continuing in Manhattan, Brooklyn, Bronx and Queens, which plaintiff rejected. Curtis had a legitimate economic interest in seeking the other defendants' patronage for the newcomers, *viz.*, the lightening of its subsidy payments as fresh business tended to raise the new wholesalers' profit level.

Curtis having been long dissatisfied with plaintiff's services, set up the thirteen newcomers as competitors of plaintiff. At great expense to itself, more than it anticipated, Curtis agreed to subsidize its proteges and certainly had the right (and duty to its stockholders) to solicit the other defendants' patronage for them. That there was no agreement binding the other defendants to support Curtis' wholesalers is adequately demonstrated by the vacillating course of conduct pursued by several of the major defendants. Nothing in the record indicates that had plaintiff or any wholesaler other than the Curtis group offered to serve defendants on terms and performance equal to or better than those of the newcomers, the defendants would have refused to deal with them. In fact just the opposite occurred in Richmond with respect to defendant PDC. If anything, the record demonstrates that all the defendants, including Curtis, avidly sought the local wholesaler offering the best terms for the distribution of its periodicals.

If there was any sinister arrangement between the defendants and the wholesalers or between any defendants where-

by the Greater New York distribution of defendants' publications was to be handled by the new wholesalers to the exclusion of other competition generally and without regard to the play of normal competitive forces, it has not been brought out by plaintiff's evidence.

In the absence of either (a) the existence of monopoly power and intent to exercise it or (b) conduct intended to result in monopoly or monopoly power, there is no violation of § 2.[9] Plaintiff has not proved the defendants to have held such unlawful power nor to have acted with intent to achieve it in this case.

The evidence shows that the new wholesalers were not mere tools in the hands of the defendants in furtherance of a design to control that segment of trade and commerce. Each defendant independently negotiated its agreements with its respective wholesalers. Each new wholesaler was in spirited competition with plaintiff and each other.

There remains the question of defendants' violation of § 1 of the Act with respect to the Greater New York area. The plaintiff charges that Curtis brought pressure to bear on the other defendants to deal with the new wholesalers instead of with plaintiff, that the other defendants acceded thereto thus knowingly cooperating in plaintiff's destruction and so became co-conspirators. That such pressure was exerted and that at least some of the defendants yielded to it seems clear. Was this conduct unlawful under § 1? It was if (1) the conduct was unlawful *per se*, (2) the defendants' purpose was to accomplish a forbidden result or (3) a forbidden result was the natural effect of the defendants' acts.[10]

Plaintiff contends defendants' acts were a "per se" violation of the Act, i. e., a "boycott" condemned by the cases.[11]

8. Associated Press v. United States, 326 U. S. 1, 19, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013.

9. United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 432.

10. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Patten, 226 U.S. 525, 526, 543, 33 S.Ct. 141, 57 L.Ed. 333.

11. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34

■ Plaintiff's abstract proposition of law urged in this case that a "boycott" by others of even one person engaged in interstate commerce is now to be deemed a *per se* violation of § 1 of the Act, and that no inquiry need be made in such case as to the substantiality of the restraint imposed by the boycott on the affected commerce, appears, at first glance, to be supported by the more recent decisions of the Supreme Court.[12] However, I have doubt that such all-encompassing condemnation of group refusals to deal, as plaintiff urges, was intended by those cases. On analysis, it seems that the boycott itself was not condemned as an unreasonable restraint of trade in each of those cases, but rather the Court condemned either what was sought to be accomplished by the concerted refusals to deal or what was the necessary result thereof.[13] Hence, branding of defendants' acts a "boycott" and therefore a *per se* violation of the Act is not justified by a mere showing of the refusal by defendants to deal with plaintiff and their choice to deal with the 13 competing wholesalers.[14]

■ The "purpose" of the accused agreement, *i. e.*, the result sought to be

---

S.Ct. 951, 58 L.Ed. 1490; Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277.

12. "* * * group boycotts or concerted refusals to deal, clearly run afoul of § 1, * * *." Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 889, 97 L.Ed. 1277; "But the Sherman Act makes it an offense for respondents to agree among themselves to stop selling to particular customers," Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219; "For example, where a complaint charges that the defendants * * * have concertedly refused to deal with nonmembers of an association, * * * then the amount of commerce involved is immaterial because such restraints are illegal *per se*." United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533; cf. Kahn, "A Legal and Economic Appraisal of the 'New' Sherman and Clayton Acts," 63 Yale L.J. 293, 305–313.

13. In Eastern States Retail Lumber Dealers' Ass'n v. United States, supra, the refusals to deal were found to in fact suppress competition and interfere with the natural flow of commerce, 234 U.S. at page 614, 34 S.Ct. 951, and it appears that they tended toward the creation of a monopoly in favor of the members of the association. In Binderup v. Pathe Exchange, supra, the case was in the Supreme Court on appeal from the affirmance of a motion to dismiss the complaint which alleged *inter alia* that the group refusal to deal was *intended* to restrain the interstate commerce involved. 263 U.S. at page 312, 44 S.Ct. 96. In Fashion Originators' Guild of America v. Federal Trade Comm., supra, the boycott was held to tend toward the creation of a monopoly in the participants. 312 U.S. at page 466, 61 S.Ct. 703. In Associated Press v. United States, supra, the Court condemned an arrangement or combination "designed to stifle competition", 326 U.S. at page 19, 65 S.Ct. at page 1424, which was unreasonable in the light of "the significance of the restraint in relation to [the] particular industry". 326 U.S. at page 27, 65 S.Ct. at page 1428. In Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra, the concerted refusals to deal were condemned not as such but because they were the implementation of a "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce * * *", which is illegal *per se*. 340 U.S. at page 213, 71 S.Ct. at page 260; Times-Picayune Pub. Co. v. United States, supra [345 U.S. 594, 73 S.Ct. 889], dealt with an individual's refusal to deal. The dictum "group boycotts, or concerted refusals to deal, clearly run afoul of § 1 * * *" is followed by citations to Kiefer-Stewart Co. v. Joseph E. Seagram & Sons and Associated Press v. United States, both discussed herein. See United States v. Associated Press, D.C., 52 F. Supp. 362, 369, 370; Refusals to Sell and Public Control of Competition, 52 Yale L.J. 1121, 1134–1140.

14. Arkansas Brokerage Co. v. Dunn & Powell, 8 Cir., 173 F. 899, 901; Prairie Farmer Pub. Co. v. Indiana Farmer's Guide Pub. Co., 7 Cir., 88 F.2d 979, 982–984.

achieved, is decisive in determining liability to a party claiming to be injured by reason of the claimed violation of § 1.[15]

■ Testing defendant's conduct in this light, the record shows no convincing evidence that the defendants sought to acquire by their concerted action the power to control collectively the independent local wholesaling of their respective publications.

■ Rather the defendants in the instant case each acting on its own independent judgment in the light of existing realities, although under much persuasion from Curtis, decided that its best interests lay in transferring its respective business from Interborough to the new wholesalers and in some instances back to Interborough. The mere fact that under the circumstances presented, each knew what the others were doing and in some instances nearly contemporaneously did the same thing, does not, without more, make out an unlawful conspiracy.[16]

The "conscious parallel action" of the defendants in taking their business elsewhere was no more unlawful than the action of any group of persons who take their patronage from a common dealer to another or others who promise to give them a better product or better services.

The instant case is thus distinguishable from Butterick Pub. Co. v. Federal Trade Commission [17] cited by plaintiff where the court said at page 526 " * * * the business of selling second-hand magazines had been seriously curtailed by the agreement of the publishers and the action taken thereunder; and * * * the action was plainly for the purpose of stifling competition."

Undoubtedly, plaintiff's strength was sapped by the inroads on its business made by the new competition under the leadership and the active financial assistance of defendant Curtis. However, plaintiff's unfortunate plight is merely an incidental result of the operation of those competitive forces that the Sherman Act was designed to foster.

■ The final test to be applied to plaintiff's First Separate Claim to determine whether § 1 of the Sherman Act was violated is whether the defendants' several refusals to deal with plaintiff necessarily had or will have any substantial pernicious effect on the commerce concerned in the sense that an adverse effect therefrom will be felt by the public. No such element of public injury is proven by the testimony and exhibits in the case.[18] I am not persuaded that as a result of defendants' conduct, the purchasing public had to pay any increase in price, suffered any diminution in the quality or kind of service prevalent in the market prior to the defendants' acts complained of, or that there was any effect resultant from defendants' act detrimental to any person but the plaintiff.

What occurred with respect to Long Island News Company and Pilgrim News Company, the Interborough subsidiaries mentioned in the plaintiff's First Separate Claim, offers nothing to alter the above conclusion.

### The Second Separate Claim— The Ohio Galley

■ The above discussion of the law applies equally to the plaintiff's second claim and need not be repeated.

The record on this score similarly fails to expose more than a common ef-

---

15. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L. Ed. 1575.

16. Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S.Ct. 257.

17. 2 Cir., 85 F.2d 522.

18. Cf. Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, 273; Neumann v. Bas-tian-Blessing Co., D.C.N.D.Ill., E.D., 70 F.Supp. 447; Ruddy Brook Clothes v. British Foreign & Marine Ins. Co., D.C. N.D.Ill., E.D., 103 F.Supp. 290, affirmed 7 Cir., 195 F.2d 86, certiorari denied 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635; National Used Car Market Report v. National Auto. Dealers Ass'n, D.C.D.C., 108 F.Supp. 692, 694, modified 91 U.S. App.D.C. 313, 200 F.2d 359.

fort to substitute the admittedly more desirable methods of reshipment and truck delivery for its archaic, expensive and unsatisfactory forerunner, strict galley. Interborough having declined to progress to the more effective method of operation lost the business by force of economic pressure, not by reason of any conspiracy to restrain or monopolize interstate commerce.

In summary of the plaintiff's whole case I do not find that common design and understanding or unity of purpose of defendants or any of them to do anything that did or tended to or was intended to monopolize the Greater New York or Ohio wholesaling of publications or otherwise unlawfully restrain that segment of interstate trade and commerce within the meaning of the Sherman Act.

This conclusion makes it unnecessary to analyze plaintiff's proof of damages or to pass upon defendants' several motions to strike which accompanied their motions to dismiss.

Pursuant to F.R.Civ.P. 52, 28 U.S.C.A., this decision and the appendix hereto shall constitute the court's findings of fact and conclusions of law unless the parties desire more formal findings and conclusions in which event the settlement of same will await the conclusion of the trial.

The court will notify counsel when they will convene for the purpose of fixing time and place for the trial of the remaining counterclaims.

Settle order.

## APPENDIX

I The Industry Generally

II The Interborough Operation Generally
 A—The Plant
 B—Managerial Personnel
 C—Sources of Income

III The Interborough City Department Generally

IV The Interborough City Department Operating Technique
 A—Distribution
 B—Redistribution
 C—Promotional Services
 D—Clerical Work
 E—Handling of Returns
 F—City Department Employees

V The Interborough City Department Demise
 A—Dealings Between Interborough and Curtis
 B— " " " " Triangle
 C— " " " " S-M
 D— " " " " Hearst
 E— " " " " Fawcett
 F— " " " " Macfadden
 G— " " " " Hillman
 H— " " " " Independent
 I— " " " " PDC
 J— " " " " Pocket Books
 K— " " " " Non-Defendants
 Kable, Poplar and Leader

 VI Dealings Between the Independent National Distributors and the So-Called Curtis Wholesalers
 A—Dealings Between Curtis and the New Wholesalers
 B—Dealings Between the Other National Distributors and the New Wholesalers

 VII Meetings, etc., of Independent National Distributors
 A—Meetings, etc., for undisclosed purposes
 B—Meetings, etc., for disclosed purposes

 VIII The Interborough Country Department
 A—Generally
 B—Pilgrim News Company
 C—Long Island News Company, Inc.
 D—The Interborough Ohio Galley

## I

### The Industry Generally

There are various categories of nationally distributed magazines. Some are known as "pulp," some are "comic" and some are "flat" or "slick." The last class includes, among others, Good Housekeeping, Cosmopolitan, Today's Woman and True, and get their description "slick" from the smooth varnish cover (582).

They are distributed in varying ways, i. e., "single copy sales," "bulk" and "subscription." "Single copy sales" represent those sold by a publisher through a national distributor, wholesaler such as Interborough and retail dealer. "Bulk" sales are those sold in multiple numbers directly to advertising agencies, etc. "Subscription" sales are those sold and mailed directly to the consumer or subscriber usually on an annual basis (156).

This case deals with the "single copy sales" class of distribution of magazines, periodicals and re-prints, the last being pocket size, paper-bound reprints or original editions of full stories, etc.

The publishers of these magazines and reprints in the main market them through national distributors. National distribution is divided between American News Company on the one hand and thirteen independent national distributors on the other. Nine of the thirteen independent national distributors are among the remaining defendants in this suit.

American News Company, which is not here involved, distributes nationally only for those publications which grant it an exclusive franchise and it delivers to the retail dealers through its own branches throughout the country. It also owns subsidiaries such as Union News Company which operate retail outlets such as newsstands, cigar stands, restaurants and various other types of retail enterprizes (86).

None of the thirteen independent national distributors engages in wholesale operations (133). These independent national distributors (except S-M (916)) are an outgrowth of and successors to the circulation departments which the publishers at one time maintained. The independent national distributors do not actually handle the periodicals. They regulate the allotment of magazines either sent by the publishers to the wholesaler who distributes them by truck, or reshipment to the retailer or sent by the publisher to the retailer under the strict galley system (truck, reshipment and galley are elsewhere herein explained). The independent national distributors do all their own billing, crediting and bookkeeping necessary in collecting the wholesalers' accounts (131).

A "franchise" is an arrangement under which an independent national distributor gives a wholesaler exclusive right in a given territory to distribute to retail outlets the products of the publishers whom that distributor represents (114). These franchises are written, oral or both (117).

Between 1940 and 1950 there were from 750 to 800 wholesalers in the United States (132). In some places, known as "split towns," in addition to the American News Company, there would be wholesalers representing some of the independent national distributors and other wholesalers representing other of such distributors (133).

In 1946 a "newsdealer" meant any retail outlet for magazines generally to the public whether it be a stationery store, street corner, hotel, club or pier newsstand (116).

Magazines are distributed on the basis that unsold copies may be returned by retailer to wholesaler to publisher or distributor for full credit. These unsold copies are called "returns" (144).

A "tailboard rider" is (1) a magazine that doesn't pay its way and is merely accommodated because the truck is calling at the retailer's or (2) a type of distributor not described in the record other than to exclude Curtis, S-M, Hearst and possibly Triangle (424).

There are trade organizations in the magazine distribution field such as The Newsstand Circulation Managers and Executives Association; Pacific Coast Independent Magazine Wholesalers Association (PACIMWA); Atlantic Coast Independent Distributors Association (ACIDA); Bureau of Independent Publishers and Distributors (BIPAD); Central States Distributors Association; Midwest Independent Distributors Association (MIDA) and Independent Distributors of the Great Lakes Region (IDGLR), some of which are herein elsewhere mentioned.

## II

### The Interborough Operation Generally
#### A—The Plant

The plaintiff Interborough was generally divided into a number of departments.

The "City Department" engaged in truck delivery of periodicals and paperbound reprints for independent national distributors to newsstands and other retail outlets in the five boroughs of the City of New York and in the adjoining territory on Long Island and in Westchester and New Jersey (94).

The "Country" or "Galley Department" concerned itself with the distribution by express or mail of these magazines or periodicals or reprints to territories not serviced by the City Department, i. e.—rural areas in fourteen northeastern states (89).

The "Subway Department" handled the retail sale of magazines, newspapers and merchandise from subway stands in the Independent Subway System of the City of New York pursuant to a contract with the transit authorities (89).

The "Merchandise Department" undertook the sale and distribution of merchandise other than periodicals and reprints (89 and 129). Interborough also engaged in the sale at retail of flowers in the Independent Subway System through a wholly owned subsidiary called "Transit Florist."

Concomitant with these operations there were the necessary clerical and mechanical staffs to fill out the operations.

Interborough also, in about 1942, undertook a venture as a national distributor [plaintiff's 318] and, in that field, more recently, through a wholly owned subsidiary, United States News Company, distributed Farm Journal and Pathfinder magazines; the subsidiary being now merely engaged in cleaning up its outstanding accounts (615).

The relative importance in the Interborough structure of these various departments is evidenced by data exposing Interborough's operations for the calendar year 1946 (114, 192, 703 and 1544) [defendants' C2]. Of the $12,021,427 in gross sales made by Interborough in that calendar year, $8,257,260 was accounted for by the City Department; $2,602,960 by the Subway Department and $1,161,206 by the Galley Department. Thus Interborough's City Department accounted for 70% of its gross sales (115 and 192). However, profit-wise, the Subway Department was the more lucrative of the Interborough enterprises for, out of

$108,168 net income for the year 1946, $37,538 was attributable to the City Department, $65,417 to the Subway Department and $5,212 to the Galley Department (703).

### B—Managerial Personnel

Management personnel of Interborough was in the main controlled by the Meyer and Booth families. In the early 1900's S. P. Booth and Nicholas Meyer formed a partnership, known as the Interborough News Delivery Company, predecessor of the present plaintiff (170). The plaintiff was incorporated in 1911 (83). S. P. Booth became its first President and Nicholas Meyer became its first Treasurer (84). In 1939 S. P. Booth died (84 and 618). In 1946 Nicholas Meyer retired as Treasurer of Interborough (619). The Interborough stock was owned by the Booth and Meyer families, except for a small number of shares held by Edward Stolz and C. A. Schultheis, respectively (133, 617 and 618).

Herbert Meyer became associated with the plaintiff in February of 1924 when he was 21 years old (83, 618 and 968). He was put in charge of a trade publication, distributed by Interborough to its retailers and given charge of the distribution of the then popular dime novels. He worked out of the main office and branches of Interborough learning the business (84). He became a director of Interborough in 1928 (83). In 1930, he was given charge of the Merchandise Department, and went throughout the territory promoting the sale of Interborough's merchandise line (1222). He became First Vice President of Interborough in 1939. He left Interborough for military service in 1942 and returned at the end thereof in 1944 (85). He became Treasurer of Interborough in 1946 (83 and 187) and President of Interborough in 1952 (83 and 615).

Jules Stolz was first employed by Interborough in 1924 as General Manager (618). He succeeded S. P. Booth as President of the plaintiff in 1939, which office he vacated in 1949 (84).

George P. Booth (a nephew of S. P. Booth) first came to Interborough in the early 1930's (86 and 1490) when he was about 20 years old (619). His first duties until 1934 were those of a sales promotion man and route inspector (1324). He became a director of the plaintiff in 1939 and he became a Vice President of the plaintiff in 1943 (85 and 1324).

Almond E. Booth (a nephew of S. P. Booth) first became employed by Interborough in the middle 1920's when he was approximately 22 years old (85 and 619). He became a director of the plaintiff in 1935 (85). He is presently Treasurer of the plaintiff (85).

In 1946 the division of managerial responsibility fell as follows: Herbert Meyer was in charge of the newsstand section of the Subway Division; George P. Booth was in charge of the vending machine section of the Subway Division; Jules Stolz and Almond E. Booth shared jurisdiction of the City Department (827); the Country Department was under the direct supervision of one W. J. Moriarty (not an officer of the corporation) who in turn reported to George P. Booth and on questions of policy involving the Country Department, George P. Booth consulted with Jules Stolz (620 and 622).

### C—Sources of Income

In order to profitably sustain the structure hereinafter described, Interborough had a generally uniform working arrangement with its independent national distributor customers. In each instance the national distributor dictated the price that Interborough was permitted to charge its retailer dealers for a given copy of a given issue of a given publication and the national distributor also fixed the price at which the retailer was to resell that periodical to the ultimate consumer (151). The ultimate sales price was usually printed on the publication (198). In each instance, the price that Interborough was to charge its retailers for a periodical was a matter of negotiation between Interborough and the specific independent national distributor (199). The differential between that price and the one which Interborough paid to the independent national distrib-

utor for the specific periodical was part of Interborough's compensation (204). This spread, although commonly referred to in the trade as a commission, was really a controlled markup because Interborough assumed all of the credit risks incident to its sale of the periodicals (210).

In addition to the so-called commission, Interborough received compensation from other sources, one form of which was a discount on the net billings from the independent national distributors to Interborough (1054). Interborough's discount, which was unique among wholesalers nationwide, came about in April of 1930 in this manner: Interborough's route men were unionized causing an increase in the labor cost of distribution. At that time Interborough's customers were not all independent national distributors; it then dealt directly with some publishers. Interborough's increased labor cost was severally individually discussed by it with the customers it then represented and it was conceded that some increase in Interborough's compensation was in order. After these several discussions a meeting was held at the Interborough office where all of Interborough's customers were represented. It was mutually agreed that some method of additional compensation to Interborough be devised. Most of the customers favored a percentage discount on Interborough's net billings from them. It was tentatively agreed that the discount be pegged at 5% pending the coming in of a report of an independent certified accountant to determine the actual increase brought about by the unionization. Upon the coming in of the result of that survey, it was agreed that 3½% would be adequate to cover Interborough's increased labor costs. All of the customers agreed to the 3½% discount arrangement except one independent national distributor, i. e.—S–M News Company, which preferred an adjustment of Interborough's purchase price of the periodicals which it distributed for S–M, the net result of which adjustment was an equalization to approximately the 3½% allowed by the

others (211, 917, 1058 and 1231) [plaintiff's 216 and 217]. By 1946 the only exceptions to the 3½% discount practice were S–M for the reasons above noted, Fawcett, which, in the interim, had increased its discount to 5½% and Curtis, which, in the interim, had changed to its bonus system (683) (see the discussion of the Curtis and Fawcett dealings with Interborough infra).

While, in all other instances the 3½% discount was uniform as between Interborough and its customers, the amount of service Interborough rendered to a given customer might vary greatly from that rendered to another, because the extent of the service was a result of individual negotiation between Interborough and each of its customers (684). Similarly, there was no difference in the service rendered between a 3½% discount customer and a 5½% discount customer, service being determined in each case by negotiation (684).

In addition to the so-called commissions and so-called discounts, which each constituted part of Interborough's compensation, it received as a result of individual negotiation from certain of its independent national distributors other income by way of charges made against those lines that did not sell as well as others. These charges were generally on a per copy basis for returns in excess of an agreed percentage of the original draw. The percentage was usually 25% and the amount of the per copy charge depended on the selling price of the magazine. These return charges were substantially uniform as against all of the independent national distributors (1243).

Finally, another source of revenue to Interborough was the service charge which it imposed upon its retail dealers with the consent of the independent national distributors. The service charge was usually a weekly charge of 25¢, 35¢ or 50¢ depending upon the weekly dollar volume of the retailer (522). Periodically, retailers would be reclassified to determine the amount of their weekly service charges (683).

Aside from its regular supply of periodicals to the newsstands, and particularly in the earlier years, Interborough would receive direct subscription orders for magazines from its retailers into its City Department and would turn these over to whatever channel would yield Interborough the greater profit on the subscription (225).

## III

### The Interborough City Department Generally

Interborough's City Department was conducted out of its main building on 52nd Street in New York and three branches maintained respectively in Jamaica, Westchester and Brooklyn (627 and 671). Interborough had given up its Bronx branch in 1941 (628). In the year 1946 all of Manhattan, part of New Jersey, part of Brooklyn and part of the Bronx were serviced out of the 52nd Street building (639). In 1946 the Westchester branch serviced all of Westchester County (except the city of Yonkers which was serviced by another company (650)), and the northernmost portion of the Bronx (642). In 1946 the Jamaica branch serviced dealers primarily situated in Queens and in the immediately adjoining portion of Nassau County (641). The Brooklyn branch serviced Interborough's customers in Brooklyn (114 and 641).

The extent of the branch operations varied. In Brooklyn there was no clerical force, whereas in Westchester and Jamaica clerical workers operated in 1946 and thereafter (636), and in the Jamaica branch there was also an order regulation force setting up the draw of the various retailers (637). Promotion work was done out of the main plant and all three branches so that in 1946 there were 48 supervisors and inspectors working on promotion in the territory.

The City Department, through the main office and the branches, prior to World War II, serviced approximately 10,000 newsdealers in the Greater New York area (116, 149 and 680). At the end of the war that number had been reduced to somewhere between 6,500 and 8,500 outlets (116, 149, 667 and 680). During the war these dealers were serviced by 66 routes, which, subsequent thereto, were increased to 87 routes (145 and 878) [plaintiff's 326 and 327]. These routes required more than one man per route because Interborough's route men, under their union contract, worked 40 hours in a 5 day week, whereas the delivery service was on a 6 day basis, hence, additional employees were necessary to cover the territory fully (880).

In Interborough's City Department there was an average monthly delivery of between 7,000,000 and 9,000,000 copies of magazines and soft cover reprints per month (146).

Although in its dealings with the independent national distributors Interborough was deemed a wholesaler in charge of Staten Island as part of the Greater New York area, it did not actually make the deliveries in Staten Island as it did elsewhere in this territory. In Staten Island it had a contract with Staten Island News Company, operated by one MacAloon. In every respect Interborough's relationship with the retailers on Staten Island was the same as elsewhere except that the actual physical delivery of the publications was made by Staten Island News Company as an agent of Interborough (271 and 642). Interborough made no deliveries independently of Staten Island News Company's representation on Staten Island (876). For his said services, MacAloon received a portion of the price differential between Interborough's cost and its selling price of the magazines distributed, together with an agreed flat price weekly to cover haulage. MacAloon did not receive any part of the additional discounts which Interborough received from the independent national distributors (652).

Interborough's basic operation was from its main building, built specifically for that purpose in 1929 or 1930 (188), at 525 West 52nd Street, Manhattan. This building ran through to West 53rd Street. It had a complete cellar. The

52nd Street portion was 100 feet wide and 7 stories high and extended to the middle of the block. The 53rd Street portion, which was built subsequently to the 52nd Street portion, was 125 feet wide and 4 stories high and connected at the middle of the block with the 52nd Street section (113).

At the end of 1946 Interborough's total assets were approximately $3,000,000 (190), of which buildings and equipment were valued, after depreciation, at $729,740 (624), which included the book valuation of the 52nd Street building and land at $635,000 (622) [defendants' C2]. Because, at that time, the greater portion of the 52nd Street building was utilized in City Department business, those figures were attributed to the City Department operation and no allocation against the Subway, Galley or Merchandise Departments was made by Interborough (188 and 626).

In 1946, and during prior years, portions of the 52nd Street building were rented by Interborough to independent concerns (622 and 1210) and a small amount of space was utilized by the Country and Subway Departments (626).

Up to 1933 the New York suburbs were not serviced by truck delivery. At that time they were serviced by galley directly from the publishers via mail or express, or in a few instances by small independent truck wholesalers. That type of coverage was unsatisfactory and the publishers requested Interborough to extend its city truck service so as to cover the suburban areas and thus improve the service. Interborough did so, acquiring equipment and personnel and established the branches earlier referred to (239). In so doing, and for many years, Interborough sustained an operating loss because the dealers serviced were not sufficiently numerous to yield a profit on the truck routes maintained. After the war with the flow of population from the city proper to the suburbs and the increase of retail outlets, due in part to Interborough's promotion thereof, the suburban areas began to show a profit and for that reason Interborough felt

that Curtis' disenfranchisement of Interborough in the suburban areas at the conferences of April 27 and 30, 1947 was extremely unfair (238) (see infra the Curtis-Interborough dealings).

The Westchester branch was located in Tuckahoe and was the first floor of a two or three story building rented by Interborough, which housed a clerical office, a manager's office, storage place for automobiles, a return department and a mechanical department (629).

The Jamaica branch was a few blocks from the Long Island depot. It was a one story building which housed a number of automobiles, a clerical office, a manager's office, a return department, a mechanical department and warehouse space (629).

The Brooklyn branch was located on Pacific Street in that borough. It was a one story building housing a garage section for the storage of a number of Interborough's automobiles, a return department, several offices, locker space for employees and a mechanical department (628).

In addition to Interborough's physical plant, it was required to maintain a large fleet of automobiles to service its customers. In 1946 this fleet consisted of approximately 115 trucks and approximately 20 lighter vehicles. The trucks ranged from 10 ton Macks to 1½ ton panel-body trucks. The lighter vehicles, which were used for promotion work, were three-quarter ton panel-body commercial vehicles (192). As of December 31, 1946, although during that year Interborough had added $19,993 worth of equipment to its rolling stock, the net book value, due to depreciation and no replacement during the war years, for its entire fleet of automotive equipment was $20,355 (1159 and 1160) [defendants' C2]. However, during 1947 Interborough added additional equipment valued at $95,209 so that, by the end of 1947 the net book value of its rolling stock had grown to $100,518 (1159 and 1160) [plaintiff's 200]. In its desire to build up its suburban business, after restrictions on the acquisition of rolling stock were lifted in

1946, as Interborough acquired new automotive equipment, it put that equipment into service in the suburban areas (842).

In order to keep its trucks in good operating condition, Interborough maintained a Mechanical Department in its main plant and branches. Major repairs were made in the mechanical department of the main plant (637). Twenty-six maintenance men or mechanics were employed in the Mechanical Department in 1946 (672) in servicing the rolling equipment.

## IV

The Interborough City Department Operating Technique
A—Distribution

Distribution in the City Department would start with the regulation by Interborough of the prepublication order of each of its retail dealers. Interborough would determine the number of copies of a given issue of a given magazine to be sent to a given retailer by appraising its prior experience with that retailer in the distribution of that periodical. This information, which was kept in permanent record form by Interborough, would be imparted to the independent national distributors who would thereby determine Interborough's needs and, incidentally, advise their publishers as to the anticipated print requirements of a given issue (136). Interborough maintained 60 employees in 1946 engaged in the Order Regulation Department determining the number of periodicals to be distributed to each of its retailers (671). Sometimes an independent national distributor would supply Interborough with its desired formula for determining the prepublication order, i. e.—Curtis had Interborough use its "red figure," a formula of dividing the total of the last three net sales experiences of a given retailer by two, to determine that retailer's draw for the next succeeding original distribution of that Curtis publication (928).

Having thus determined, before publication, the number of copies required and having appropriately advised the independent national distributor thereof, Interborough would in due course receive those periodicals in bulk. In all instances except that of Curtis, delivery was made to the main plant at 52nd Street (928). Curtis in some instances shipped its publications directly to the other branches, but this was not indulged in as a general practice because of union opposition (928). The bulk of magazines thus received at 52nd Street were broken down into shipments to the other branches or to the route men working out of 52nd Street. The employees who broke these bulk shipments down into branch or route allotments and who delivered them to the branches or route men were known as relay men (182). Neither the relay men nor the route men would actually load the trucks. This loading from floor to truck was done by another group of employees known as floor men (183).

There then commenced the original distribution to the retailers (927). In 1946 this was under what was commonly known as the "loose delivery system." Each route man would receive in bulk the total copies of a given magazine intended for distribution to the retailers on his route for that day. He would simultaneously receive a route sheet indicating the number of copies to be given to each dealer. It would then be his obligation to distribute along the route the appropriate number of copies to each of the dealers on his route. Simultaneously he would deliver to the dealer a bill for the copies then left (657).

Timing was of the utmost importance in the distribution of periodicals and this was particularly so in the case of weekly publications. For example, the Saturday Evening Post issue dated Saturday, April 26, 1947 arrived from Curtis at Interborough on Friday and Saturady, April 18 and 19, 1947. The shipments thus received at the branches were broken down into routes and loaded on route trucks as aforesaid so that these trucks could commence delivery of that issue on the release date, i. e., Wednesday, April 23,

1947, on which day the retailers would put the issue on sale on their newsstands (110).

## B—Redistribution

Coincidentally with the original delivery of a magazine and a bill therefor, the route man would be engaged in other activities with the retailers on his route, including collections for prior deliveries, promotional work, pickup and recovery and credits for returns (178), some of which activities will be hereinafter discussed. Of importance equal to the original distribution of the publications was the process of redistribution by Interborough's route men. Redistribution involved checkups, pickups and recoveries. The checkup made by the route man was the process of visiting his retailers periodically after the original distribution to check up on the number of copies of a given issue available for sale by that retailer currently. This information was relayed by Interborough to the independent national distributors and by them in turn to the publishers to enable all to know currently of the sales trends of that particular periodical (141 and 926). Checkups also minimize the amount of returns because of the concomitant processes of pickup and recovery (924). In the case of weekly periodicals as against monthly periodicals, the selling span being so much less, the process of redistribution had to be more punctual (664). If in the course of checking up, the route man ascertained that one retailer was oversupplied while another was undersupplied, he would pick up from the former and re-cover the latter so as to try and equalize the supply and demand of the retailers on his route. Of course, appropriate credit and debit would have to be made by the route man and passed on to Interborough for proper bookkeeping. Obviously, throughout the process of adequately supplying retailers, proper forms and the maintenance thereof were imperative in order that accuracy be maintained in the distribution of the periodicals involved (930). On occasions, where pickups were insufficient to recover retailers in short supply, Inter-

borough would have to re-order after publication to make up the deficiency. In most instances, the independent national distributor would apply the counterpart of pickup and recovery, but on a grander scale, i. e.—recouping an oversupply from one city and sending it to make up for a deficiency in another city (140).

The obligation of checkups by the wholesaler had its genesis in the industry approximately a score of years ago and did not previously prevail (1245 and 1248). The redistribution requirements imposed on Interborough by the several independent national distributors varied depending upon the needs and demands of each distributor (1241) and in some instances no checkups or redistribution was required at all (142). Accordingly, in its negotiations with the independent national distributors, Interborough was influenced by the degree of redistribution sought by an independent national distributor as much as it was influenced by the volume of sale and popularity of the individual publication involved because the most profitable of Interborough's franchises were those where there was a minimum of returns and a minimum of redistribution requirements (1137). Notwithstanding this basic consideration, there was no specific charge imposed by Interborough upon any independent national distributor for the services of redistribution (431 and 1137). Redistribution therefore, depending upon specific negotiation, varied greatly and there was no set pattern. Thus, Ladies' Home Journal, distributed by Curtis, required three checkups during the sale period as did McCall's, a competing publication distributed by S–M. On the other hand, Reader's Digest required three checkups, whereas a competing publication, Magazine Digest, required none (429).

In the early years of redistribution practice, the various national distributors evolved their own methods of determining the procedures of redistribution and did not leave it entirely to the wholesalers' devices. Accordingly, S–M suggested the use on its publications of what was known as its recovery guide, a

method which Interborough never seriously followed because it considered it too cumbersome (928 and 937). Macfadden, on the other hand, had its own formula named after its inventor, the Fiori Formula. Curtis issued its instructions based upon its "red figure" formula for determining prepublication orders (1254 and 1274) [plaintiff's 194].

### C—Promotional Services

Promotion of the sale of magazines was one of the services that Interborough rendered to the independent national distributors through aiding the sales techniques of its retailers. Each month Interborough would issue a list of all the publications handled by it, which was distributed to each of the dealers serviced by Interborough's City Department (149) [plaintiff's 8]. Each of Interborough's route men, in addition to his other duties at the retailer's, put up posters and arranged the magazines for proper display in order to attract the consumer's eye (675). The route men would also report daily to their supervisors regarding anything occurring in the territory that might be of interest to the Interborough management. The supervisors, sometimes referred to as inspectors, in addition to receiving route men's reports, would travel in the field and call upon newsdealers to adjust complaints and try and promote the sale of publications. The supervisors would then daily report on special forms provided therefor to the chief inspector, who in turn would route portions of each such report to the Interborough executive concerned with that phase of the business (180 and 1233). There were in 1946 approximately 130 persons engaged in promotion work for Interborough, made up of 50 supervisors and the balance route men (136, 139 and 180). The material used for promotional work was supplied to Interborough by the independent national distributors (174). Promotional work emanated from the 52nd Street building and from each of the branches in Westchester, Jamaica and Brooklyn (638).

Another phase of Interborough's promotional work consisted of increasing the number of retailer outlets. Prior to 1946 no serious attempt on this score was made by Interborough due to limitations on equipment and personnel. Once the effort was undertaken, the technique was to survey an area in which it was thought there were not sufficient dealer outlets. In the main, interest was centered on drug stores where such a store would not be in direct competition with one of Interborough's existing retailers. If such outlet was found, efforts were made to induce the proprietor to take on a line of periodicals. These efforts, to a limited extent, increased the number of retail outlets in 1946 (680). However, this effort did not include chain drug stores, for they were usually found to be so located as to compete with Interborough's newsstand customers. Another impediment was that the independent national distributors in some instances supplied chain drug stores directly at a rate that prohibited Interborough's competition therewith (682 and 1139).

The independent national distributors serviced by Interborough participated in the promotional effort. One method was by the issuance of regulations and instructions to be adhered to by the Interborough employees (187 and 221). Another was to assign to the Interborough office a field representative of the independent national distributor to work with Interborough's route men and supervisors in promotional effort and to act as liaison between the independent national distributor and Interborough (224). The representatives of the independent national distributors, while their activities were based in the Interborough office, spent most of their time in the field working with Interborough employees and contacting retailers (225). Curtis was the most active of the independent national distributors in this effort. It had a large staff of employees working out of the Interborough office in daily contact with Interborough's route men and the retailers serviced— each Curtis man being assigned a given territory in which to work. Occasionally, this arrangement created friction

between Interborough and Curtis; for example, in a case where Interborough had cut off a retailer's supply because of delinquency in the payment of his bill, Curtis' representative would nevertheless supply Curtis publications to that retailer without regard to Interborough's interest (226).

### D—Clerical Work

The process of distribution and redistribution imposed upon Interborough the necessity of maintaining appropriate departments for clerically handling the data of its dealings with its retailers, so at the 52nd Street plant, there were various bookkeeping departments. One billed to the dealers; another issued credits to the dealers for pickups; another issued credits to the dealers for returns; another, as aforesaid, concerned itself with order regulations (671). These billing facilities occupied part of the second floor of the 52nd Street building. In addition thereto, part of that floor was devoted to the maintenance of the previously mentioned sales records by Interborough which always were available to representatives of the independent national distributors (668).

Entirely apart from the bookkeeping involved in Interborough's dealings with its retailers was the companion bookkeeping arising out of Interborough's dealings with its independent national distributors and there too there was the problem of accurate records of billings by the distributors to Interborough and credits for the return by Interborough to the distributors of unsold periodicals and the proper allowance of discounts, etc. (202).

In 1946 Interborough's Billing Department made out a separate daily bill for each one of its thousands of dealers. Each week one or two credit memoranda for unsold magazines returned or for unsold magazines picked up during the current selling span would also have to be prepared. Periodically these bills and credit memoranda would have to be consolidated into a statement to each retailer. In the aggregate the book-

keeping would involve as much as 10,-000 daily bills, from 10,000 to 20,000 weekly credit memoranda and approximately 10,000 weekly statements (146). Interborough was therefore required in 1946 to maintain 40 daytime employees in the W. A. D. Billing Department (Weekly Account Delivery Billing) and an additional 34 working at night (669). At that time it also maintained 17 daytime employees in the W. A. D. Credits Department (Weekly Account Delivery Credits Department) (669) and 14 thus employed at night (670). In addition to these, Interborough maintained 22 employees doing general office clerical work (670). In 1947 Interborough installed mechanized bookkeeping to handle its then voluminous billing requirements (674).

### E—Handling of Returns

Returns were an important facet of the Interborough operation. Public taste determined the number of returns of each periodical distributed (1601). The type of magazine was a factor. Comics, which were frequently overdistributed and did not sell proportionately as well as other types of publications had high returns (1602). The returns were supposed to be individually counted but due to manpower emergencies that occasionally arose, the employees in the Returns Department would make a "spot check" of a bundle of returns by a process of sampling and comparing the results of the "spot check" with the retailer's return slip. This was commonly known in the trade as "pulling returns" (807).

Returns Departments were maintained at 52nd Street and in the branches in Brooklyn, Jamaica and Westchester (637). In 1946 Interborough employed, in the Returns Department in the 52nd Street building and in the three branches, 99 employees engaged in counting, processing and posting data on returned periodicals. These employees were engaged in services distinguished from those performed by the employees in the Billing Department who issued the credits after the returns had been posted

(668). After the returns would be checked, the credit data based thereon would proceed from the Returns Department to the W. A. D. Credits Department to be posted to the dealer's account. Thence, the credit information would proceed to the Order Regulating Department to be posted on the dealer's record (672).

### F—City Department Employees

In 1946 Interborough employed in connection with its city business approximately 700 persons (177) [plaintiff's 10] of whom 34 were engaged in the Merchandise Department. Some of these employees were unionized and some were not; for example, the inspectors were non-union (675) and the office employees had been unionized at one time, but more recently had disaffiliated themselves from any union connection (182 and 676). In 1946 Interborough had contracts with seven or eight unions (182). The route men, delivery men (who sometimes substituted for absent route men) (651), the relay men and the loaders who worked on the magazines at the piers, in the warehouses and in the 52nd Street plant or in the branches, were all members of the Newspaper and Mail Deliverers Union (182). Interborough had a succession of contracts with this union, the last of which expired by its terms on July 16, 1947 (181) [plaintiff's 325], but which was extended to July 16, 1948 (181) [plaintiff's 324]. Between 1945 and 1947 no route man, relay man or loader was ever paid less than the union scale and some were paid more than that scale (186). In 1946 Interborough had a contract with the Machinists Union A. F. of L. covering its mechanical staff, who cared for the automobiles (181). At that time it also had a contract with a C. I. O. union covering the Returns Department employees (181). It also had a contract with an A. F. of L. union covering the employees who serviced the vending machines in the subway (182). At that time the clerks in the Shipping Department were affiliated with a C. I. O. union with whom Interborough had a contract (182). It also had a contract with a C. I. O. affiliate covering the employees at the subway newsstands (182). It had another contract with an A. F. of L. union covering the building service employees (182). Interborough seems to have had its greatest labor problems with the Newspaper and Mail Deliverers Union (183, 2299, 2301, 2326 and 2327) [plaintiff's 325]. On occasions when Interborough sought to discharge employees for economic reasons (2304), an unauthorized slowdown or work stoppage would result and this would, of course, seriously impair the timing of the schedule of deliveries under which the periodicals had to reach the newsstands on given release dates (186). Interborough also had labor problems with other unions; for example, in 1946 the employees in the return room went on strike (804) and, although this strike was unauthorized the delivery men and mechanics refused to cross the picket line so that the plant was idle for about 10 days (678).

The formalization of contracts between Interborough and the Newspaper and Mail Deliverers Union traditionally awaited the prior settlement of the contract between that union and the newspaper publishers who negotiated through the New York City Publishers' Association (1065). Once the terms were agreed upon between the union and the newspaper publishers, Interborough's contract would be formalized, but the terms would be made retroactive to the date of the expiration of the last contract between Interborough and the union (894, 990, 2312 and 2319). Although Interborough's last formal contract with the Newspaper and Mail Deliverers Union was scheduled to expire on July 16, 1948 [plaintiff's 324], negotiations with a view toward its renewal were undertaken between Interborough and union representatives (268 and 989) in May of 1948 and they continued until June of 1949 (893, 895, 989 and 1176). While

these negotiations were pending, all parties knew that the newspaper publishers had formalized their agreement with the union on October 25, 1948 (1065 and 1066) [defendants' F48]. The negotiations ultimately broke down because of Interborough's failure to obtain union consent to the lay-off of 21 delivery men due to a recession in Interborough's business (1174), although a tentative agreement had been worked out by the negotiators in May of 1949, which was rejected by union vote (1072). The negotiations also broke down because, for the first time in all of their dealings, Interborough refused to meet the union's demands for wage increases (192 and 2319). The members of the Newspaper and Mail Deliverers Union struck against Interborough on June 20, 1949 (678, 988, 1074) [defendants' F49]. When the strikers commenced picketing Interborough's subway newsstands, Interborough made complaint to the N.L.R.B. and the picketing ceased (1074). While the strike on June 20, 1949 halted City Department deliveries both from the 52nd Street plant and the Brooklyn, Jamaica and Westchester branches, it did not impede the galley or country delivery or any of the office work (604 and 892). Thereafter Interborough never resumed the operation of its City Department (603 and 895).

Interborough had previously suspended distribution in the suburbs in New Jersey and in Westchester, Nassau and Suffolk counties of New York in December of 1948 (888 and 1167) [defendants' C26].

**V**

### The Interborough City Department Demise

The first separate claim of the complaint as finally amended poses the issues partially formulated in the pretrial order as finally amended to be

"1. Whether, in or about 1947, defendants, or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to withdraw from plaintiff, and

transfer to others, the wholesale distribution of magazines, periodicals and reprints in the Greater New York area;

"2. Whether, in or about 1947, defendants, or any of them entered into and carried out, by the means alleged, a combination or conspiracy to monopolize, or monopolized, or attempted to monopolize, the wholesale distribution of magazines, periodicals and reprints in the Greater New York area."

The dealings between Interborough and the various corporate defendants as disclosed by the proof are now set forth.

### A—Dealings Between Interborough and Curtis

The dealings between Interborough and Curtis commenced in 1905 [plaintiff's 198]. At various times thereafter new contracts were entered into, and the compensation paid by Curtis to Interborough for the distribution of Curtis' magazines was always the result of negotiation between the officials of Interborough and the officials of Curtis (202).

On December 4, 1924 certain contracts between Interborough and Curtis covering distribution by Interborough of Curtis publications in the five boroughs of the City of New York were entered into. These contracts prevailed, with certain changes, down to April 30, 1947, when Curtis and Interborough discontinued doing business in the distribution of Curtis publications in the five boroughs of New York City (705).

These contracts were the contract between Interborough and Curtis, covering the borough of Manhattan [plaintiff's 180]; that covering the borough of Bronx [plaintiff's 180A]; that covering the borough of Brooklyn [plaintiff's 180B]; that covering the borough of Queens [plaintiff's 180C] and that covering the borough of Richmond [plaintiff's 180D]. Subsequently, on April 25, 1928, contracts were entered into between Curtis and Interborough, covering territory in the suburbs of New York

City, which contracts prevailed until the parties terminated New York City delivery, as aforesaid. These contracts were that covering Bayonne, New Jersey [plaintiff's 180E]; that covering Union City, New Jersey [plaintiff's 180 F]; that covering Weehawken, New Jersey [plaintiff's 180G]; that covering Jersey City, New Jersey [plaintiff's 180H]; and that covering Hoboken, New Jersey [plaintiff's 180I]. The foregoing contracts represented the territory serviced by Interborough for Curtis through Interborough's City Department.

The defendant, Victor E. Lance, after ten years' previous employment in various parts of the country by defendant Curtis, came to New York in late 1940 as territorial manager for Curtis. He remained in that assignment for about a year, left New York and returned several months later in 1941, and remained as district manager for Curtis in the New York area until April of 1951. Shortly after Lance came to New York in 1941, he set up an office in the Interborough building at 52nd Street, and from thence on consulted with the Interborough officials frequently in connection with the distribution of Curtis publications by Interborough (220). Soon thereafter Lance set up in New York a staff of between 40 and 50 Curtis employees who worked out of the Interborough office, promoting the sale of Curtis publications by the retail newsdealers whom Interborough served. At Lance's direction, Interborough furnished this Curtis field staff almost daily and in great detail with information to enable the Curtis field representatives to cooperate with the Interborough employees in the promotion of Curtis publications. Interborough furnished the office space, desks and physical facilities for the Curtis field staff. This arrangement, in greater or lesser degree, prevailed until the discontinuance by Curtis of the Interborough City Department business in 1947 (222).

Lance would assign a specific Curtis employee from his field staff to cover a specific Interborough route and to work with the Interborough route man and the retail dealers in promoting the sales of Curtis publications. In some instances, this arrangement caused conflict between the Curtis representatives and the Interborough management in the instructions given to Interborough's employees. As an example, instances arose where Interborough would, for reasons such as nonpayment of a bill, decline to deliver publications to a retailer. This would, of course, cut that retailer off from receiving Curtis magazines. Notwithstanding, the Curtis representative assigned to that route would supply that retailer with Curtis publications.

At one point (the exact date of which is not disclosed by the testimony) Curtis removed the bulk of its staff from the Interborough office to its own office on Madison Avenue (773). After that removal by Curtis from the Interborough office, one or two of Lance's assistants continued to spend practically all of their time in the Interborough office working at desks supplied by Interborough and other Curtis representatives would come in and consult with Interborough route men and consult Interborough records and would work at desks supplied by Interborough (775).

The arrangement, under the then existing contract between Curtis and Interborough, was substantially changed at least as early as 1936 [plaintiff's 30], whereby Interborough received certain additional bonuses. Apparently dissatisfied with Interborough's performance in justification of these bonuses, the representatives of Interborough and of Curtis conferred in the fall of 1940 about an improvement in Interborough's service to justify a continuation of the payment of these bonuses by Curtis [plaintiff's 30].

Lance was apparently dissatisfied with Interborough's performance and accordingly, on February 11, 1941, he wrote McLarty, his superior at Curtis, of his dissatisfaction, suggesting that at an impending meeting between the Curtis

and Interborough representatives, the former indicate their dissatisfaction with the latter's performance and undertake to continue payment of these extra commissions or bonuses only to the extent that Interborough promoted the sale of Curtis publications. In that letter, Lance pointed out to McLarty that in 1940 the extra bonuses paid to Interborough by Curtis had aggregated $27,465.29. Eliminating therefrom an item of $5,200 per annum for Interborough's cartage of Curtis publications distributed by boys, and $4,875.45 representing Interborough's promotion of Curtis publications in its subway sales, both of which categories apparently were satisfactory to Curtis, Lance suggested to McLarty that the remainder of $17,389.84 (averaging $334.42 per week) be adjusted to a new basis of payment that would aggregate approximately $400 per week. These payments were to be made upon certain conditions of which Curtis' New York office was to be the sole judge of Interborough's fulfillment thereof with certain penalties to be imposed should Interborough fail to perform these conditions. Among the conditions which Lance would have imposed on Interborough, if the $400 weekly bonus arrangement was agreed to, was one that would have required at least 58,266 checkups per month by Interborough on Curtis publications distributed through the Interborough City Department (1632). Anticipating the rejection by Interborough of any such arrangement, Lance stated

"It is very unlikely that Interborough will agree to operate under any such agreement for it is apparent from their present attitude that they expect us to reimburse them even more liberally for anything additional that we may require.

"Such being the case it would be well to explore the possibilities of having our distribution made by someone else * * * even before this meeting takes place so that in the event they flatly refuse it will not be necessary for us to lighten our demands."

After suggesting that Curtis set up its own personnel as four separate wholesalers in Manhattan, Bronx, Brooklyn and Long Island and employ existing wholesalers in Westchester, Jersey City and Staten Island, Lance proceeded to analyze the investment that Curtis would have to make in order to set up the four new wholesalers, and the amount that Curtis might have to advance as a subsidy to maintain these wholesalers until their collections commenced coming in. After reckoning that the venture would bring about a monthly loss in Manhattan, Brooklyn, Long Island and the Bronx of $10,629 at its inception, on the basis of maximum expenditure estimates and minimum income estimates, Lance suggested that

"Neither have we included any of the various factors which might produce more income * * * here are some of these possibilities.

1. Other publications
 S-M News
 International
 Kable News
 Independent
 Fawcett
 McFadden
 Others
2. Merchandise
 Vikings
 Greeting cards
 Stationery
 Post cards
 Razor blades
3. Service Charge."

Lance then indicated to McLarty that as an alternative, an existing wholesaler, Beacon News Company, who distributed some publications, might be employed to take over the Curtis distribution not only in New York City proper but also through sub-agents in Westchester, Jersey City and Long Island [plaintiff's 30].

In March of 1941, Lance again wrote McLarty elaborating upon his statements made the previous month. In the later

communication [plaintiff's 31], Lance set forth the reasons for Curtis's dissatisfaction with the Interborough service. He characterized Interborough's original allotment as unsatisfactory because its records of prior dealings with its retailers were incomplete, inaccurate and inadequate. He found Interborough's checkup and redistribution unsatisfactory because of Interborough's route men's failure to properly handle that phase of distribution. Other bases of stated dissatisfaction were late deliveries of the Saturday Evening Post; no poster or display work on other Curtis magazines; a refusal to operate on Curtis forms; a refusal to start new outlets, despite the fact that such were being supplied by a competitor, American News Company; and a refusal to service certain other outlets, which would be good sales possibilities. After pointing out that the Curtis franchise was worth in excess of $2000 a week to Interborough in commissions, bonuses and subsidies, Lance stated

"I can't help but feel that even if they are not aware of this at the moment they will certainly 'discover' it the minute we start talking about someone else making our distribution.

"That's why I venture the prediction they will promise almost anything to hold the business even though they are convinced of their own inability to do the job that we require. By making a lot of rash promises they can at least delay any action we might be contemplating."

After setting forth the type of distribution which Curtis, in his opinion, had the right to expect, both as to original distribution, checkups and redistribution, and the type of bonus structure that he felt would be warranted for "unusual promotive services," Lance then considered possibilities of making distribution through wholesalers other than Interborough. Lance then reported "The entire area now covered by Interborough News Company can be covered by the following wholesalers * * * all of whom have already indicated a desire to take over our distribution." Lance then concluded with an analysis of economies that could be effected by making distribution through wholesalers other than Interborough and the various ways in which Curtis' service and distribution would be improved with the new wholesaler setup in place of Interborough [plaintiff's 31].

On April 20, 1941, a conference between the representatives of Interborough and those of Curtis was held in Philadelphia (737), at which conference McLarty of Curtis delivered to Meyer of Interborough a six page memo analyzing the basis for Curtis' dissatisfaction with Interborough's service in its City Department, intimating that Interborough be confined to the five boroughs of New York City in its representation of Curtis and setting up a new bonus arrangement and the conditions governing the payment of the bonuses contemplated by the new arrangement [defendants' C6].

The representatives of Curtis and Interborough subsequently met again in Philadelphia on May 15, 1941, at which meeting Curtis reiterated its dissatisfaction with Interborough's service in its City Department and Interborough in turn levelled certain criticisms at Curtis (724). At the May 15th conference the suggestion that Curtis take away its franchise from the Interborough City Department for service in the suburban areas of New York City, i. e., Westchester, Long Island and New Jersey was discussed and the Interborough representatives indicated their displeasure with the suggestion and pointed out its unfairness to Interborough (741).

Interborough's position with respect to the criticism by Curtis of its service in its City Department was summarized by Meyer of Interborough in a memorandum on May 23, 1941 to his associates [defendants' C5].

The parties again met at the end of May, 1941 and continued their discussion of complaints, one against the other

(744). In any event, these meetings resulted in an abandonment by Curtis and Interborough of a 3½% discount paid by Curtis to Interborough since 1930 (211) for a new bonus plan effective on June 1, 1941 [plaintiff's 15].

The new route bonus payments, contemplated by the arrangement in effect June 1, 1941, were in lieu of all prior bonus arrangements under previously existing plans (750). While many of the conditions under the new bonus plan were a reiteration of prior arrangements, a substantial number of them represented new undertakings by Interborough as a consideration for the bonus payments (714).

Under the new bonus plan, Curtis was to pay Interborough monthly $435 for the subway business and $25 per month per route for each of the 66 routes which Interborough was then operating as its City Department. It was specifically provided that bonuses could be withheld if the New York office of Curtis was of the opinion that Interborough had not complied with the detailed conditions of performance which were set forth and made a condition of the new bonus arrangement. On June 27, 1941, agreeable with the conditions imposed under the new Curtis bonus plan, the executives of Interborough promulgated instructions governing the route men, inspectors and branch managers in checking up on distribution and redistribution of certain Curtis publications (1254) [plaintiff's 192 and 193].

Apparently, Interborough's performance of the conditions under the new bonus plan were satisfactory for on September 30, 1941 McLarty of Curtis expressed his pleasure at the continued cooperation from the executives of Interborough and at the real progress shown in the improvement in the service by Interborough personnel [plaintiff's 195]. Curtis' satisfaction with Interborough's performance survived the outbreak of World War II in December, 1941, and prevailed, at least until April of 1942 when Curtis, in the issue of its "Curtis Field-News" announcing an increase in

price of the Saturday Evening Post, and an increase in the commissions to its wholesalers (1250), devoted seven full pages of laudatory comment on the Interborough organization in New York City (1152) [plaintiff's 196].

On July 14, 1943, Interborough and Curtis entered into a new arrangement under which the bonus payments of $435 per month for subway operations and $25 per month for the 66 city delivery routes remained the same, but the commissions on individual magazines distributed by Interborough for Curtis was increased [defendants' C7].

The unruffled atmosphere continued to prevail between Interborough and Curtis throughout the war. In fact, on April 26, 1944, Lance of Curtis wrote Stolz of Interborough

"As I have repeatedly said, not only to you but to our Home Office executives, I have very little fault to find with Interborough operations generally. Your cooperation in the past year has been all that anyone could ask for.

"The Interborough operation is not perfect of course and probably never will be but the progress that has been made is gratifying not only to us here in New York but to our Home Office executives as well.

"There are only two weaknesses which still cause us some concern * * *."

Lance then, in detail, set forth the weaknesses which he desired corrected and concluded the letter

"Believe me, Jules, I am more than sincere in my desire to assist the Interborough News Company in any way possible to earn the right to claim Interborough not only the largest but the best distributor in the business. I trust that you will accept any criticisms or suggestions in the light in which they are submitted * * * purely constructive.

"A great deal was said the other day about our post war plans and

certainly, we want New York to be very much a part of that rosy picture."

On July 7, 1944, Curtis increased Interborough's bonuses from $25 to $40 per route per month on the 66 routes constituting the City Department (255 and 751). This new agreement [plaintiff's 29] continued the $435 monthly subway bonus payment in addition to increasing the route bonuses, but continued the conditions under which the bonuses were payable.

Shortly thereafter, and in September of 1944, there was "presented with the compliments of Curtis Publishing Company" a 16 page brochure entitled "The Story of Interborough" [plaintiff's 198] replete with pictures and laudatory comments upon the Interborough operation in its entirety.

The good relationship continued to prevail and on March 14, 1945 Lance of Curtis wrote Stolz of Interborough a letter anticipating the expansion to be undertaken on the then expected termination of the war. In that letter he said, in referring to Interborough's franchise from Curtis

"We do feel, however, that ours is one of your most important franchises. We hope, therefore, that you will not consider us presumptuous in submitting the following suggestions designed to assist the Interborough News Company realize the maximum financial return from a more valuable Curtis franchise after the war."

Lance then detailed improvements as to deliveries and the enlargement of the number of retail outlets to which he invited Interborough's attention [defendants' C8]. On March 21, 1945 Stolz of Interborough acknowledged Lance's letter in which he said,

"We can safely say we will be in step with Curtis and other publishing houses in anticipation of a big business boom which, of course, means we will have to rectify our present shortcomings which are nu-merous and over which we have no control. One of our most needed improvements is the matter of checkups, coverage, transfers, etc., plus expansion as to new outlets" [defendants' C9].

Before Stolz replied to Lance's letter, he discussed the same and his reply with his associates in Interborough (780). The Interborough shortcomings, acknowledged by Stolz in his reply, were attributable to manpower and retailer shortages as a result of the war (782).

Clouds began to gather anew in October of 1945 when representatives of Interborough and Curtis met at the Hotel New Yorker on the 23rd. The subjects of discussion were the necessity of Interborough establishing new outlets for Curtis publications in new areas such as super markets and chain drug stores; the necessity of Interborough reassuming clerical work in connection with the Curtis line, then being done by Curtis employees in the Interborough office and Curtis' dissatisfaction with Interborough's checkups, promotion and redistribution of Curtis publications. Interborough, as to the new outlet phase of the conference, was adamant because its surveys on this subject through previous years had indicated that these outlets would run in direct competition with Interborough's regular retailer customers. As to the other complaints, Interborough attributed its deficiencies to manpower shortage due to the war (784 and 1144) [defendants' C10 and C11]. Notwithstanding Interborough's agreement at this conference to correct certain of Curtis' complaints, shortly thereafter Stolz of Interborough advised Lance of Curtis that Interborough would have to postpone action on these matters because of "union difficulties" [plaintiff's 32]. Interborough did attempt partial compliance for, shortly after that conference, it employed an assistant to train and supervise the clerical staff (784).

During the ensuing year, 1946, Interborough distributed for Curtis in its City Department about one million magazines per month out of a total of from seven to

nine million distributed by Interborough monthly (847). Interborough considered the Curtis franchise one of its more profitable franchises (848). At that time Curtis' principal publications distributed by Interborough were those published by Curtis such as Saturday Evening Post, Ladies' Home Journal and Holiday, and others not published by the Curtis group, but distributed nationally by Curtis, such as Esquire and Coronet (152).

Throughout this year 1946 Lance of Curtis continued his complaints about Interborough's deficiencies in inaccurate records and insufficient new retail outlets, inaccurate checkups, insufficient checkups, late deliveries and improper redistribution. Interborough attempted to correct some of these complaints (1148 and 1255). Thus, shortly after the turn of the year 1946, the relationship between Interborough and Curtis commenced to deteriorate rapidly. On February 5, 1946, Lance of Curtis wrote Booth of Interborough detailing his complaints against the Interborough service

"In the past several months much has happened which can rightfully be termed unsatisfactory: failure of route men to complete delivery of the Post, failure to make checkups, failure to make redistributions, inability to promptly handle orders for Bantam Books, inability to take care of new accounts, inability to stock surplus books where they were readily accessible for filling orders, failure to enter returns promptly, incomplete posting of returns, no indication that the large force of inspectors were taking over any of the promotion work done by our own personnel due to the need for their riding route men's trucks, and, generally speaking, a rather unsatisfactory trend."

Curtis then, for the first time, imposed a penalty by deducting from its bonus payments to Interborough and in Lance's letter of February 5th, he stated,

"Toward that end the attached checks for bonus payments for the month of January have been reduced by $280 because the following routes have failed to attain the minimum degree of efficiency required: * * *" [defendants' C12].

On February 15, 1946, Lance of Curtis met with Interborough representatives. He insisted that unless Interborough did a satisfactory job on Curtis distribution, the penalties on bonuses would be applied. Interborough's reply was that it was impossible to provide the degree of efficiency that Curtis had set as a standard [plaintiff's 199].

On July 10, 1946, in rejecting a conference sought by Interborough with a view toward increasing its compensation from Curtis, Lance of Curtis again expressed his dissatisfaction with Interborough's performance of the conditions it had undertaken at the October 1945 meeting between the parties. In that letter Lance stated

"As I have stated on so many occasions, it is my hope and ambition that some day I can boast 'Interborough's not only the largest but the best distributor in the world.' That's all the personal gain I hope to derive, but Interborough has much of a more tangible nature to profit by such an ultimate result. However, we have to be realistic about it * * * Interborough alone can produce these results. It is not a job a publisher can do for them" [defendants' C13].

On October 7, 1946, in sending Interborough its bonus check for September, 1946, Lance noted that Interborough's performance would have justified a deduction of $1,520 from the route bonuses because of deficiencies in route performance during that month [defendants' C14].

Notwithstanding, Interborough continued to press Curtis for a meeting to discuss a revision of Interborough's compensation because of its claim of increased operating costs (229). In anticipation of such a meeting, Lance reported to McLarty of Curtis on November 18, 1946 his objection to any in-

crease in Interborough's compensation because of the mediocrity of its service and traced the history of the dealings between the parties from their inception, concluding with a detailed recital of the inadequacies of the Interborough service and alternatives of suggested remedial action, among which were various plans of substituting other methods of distribution for that handled by Interborough [plaintiff's 39].

On December 3, 1946, in sending Interborough its bonus payments for November, Lance pointed out that for deficiencies in designated route performance, the bonuses could have been, in his view, reduced by $1,680. In that transmittal, Lance said,

"Frankly, I am very much disappointed and concerned by the fact that no improvement is apparent. Let me point out that we cannot continue indefinitely overlooking this failure to correct unsatisfactory conditions" [defendants' C15].

Again, and on January 3, 1947, in remitting the bonus check to Interborough for the prior month of December, Lance indicated that for route deficiencies the bonuses could have been reduced by $1,240. Here, too, he complained

"Month by month, for the past year, we had hoped the service would improve. Instead, however, it seems to be deteriorating. Frankly we are *not* satisfied with the service rendered" [defendants' C16].

In anticipation of Curtis and Interborough respresentatives discussing their mutual concerns, Lance of Curtis wrote McLarty of Curtis on January 23, 1947 a series of conditions that he felt would have to be part of the Interborough-Curtis arrangement. Among his suggestions was that in the distribution in the five boroughs of New York City proper, Interborough be decentralized into an individual wholesale operation in each borough, with Interborough being relieved of all distribution outside of the five boroughs. As an alternative, Lance suggested

"On the other hand, we might have come to the conclusion we 'had had enough' and regardless of Interborough's pleas, protestations or threats we might have decided 'to make distribution through someone else."

In this connection, Lance set forth five alternatives of methods of distribution by wholesalers other than Interborough. He terminated the report on a conciliatory note, offering

"as the suggested remedy what might be considered a compromise or at least more neutral ground between a continuation of present unsatisfactory representation and a complete upheaval and reorganization."

Lance then set forth fourteen points of improvement in Interborough's past performance that would be the basis for the negotiations of a new arrangement between the parties [plaintiff's 41].

In replying to Lance's advice that inadequate route performance during the month of January, 1947, would have justified a reduction in bonuses of $1520 [defendants' C17], Stolz of Interborough wrote Lance on February 6, 1947

"We fully appreciate the fact that you have made no deductions and do hope that we can turn in a better job now that we have so many more routes" [defendants' C18].

About this time Interborough's accountants were preparing a report upon which Interborough was going to seek an increase from the independent national distributors [defendants' C84].

On February 18, 1947 Lance wrote McLarty, in anticipation of Interborough's representatives discussing their relationship with Curtis,

"As a further indication of our intention to take corrective action, advise Mr. Stolz of our intention to relieve the Interborough News Company of the so-called Jersey territory, Westchester territory, Nassau-Suffolk territory and to appoint MacAloon in Staten Island, a distributor

of the Curtis Circulation Company instead of having him operate as a sub-agent of the Interborough News Company.

"I feel sure Mr. Stolz would react violently to such a statement. It is my opinion he would lose no time in making it clear to us that if we plan any such change the Interborough News Company will not be interested in handling any part of our distribution.

"I think it would be in our best interest to *plan* on such a reaction even though it may not materialize."

Lance then indicated the steps to be taken in the event Curtis should break with Interborough, among which were using Interborough employees as wholesalers in the district and the comparative cost thereof [plaintiff's 42].

On March 1, Lance sent the bonus check to Interborough indicating that deficiencies in route service would have justified a $1400 reduction [defendants' C19].

In the early part of April, 1947, while attending a convention of the Atlantic Coast Independent Distributors Association (ACIDA), Meyer, Stolz and Booth of Interborough first heard of an impending break between Curtis and Interborough from persons attending the convention other than the Curtis representatives there. At about the same time Lance had arranged with Stolz for the representatives of Interborough and Curtis to meet at the Hotel New Yorker on April 28 [plaintiff's 24] and had simultaneously arranged with representatives of Curtis to meet representatives of certain wholesalers, *i e.*, Hudson County News Company, Gaynor News Company and John Somyak, on April 7 at Curtis' office in Philadelphia [plaintiff's 24]. Shortly thereafter, on April 8, Lance wrote Stolz in connection with the bonus payment by Curtis to Interborough for the month of March that deficiencies in route service would have justified a reduction of $1640 [defendants' C20].

The meeting in Philadelphia between representatives of Curtis and the proposed new wholesalers took place on April 7, whereat those wholesalers, subject to approval by the newspapers for whom they were then operating, undertook to assume the distribution of Curtis publications where Interborough was then distributing in Nassau and Suffolk Counties on Long Island and in Westchester County, Jersey City and Staten Island [plaintiff's 25]. Two days later Lance reported to McLarty that he entertained doubt that the new wholesalers would be permitted to take over Curtis' distribution in Westchester, Nassau, New Jersey and Richmond because of objection on the part of certain of their newspaper accounts. On this assumption, Lance suggested that they reexplore their relationship with Interborough at the proposed meeting of April 28, with the demand that the Interborough service improve, or that the penalties on bonuses would be strictly enforced. As alternatives he suggested advising of the disenfranchisement by Curtis of Interborough in the suburbs or a full cancellation of all their dealings, or an arrangement whereby Interborough would decentralize its distribution. Lance then indicated how each of the alternatives could be implemented in varying ways [plaintiff's 50].

During the succeeding week (between April 9th and April 16th, 1947) [plaintiff's 17], Curtis decided to relieve Interborough of the suburban territory for, on April 16th, Lance again wrote McLarty of the impending meeting with the Interborough representatives scheduled for April 28. After setting forth the manner in which he, Lance, anticipated that meeting would progress, he observed,

"I have no doubt that by this time the storm will break. There will be protestations, veiled threats, and perhaps even pleas for another chance. As you have already stated 'the die is cast' and I think they should be so informed. I feel they should also be warned we propose

to continue our investigations of other possibilities of representation, even in the territories they are being allowed to retain, in the event they fail to make the required refinements and necessary improvements in operation" [plaintiff's 16].

Lance then set forth various methods, substantially the same as those previously suggested by him, to arrange for coverage by Curtis in the suburban territory and in the event it became necessary, in the entire territory then being serviced for Curtis by Interborough.

The parties representing Interborough and Curtis met on April 28, 1947 at the Hotel New Yorker in New York (229 and 230). At this conference, McLarty stated that Curtis had decided to withdraw the suburban areas of Westchester, Long Island, New Jersey and Staten Island from Interborough service and to turn these over to other wholesale distributors, but that Curtis hoped that Interborough would continue service for Curtis in Manhattan, Bronx, Queens and Brooklyn, which represented 80% of the total territory, but that this would have to be on arrangements different from those previously prevailing. He also stated that if Interborough declined to continue to represent Curtis in the four remaining counties, Curtis would make arrangements with others to be serviced therein; that Curtis expected Interborough's decision in 15 minutes; that if Interborough declined to acquiesce in the withdrawal of the suburban territory and would not agree to continue its city distribution confined to the four remaining counties, it might lose the entire Curtis business including the galley department because McLarty considered the Curtis business as a one-package deal; that no purpose could be served by arguing the withdrawal of the suburban territory because Curtis had already arranged for wholesaler representation therein (230, 833 and 1155) [plaintiff's 18]. McLarty then offered the Interborough representatives (without either party discussing or considering their contracts of 1924 (706)), a proposed new

contract limiting the Interborough territory to the Boroughs of Manhattan, Bronx, Queens and Brooklyn (246) [plaintiff's 19 and 20].

When Interborough's representatives protested that they could not make that decision within 15 minutes, the Curtis representatives agreed to a 48 hour respite in which Interborough was to make its decision as to whether it would continue to service Curtis in the four remaining counties in New York City proper (830 and 834) [plaintiff's 21]. That night the Interborough management confered on what action to take in regard to the Curtis proposal (248) and on April 29 at a directors' meeting of Interborough

"After careful and thorough discussion of the matter it was decided to notify the Curtis company that we would discontinue serving all the territory after thirty days from today. A copy of the notice to this effect was mailed to the Curtis Publishing Company, Philadelphia with a covering letter" [plaintiffs 22].

Subsequently, and on April 30, 1947, the representatives of Interborough and Curtis again met at the Hotel New Yorker. The Interborough representatives, after expressing their opinion that the disenfranchisement by Curtis in the suburban territories, when they were just beginning to earn a profit in those operations was most unfair and after unsuccessfully attempting to prevail on McLarty to change his mind, handed McLarty a letter setting forth Interborough's decision (235 and 841). That letter stated, after tracing the business relationships of the parties for 43 years,

"It is with considerable regret and with keen disappointment over what seems to be a new Curtis method of doing business that we notify you, that, under the circumstances, we will be forced to consider the contract between us terminated as of May 31, 1947 in accordance with the 30 day notice clause in that contract" [plaintiff's 26].

McLarty urged the Interborough representatives to reconsider because of the impact that their decision might have on the galley business being done by Interborough and Curtis (846 and 1260). McLarty also protested the termination on a 30 day basis, requesting that Interborough continue to deliver Curtis publications for 60 days (834). Nevertheless, the parties ultimately agreed that Interborough's representation of Curtis would terminate at the end of 30 days (259). At no time prior to April 30 did Curtis' representatives ever suggest to those of Interborough that there be a negotiated sale of Interborough's franchises in the suburban territories to the new wholesalers being substituted in those areas by Curtis for Interborough.

On the same day, April 30, 1947, a copy of Interborough's letter to Curtis [plaintiff's 26] was mailed by Interborough to the President of Curtis Publishing Company asking for an appointment to discuss the dispute [plaintiff's 27].

On May 1, 1947 Lance of Curtis told Rogers of S–M of Curtis' action with Interborough [plaintiff's 52].

On May 2, 1947 Somyak, one of the new wholesalers, with the approval of Gaynor and Cohn, two other new wholesalers, withdrew a joint application for the wholesalership in Manhattan and the Bronx, but Somyak, Gaynor and Cohn assured Curtis that they would perform fully in the suburban territories previously allotted to them. Upon the withdrawal of the Somyak-Gaynor-Cohn combination for the Manhattan-Bronx area, Curtis proceeded to negotiate with one Garfinkel, and they agreed that he would service Manhattan and the Bronx for Curtis, who would make up any deficit in operations until Garfinkel had had an opportunity to enhance his gross revenue through the acquisition of other lines. Abe Katz, an Interborough foreman and a power in the route men's union, was contacted by Lance of Curtis and then employed by Garfinkel in the new Manhattan-Bronx wholesalership. McLarty authorized Lance to sign up wholesalers in Queens and Brooklyn and to make a flat basis subsidy arrangement with them until January 1, 1948, or until in each case the individual wholesalers acquired additional franchises. Lance and McLarty undertook to give a similar subsidy arrangement to Somyak, Gaynor and Cohn, who were servicing in the suburbs [plaintiff's 52].

In line with Lance's authority from McLarty to arrange for wholesaler representation in Brooklyn and Queens, Lance communicated with the Executive Board of the Evening Newspaper Distributors and with the Association of Morning Paper Distributors. When Lance advised these organizations that he was interested in only certain of their members as prospective Curtis distributors, and was told that Curtis would have to deal with them on an "all or nothing basis," Lance abandoned the idea of employing existing newspaper wholesalers as the wholesalers for Curtis and proceeded to set up new wholesalers out of personnel drawn from the American News Company, Interborough News Company and newspaper distributors [plaintiff's 53].

On May 2, 1947 Curtis notified Interborough of its acceptance of Interborough's notice to terminate their franchises, but disputed that the existing contracts permitted Interborough to terminate in 30 days and insisted that Interborough was bound to continue deliveries for 60 days [plaintiff's 181]. In reply thereto and on May 6, 1947, Interborough advised Curtis that it felt itself bound to continue deliveries for only the 30 day period [plaintiff's 182A].

On May 6, 1947 the President of the Curtis Publishing Company replied to Interborough's request of April 30 for a conference and declined to confer with Interborough representatives [plaintiff's 28].

On May 7, 1947, Curtis acceded to Interborough's contention that its performance under existing franchises could be concluded in 30 days and Curtis agreed to a termination date of May 31, 1947 (227 and 328) [plaintiff's 182].

By May 15 Curtis had appointed a total of 13 wholesalers in the territory formerly operated by the Interborough City Department, all of whom were to begin distribution of Curtis publications on June 4, 1947. Curtis undertook to subsidize these wholesalers to enable them to break even financially in their new ventures. The total subsidies approximated $15,000 per month, and were guaranteed by Curtis until such time as the new wholesalers acquired additional magazine franchises [plaintiff's 63]. In McLarty's report to the Board of Directors of Curtis Circulation Company, on May 26, 1947, he stated

"While of course we have had no contacts with other magazine publishers and distributors in New York since this new arrangement was decided upon, we feel rather certain that there will be further switches to the new set-up on the part of certain major publishers within the next three or four months" [plaintiff's 63].

Although in his report to the Directors of Curtis Circulation Company, McLarty spoke of 14 new wholesalers, this was obviously an error. Thirteen new wholesalers were appointed in the former Interborough City Department territory because the City of Yonkers in Westchester County, New York was continued in the service of George Goldstein, a wholesaler who had serviced that territory previously for Curtis [plaintiff's 23].

After May of 1947, Lance of Curtis was kept informed of matters occurring in the Interborough organization by one Kenneth Deuchar, an Interborough employee, who left Interborough in June or July of 1948 to become supervisor of promotion for Garfinkel's Manhattan News Company, possibly at Lance's suggestion (1637). The Interborough management did not know that Deuchar was keeping Lance informed of the affairs of their company (421).

Subsequent to June of 1947, Lance never lost an opportunity to tell the other independent national distributors how good he thought the new wholesaler set-up was (1639). McLarty of Curtis did likewise, particularly with respect to Triangle and S-M [plaintiff's 68 and 87].

By November of 1947, the distribution of Curtis publications by the new wholesalers in the area previously covered by Interborough represented a marked improvement over the service accorded Curtis publications by Interborough. Retailers were more frequently contacted by route men; distribution and redistribution was more frequent and more prompt; new outlets were opened; better promotion service was supplied to the retailers; billing to retailers was more prompt and more accurate; better kept records by the wholesalers brought about more intelligent allotment of Curtis publications; the new wholesalers were more cooperative with the Curtis representatives, and made a sincere effort to correct complaints and there existed a more congenial relationship between management and labor. All of the foregoing resulted in an increase in the number of Curtis publications sold in the same territory [plaintiff's 80].

### B—Dealings Between Interborough and Triangle

Interborough commenced distributing for Triangle or its predecessor in the City Department about 1931 (166). By 1946 Interborough distributed approximately 150,000 copies of Triangle periodicals per month in Greater New York, including such publications as Seventeen, Radio Guide, Official Detective, Screen Guide, etc. (166). In April and May of 1947 Henry Oschay was a circulation executive of Triangle. He had a telephone conversation with Meyer of Interborough in the early part of May, 1947, during which Meyer inquired about the validity of reports that had been coming back to Interborough management through its route men and inspectors of rumors in the trade that Triangle was going to leave Interborough and go over to the Curtis wholesalers. Oschay assured Meyer that there was no basis for these rumors (328).

About a month or two later Oschay let it be known that Triangle was dissatisfied with Interborough's distribution, particularly of its publication Official Detective. When Interborough pointed out that the deficiency was due to insufficient allotment of copies of this publication from Triangle, it was agreed that the allotment would be increased and that Interborough would prepare a revision of its distribution plan of Triangle publications. Interborough did so and the revision was received and approved by Oschay of Triangle and returned to Interborough (329).

A few months later, in September or October, 1947, when Meyer of Interborough was preparing to leave for the Sun Valley, Idaho, convention of Pacific Coast Independent Magazine Wholesalers Association, he acceded to a request by Freed, an executive of Triangle, to see Freed at Freed's office. Freed advised Meyer that Triangle was severing its relationship with Interborough and was transferring the franchises to the Curtis wholesalers. Meyer told Freed that only a few months before Oschay, Freed's subordinate, had assured Meyer that Triangle would remain with Interborough. Freed thereupon agreed to withhold decision on the transfer of franchises until Freed, Meyer and Oschay could discuss the matter at a later date (333). Meyer subsequently met Oschay at the Sun Valley convention and told him of his arrangement with Freed and of Freed's expression of an intention of cancelling the Triangle-Interborough franchise. Oschay later reported to Meyer that he had spoken with Freed by telephone and that it had been agreed that no decision be made until Meyer, Oschay and Freed could discuss the matter in New York (337). About a week later, when Meyer returned to the Interborough office in New York he found awaiting him a cancellation of the contract between Triangle and Interborough (341 and 881) [plaintiff's 55]. Meyer went to the Triangle office for a conference with Oschay and Freed. He had a fruitless conference with Oschay, but was unable to confer with Freed (341).

In February of 1948 Meyer of Interborough met Walter Annenburg of Triangle in Florida and sought an appointment to discuss the cancellation of the Triangle-Interborough contract. Although Annenburg promised such a conference, it was never held (342).

Triangle never returned any part of the Interborough City Department business to Interborough (822).

In 1950, Interborough leased the 52nd Street building to Triangle (1694). On July 31, 1951 Interborough "discontinued" this suit against Triangle and Triangle "discontinued" its counterclaim against Interborough and the additional defendants to its counterclaim. In 1952 Interborough sold the 52nd Street building (1695 and 2262) under an arrangement explained by Interborough's counsel as follows:

"I call your Honor's attention to the statement given to counsel for Curtis, and among the papers that your Honor has copies of. I refer particularly to the statement concerning discontinuances of the action and counterclaim between Interborough News Company and Triangle Publications. In that statement it is said—this is a lawyer's statement, your Honor; this is not accounting business:

" 'Following the complete destruction of its City Department, Interborough needed cash, and in or about May 1951 suggested to Triangle that Triangle pay Interborough two years' advance rent, in return for which Interborough would relieve Triangle of certain of its obligations under the lease agreement. The receipt of income by Interborough during this period was particularly desirable, as Interborough carried on its books a tax loss carry-forward, almost all of which would expire at the end of 1951, and income received during 1951 would receive

the benefit of such tax carry-forward.

" 'Triangle took the firm position that it would not conduct any business transactions (this is entirely a matter between lawyers) with Interborough unless the lawsuit were discontinued, and that under no circumstances would there be any consideration of any sort for such discontinuance other than the discontinuance of Triangle's counterclaim against Interborough.

" 'Subject to such mutual discontinuances, Triangle agreed to make an advance payment of two years' rent, on condition and in consideration that Interborough grant a discount for such advance payment, extend Triangle's option to purchase the building for an additional three years, and consent to the release of the deposit of security.'

"Then the remainder of that describes how the transaction was actually effected." (1920).

### C—Dealings Between Interborough and S—M

Interborough commenced distributing for S–M News Company shortly after the conclusion of World War I in 1919 (166). At that time the Reader's Digest was not in the S–M line. S–M became national distributor for Reader's Digest about 1928 or 1929. The Digest then had no proprietary interest in S–M and did not acquire one until 1947 (906). In fact many of the publishers for whom S–M was an independent national distributor had no proporietary interest in S–M (901). All of Interborough's dealings with S–M were directly with the national distributor and not with its officers, stockholder-publishers or other publishers for whom S–M was national distributor (915).

In the period from 1935 to 1948, Interborough delivered locally in New York City the magazines for which S–M was the independent national distributor, including McCall's, Redbook and Bluebook, published by McCall Corporation; Popular Science and Outdoor Life (166) published by Popular Science Publishing Company; Reader's Digest; Better Homes & Gardens of which distribution commenced in 1948 (944) after S–M succeeded International Circulation Division of Hearst as national distributor; Arnold Publications; Hit Comics, National Comics, Smash Comics (898) [plaintiff's 11]; Leatherneck published by the Marine Corps Association, and many others. Commencing in December of 1940, Interborough distributed for C–M a Spanish edition of Reader's Digest [plaintiff's 12].

In the early 1930s, Interborough also distributed in New York City merchandise, such as jig saw puzzles (914) and spot eraser, for S–M (907). In 1939 Interborough distributed a World's Fair map for S–M, published by Tony Sark Publications, Inc. (914) and at one time it distributed Hit of the Week Records for S–M (914). Between 1940 and 1947 Interborough distributed Marlin razor blades for S–M (914).

Between 1940 and 1947 S–M assigned one or two men to the Interborough New York plant to act as its representatives, a function similar to the Curtis field representatives (224). Frequently during the period of their dealings S–M gave instructions or made requests or demands upon Interborough in connection with the distribution of S–M publications (221).

Interborough was required to make checkups for S–M as follows: three on the McCall publications; three on Reader's Digest; one or two on Redbook; one or two on Popular Science and between one and three on Better Homes & Gardens. There was no regular schedule of checkups on Bluebook, Outdoor Life, or S–M's comics (919).

The extent of Interborough's monthly distribution for S–M in 1946 approximated 540 odd thousand copies of publications of which S–M was then the national distributor (168). McCall's magazine, distributed by S–M (919), was competitive to the Journal, distributed by Curtis. Reader's Digest, distributed

by S–M, was competitive to Coronet, distributed by Curtis (921). Outdoor Life, distributed by S–M, was competitive to Sports Afield, distributed by Curtis (922).

From the time of commencement of dealings between S–M and Interborough, until about 1946 or 1947, all negotiations on behalf of S–M were conducted by Wilbert Smith, its general manager. When he retired, he was succeeded by William Rogers (423). Between May 10, 1948 and June 10, 1948, representatives of Interborough had four or less conferences with representatives of S–M (948). One of these conferences took place on May 18, 1948, and another was then arranged for June 2, 1948 [defendants' S–M 29]. The May 18, 1948 meeting took place at the S–M office. Each side was fortified with statistical charts, maps, records and data—S–M indicating that Interborough was not doing a satisfactory job in the distribution of S–M publications—Interborough indicating that it was doing an excellent job in this distribution (951). The purpose of the May 18, 1948 meeting was for Interborough to inquire about persistent rumors in the trade that S–M contemplated ending the Interborough franchise on S–M publications in the metropolitan area. Interborough's representatives indicated their belief that the satisfactory service they were rendering S–M should dispel any notion that S–M discontinue the Interborough franchises. Rogers of S–M admitted that persistent overtures were being made to him by McLarty and Lance of Curtis to leave Interborough and go with the Curtis wholesalers, but as of that time no decision had been made. Rogers confessed a resentment at having been personally neglected or ignored by Interborough executives over a long period of time. The Interborough representatives denied slighting Rogers and indicated that while Wilbert Smith was Rogers' superior they had no choice but to negotiate with him, and that no intention of ignoring or slighting Rogers was intended thereby (951). Based upon the data before him, Rogers pointed

out where he thought the Interborough service for S–M was lacking and the Interborough representatives, consulting their data, indicated where they thought the service was satisfactory (962). The Interborough representatives agreed to consult their records to meet Rogers' complaints (962) [defendants' S–M 29].

Subsequent to the May 18 meeting, and before the June 2 meeting, Meyers of Interborough went to the home of Wilbert Smith and discussed the relationship between S–M and Interborough with Smith. When Interborough representatives subsequently conferred again with S–M's representatives on June 2, 1948, Rogers of S–M expressed resentment at Meyer's having gone to see Smith on the S–M account, particularly since Rogers had for two years been the active general manager of S–M (961). When Meyers had visited Smith at his home, Smith advised him that, at a meeting of the Board of Directors of S–M, Rogers had requested permission to end the franchises with Interborough and turn them over to the Curtis wholesalers, but that the Board had denied Rogers permission to do so, without first having given Interborough notice of the shortcomings of its service and a reasonable opportunity to correct the same (1122). Although at the meeting of June 2, 1948, the Interborough representatives had come prepared to answer the complaint against Interborough service voiced by Rogers at the earlier meeting, they were not given an opportunity to do so and were met with Rogers' reiteration of his resentment for having been slighted by Interborough's representatives in the past and his expression of resentment at Meyers' having consulted Smith subsequent to their last meeting. In the hope of placating Rogers, Interborough's representatives disclosed that it had made a price adjustment with Hearst and expressed a desire in fairness to do likewise for S–M, but Rogers then advised them that price was not a factor at that time in the consideration of whether Interborough should continue as the S–M wholesaler in New York City (963). On

June 10, 1948, effective August 25, 1948, S–M cancelled its franchises to Interborough's City Department (946) [plaintiff's 88].

Although Interborough discontinued as wholesaler for S–M in the City Department, it continued to sell the publications of which S–M was independent national distributor from its Subway Division retail outlets throughout 1948 and 1949 (966).

### D—Dealings Between Interborough and Hearst

At one time International Circulation Co., Inc., was an independent national distributor distributing magazines published by Hearst Magazines, Inc., and magazines published by others. It was then a subsidiary of Hearst Magazines, Inc. Subsequently, and before the commencement of this suit, International Circulation Co., Inc., became International Circulation Division of Hearst Magazines, Inc. It continued to distribute nationally Hearst published magazines and those of other publishers (206).

Interborough commenced distribution for Hearst in the Metropolitan area in 1932 (171). At the inception of the arrangement, Interborough delivered only those magazines distributed by Hearst as an independent national distributor and published by others. It did not, in the beginning, distribute the Hearst published magazines. The distribution was in the five boroughs of New York City and the outlying suburbs, including that portion of Nassau and Suffolk Counties serviced by Interborough for other national distributors, and Hudson and Bergen Counties in New Jersey. The arrangement was pursuant to written contract and letter amendments from time to time (said contract and amendments not offered in evidence) and by oral agreements (970).

At one time Interborough had distributed Better Homes & Gardens by direct arrangement with the publishers, which was subsequently changed when Hearst became independent national distributor of Better Homes & Gardens and

continued to distribute the same through Interborough until March of 1948 when this publisher switched his national distribution to S–M (208).

Until 1946 Hearst distributed the magazines which it published through distribution facilities of its New York Evening Journal and those of the Rockaway News Company and Hudson County News Company (975). The principal Hearst published magazines thus distributed were Cosmopolitan, Good House-keeping, Harper's Bazaar, Motor and a few others (171).

In 1946 Hearst discontinued its own and Rockland and Hudson distribution of its own publications and turned over this distribution in the five boroughs in New York and in part of Long Island also to Interborough (171 and 974). Interborough paid no consideration to either Hearst or the prior wholesalers for the franchise to distribute Hearst published magazines in the Greater New York area (975).

During the period that Interborough serviced Hearst publications in the Greater New York area, Hearst had between one and three men assigned to the Interborough office as a liaison between Hearst and Interborough (224).

In February of 1948, while representatives of Interborough were attending a BIPAD convention in Chicago, one of them (George P. Booth) had a conversation with Haig of Hearst in which Haig stated to Booth that McLarty of Curtis was constantly trying to get Haig to leave Interborough's City Department. At about this time, in a telephone conversation, Haig asked Meyer whether he thought Interborough could remain in business if it lost the S–M franchise (414).

Subsequent thereto and in April or May of 1948, Meyer of Interborough had a conversation with Donnenfeld of Independent, at which time Meyer indicated to Donnenfeld that the Interborough route men were bringing back rumors that Hearst was going to transfer its franchise in the City Department from Interborough to the Curtis

330

wholesalers, whereupon Donnenfeld agreed to inquire from Haig of Hearst whether there was any basis for the rumors (412). A few days later, when Meyer and Donnenfeld again met, Donnenfeld assured Meyer that Haig had told him that there was no basis for the rumors that Hearst was going to leave Interborough (414). Thereafter, and in May of 1948, Meyer of Interborough had a number of conferences with Haig of Hearst. The first of these took place in the early part of May 1948, when representatives of Interborough, at Haig's invitation visited Haig at the Hearst office. At that conference Haig assured the Interborough representatives that he was satisfied with Interborough's service, but that he had been subjected to strong pressure by McLarty of Curtis to leave Interborough's City Department and go with the new Curtis wholesalers (981). Haig indicated to the Interborough representatives that he considered himself first, his employers second and Interborough last, and that he could not afford to be left open to criticism by his employers in the event they believed McLarty's statements that Hearst could save money by transferring from the Interborough City Department to the Curtis wholesalers. Haig, therefore suggested to the Interborough representatives that they "sharpen their pencils" and reduce Hearst's costs of distribution so that Haig would be relieved of any criticism by his employers. Interborough's representatives agreed to analyze their operation of the Hearst contract and let Haig know to what extent, if any, they could reduce Hearst's costs (409).

At a subsequent conference, Interborough's representatives advised Haig of a proposed reduction in Hearst's costs of distribution through Interborough's City Department, and Haig promised to take the matter up with Hearst's Board of Directors and let Interborough know what decision would be made (981). The new prices that Interborough offered to Hearst would have represented a saving of between $17,000 and $18,000 a year to Hearst in the distribution of its publications through the Interborough City Department. Haig coupled his promise to take this matter up with the Hearst Board of Directors with another that he would recommend that Hearst remain with Interborough in its City Department distribution (411). Soon after, Meyer of Interborough told Rogers of S–M of the proposed reduction of Interborough's charges to Hearst (981).

Notwithstanding the foregoing, on May 27, 1948, Hearst cancelled its franchises with Interborough (882, 977, 1327 and 1638) [plaintiff's 86 and 177], Haig having first telephoned Booth of Interborough, to advise that this action was taken by Hearst's Board of Directors and that Haig could do nothing about it (1327).

A few days after the cancellation of the City Department franchise by Hearst, one Harry Strickler, a Vice President and circulation executive of Hearst, telephoned Meyer of Interborough, expressed his regret over the cancellation of the Hearst franchise and stated that he, Strickler, notwithstanding, had felt that Interborough had done a very good job for Hearst over the years (418).

Notwithstanding the loss of the Hearst business in the City Department, Interborough made every effort to recoup the Hearst franchise (978) from the Curtis wholesalers who had taken over the distribution after Interborough (866). Finally, in September of 1948, Meyer of Interborough received a telephone invitation to confer with Grady of Hearst. The conference was held that day and Meyer was advised that, in Grady's opinion, Interborough should press for a return of the Hearst franchises because Hearst was dissatisfied with the distribution job being performed for it by the Curtis wholesalers (501). A few days later, Meyer of Interborough telephoned Marcum of Hearst and asked for an appointment which was granted (503). The appointment was with Haig of Hearst (866) at which Marcum was

also present. Hearst representatives at this conference indicated to Interborough's representatives that Hearst was not getting proper coverage by the new Curtis wholesalers because they were dominated by Curtis, who was meddling and interfering in the relationships between the new wholesalers and Hearst. Haig of Hearst indicated that the particularly sore spots to Hearst were the Manhattan News Company and Seljan News Company (983). When Meyer asked for the return of the business, Marcum indicated that this might be done if the price structure with Interborough would be the same as that prevailing between Hearst and the Curtis wholesalers, to which Meyer replied that this would be satisfactory. Marcum then indicated that the return would have to be on a piecemeal basis, but that Manhattan and Seljan would be the first territories returned by Hearst to Interborough and the others would follow in sequence. Marcum mentioned having but recently called the Curtis distributors together at a meeting and indicated Hearst's dissatisfaction with their service and its determination that it would bridge no interference warranted or unwarranted by any other national distributor (503).

The Hearst and Interborough representatives met again a few days later, at which time Haig suggested to Marcum that strict requirements be distributed to the Curtis wholesalers as to Hearst's demands for service, to be complied with within 30 or 60 days and upon failure of compliance the franchises be cancelled and returned to Interborough (507 and 1173). There was no discussion between the Hearst and Interborough representatives as to what these requirements were to be, nor did any Interborough representative ever see what the requirements ultimately were (866, 985 and 986). On October 1, 1948, Marcum wrote Haig inter-office requesting permission to cancel the Hearst franchise with the Manhattan News Company and re-enfranchise that borough to Interborough News Company [plaintiff's 132], whereupon Hearst re-turned the Manhattan territory to Interborough (865). On December 3, 1948 Marcum notified the other independent national distributors of its decision to return the Manhattan franchise to Interborough effective December 20, 1948 [plaintiff's 141], a course which displeased some of the other distributors [plaintiff's 143 and 144]. Thereafter and within a period of five months, Hearst returned to Interborough, in addition to the Manhattan franchise, those covering territory serviced by the Curtis wholesalers Queensbrook, Seljan, Bay Ridge and Flushing (869, 977, 988 and 1030). When Hearst returned to Interborough, it no longer allowed any discount on Interborough's net billings as had prevailed previously (1030). Subsequently, and in April of 1949, representatives of Interborough again met with those of Hearst, this time to discuss the return of the balance of the Interborough territory. While they were discussing a schedule of returns of territories serviced by the Curtis wholesalers, Haig directed Marcum to take the entire territory and return it to Interborough immediately, whereupon Meyer of Interborough requested permission from Haig of Hearst to advise Donnenfeld of Independent of these instructions (592). During that conference Haig stated to the representatives of Interborough that he had an arrangement with Rogers of S–M that neither one of them would change wholesalers in any part of the country without first consulting the other because Haig did not want to be "left out in the cold," as had been his previous experience in San Francisco (553). Haig then told Marcum to advise Rogers of S–M and McLarty of Curtis of the proposed change (867).

The following day Meyer of Interborough met Marcum of Hearst at the office of Donnenfeld of Independent with a view toward Interborough getting back the Independent franchise. Right after Donnenfeld had been advised that Hearst was returning its full territory to Interborough, Haig telephoned Marcum and advised that the deal was can-

celled because he, Haig, had been embarrassed by a number of telephone calls brought about by the premature disclosure in the trade of his arrangement to return the Hearst distribution in its entirety to Interborough, this, notwithstanding his agreement the day before that Donnenfeld of Independent might be advised of the decision (594 and 596). Interborough never got back the balance of the Hearst territory and it never thereafter inquired about or discussed that territory with Hearst representatives (987).

To the extent that Interborough serviced Hearst in the latter period, that relationship came to an end, when Hearst again cancelled its partially returned franchise with Interborough on June 15, 1949 [plaintiff's 173].

### E—Dealings Between Interborough and Fawcett

Interborough became the wholesale distributor for Fawcett in 1920 (172) and that relationship continued between Interborough and one or another of the Fawcett national distribution agencies uninterrupted until its termination in October, 1948 (1056). The bulk of the Fawcett franchise dealt with comic type magazines (1602).

On June 1, 1935, Interborough and Mid-West Distributors, Inc. (Fawcett's then predecessor) entered into a formal contract enfranchising Interborough as Mid-West's wholesaler in the Metropolitan area until December 31, 1936 under certain terms and conditions [plaintiff's 219]. A subsequent agreement, substantially in the same form, was entered into between Mid-West and Interborough on December 31, 1936 for a period terminating December 31, 1938. Thereafter no formal agreements were entered into between Interborough and Fawcett or its predecessors, but the parties continued to operate under the earlier agreement expiring December 31, 1938 (1224 and 1306), although there were from time to time changes in the dealings between the parties by letter [plaintiff's 220].

On March 30, 1942 Interborough's discount on net billings from Fawcett was increased from 3½% to 5½% (1059) [plaintiff's 220]. This increase in discount was occasioned by Interborough's agreement to accelerate its payments to Fawcett; by changes in the basic price to Interborough of certain of Fawcett's magazines; and by the discontinuance of certain discounts which Interborough previously received from Fawcett on the galley or country business (1135, 1226, 1231 and 1311). Another of the inducements was the discontinuance by Interborough of its charges to Fawcett for excessive returns on Fawcett distributed (but not Fawcett published) magazines, which represented approximately seventy titles (1315 and 1318). Shortly thereafter, and on April 27, 1942, Interborough restored the charges on excessive returns of Fawcett distributed (but not Fawcett published) magazines (1316 and 1318) [defendants' F54].

In 1946 the principal Fawcett distributed magazines were True Confessions, Today's Woman, True, Captain Marvel, Motion Picture and others, representing a distribution by Interborough thereof in the Metropolitan area of an excess of 200,000 magazines a month (172 and 173).

In April of 1948 representatives of Interborough met at a luncheon with representatives of Fawcett, the latter indicating that they felt that Fawcett had been overpaying Interborough for its service and inquiring what Interborough proposed to do about a reduction. In the course of that conference, Adams of Fawcett mentioned that he would not go to any more of the meetings of the independent national distributors because he felt that those meetings were useless in that no one adhered to what was agreed to be done. He also advised that McLarty of Curtis had been continually soliciting the removal of the Fawcett franchise in the Metropolitan New York area from Interborough to the Curtis Wholesalers (427). The next day, April 8, 1948, Fawcett advised Interborough by letter of the price reconstruction that it deemed appropriate at that time [defendants' F45]. Thereafter, and on May 29, 1948, the parties agreed to a

reduction of the Interborough discount on net billings from 5½% back to 3½% and also an increase of the cost of certain Fawcett magazines to Interborough (1061) [defendants' F46 and F47].

Notwithstanding this new arrangement, on July 1, 1948, Fawcett cancelled Interborough's franchise in the Metropolitan area, effective October 5, 1948 (1057) [plaintiff's 92].

In the latter part of 1948 representatives of Interborough and Fawcett commenced negotiating for a return of the Fawcett franchise for the Metropolitan area to Interborough (1057 and 1058). These negotiations resulted in an agreement, dated February 11, 1949 returning to Interborough the wholesalership in Manhattan and certain adjacent territories [plaintiff's 157]. Under this agreement, however, Interborough did not receive any discount on net billings (1030 and 1063). Thereafter Fawcett returned to Interborough the Borough of Manhattan, that part of Queens serviced for Fawcett by Seljan, one of the Curtis wholesalers, the Flushing section of Queens and the Bay Ridge and another part of Brooklyn (581).

On June 14, 1949 Fawcett cancelled Interborough's franchise in the Metropolitan area effective July 7, 1949 (1058) [plaintiff's 172].

### F—Dealings Between Interborough and Macfadden

Except for a period between 1927 and 1930, Interborough was the wholesale distributor for Macfadden magazines in the Metropolitan area, commencing in 1912 or 1913 (173). Interborough did not distribute for Macfadden in Westchester County. Distribution in that county was handled by Gaynor News Company (433). The principal Macfadden publications which Interborough distributed were True Story, True Romances, Photoplay and Physical Culture and others (173). In 1946 Macfadden's New York distribution averaged about 400,000 magazines a month (174).

Meyer of Interborough had numerous conversations with representatives of Macfadden, commencing May 1, 1947 and continuing until July 28, 1948, during which the parties discussed the withdrawal of the Curtis and Triangle franchises from Interborough (443) and during which the representatives of Macfadden never intimated to Meyer of Interborough that there was a possibility of Macfadden withdrawing its business from Interborough (449). In the earlier of these discussions, i. e., in June of 1947, Macfadden's representatives indicated to Meyer of Interborough that their experience with Garfinkel of Manhattan News (one of the Curtis wholesalers) was such that in their opinion Curtis would regret having appointed him their distributor in Manhattan (448) and that they had little regard for Garfinkel and that this opinion was shared by Donnenfeld of Independent and Annenburg of the Daily News and that they would never permit Manhattan News to get the Macfadden Manhattan franchise (446). During the latter part of the period and in June of 1948, Meyer of Interborough called Shapiro of Macfadden and advised him that Interborough's route men and inspectors were bringing back reports that Macfadden was about to leave Interborough. Shapiro reassured Meyer and advised that there was absolutely no foundation for any such rumors and to pay them no heed (449).

Subsequently, and about July 1, 1948, while Meyer was visiting a lawyer in connection with a legal matter that he was handling for Interborough, involving a labor matter, this lawyer advised Meyer that because of his (the lawyer's) connection with Macfadden he had come to learn that the management of Macfadden was endeavoring to make an arrangement to transfer the Macfadden franchise away from Interborough to the Curtis wholesalers including Manhattan News (465). A few days later and over the Independence Day weekend, Meyer spoke with Shapiro of Macfadden by telephone, the latter advising Meyer that he had learned from the said lawyer that Meyer expressed concern over the stability of the Macfadden franchise with

Interborough. Shapiro again reassured Meyer that there was no basis for any belief that Macfadden would not remain with Interborough (451). When Meyer of Interborough advised the attorney of this conversation (452), he was in turn informed by the attorney that notwithstanding same, Shapiro of Macfadden had gone before the Board of Directors of Macfadden and asked permission to transfer Macfadden's franchise away from Interborough and to the Curtis wholesalers (467).

Pursuant to an invitation by Shapiro of Macfadden, representatives of Interborough and Macfadden conferred at a luncheon on July 12, 1948. Shapiro of Macfadden announced his purpose in calling the conference to preserve Interborough by assuring that the independent national distributors then still with Interborough would remain. Shapiro asked the Interborough representatives for a financial statement so as best to determine how to prevail on the other independent national distributors not to desert Interborough. Notwithstanding that it represented a departure from all prior practice, and upon the promise that the contents thereof would remain inviolate and be used by Shapiro for personal information only, the Interborough representatives agreed to submit such financial data to the Macfadden group (467). A few days later the representatives of Macfadden called at the Interborough office and were given confidential data concerning Interborough on the renewed promise that it would remain confidential (469). Nevertheless, a few days thereafter Meyer was advised by representatives of other independent national distributors still with Interborough the details of the financial information that had been previously disclosed confidentially (470). Soon thereafter, and on July 30, 1948, representatives of Macfadden again conferred with those of Interborough at the Interborough office and then and there advised Interborough that the Macfadden franchise with Interborough for the city delivery was being cancelled (471). Although the oral advice of the cancellation was received by Interborough, as aforesaid, on July 30th, Interborough subsequently received a letter of confirmation thereof dated July 28 [plaintiff's 99]. On July 30 Interborough expressed its regret at the cancellation of the franchise in view of the repeated assurances that Macfadden would not desert Interborough [defendants' M30].

Some ten days thereafter, Shapiro of Macfadden expressed his regret at having broken his promises to Meyer, but indicated that the decision to leave Interborough was compelled in the best interests of Macfadden (472). In August, 1948, Interborough's delivery of Macfadden magazines in the City Department ceased (441).

Discussions between the representatives of Interborough and Macfadden were revived in November of 1948 with a view toward Macfadden returning its franchises to Interborough (995) resulting in a formal offer, dated November 12, 1948, by Interborough to resume distribution of Macfadden publications in New York City [defendants' M31]. That offer resulted in a formal contract between Macfadden and Interborough on December 7, 1948 [plaintiff's 135] for the Borough of Manhattan (537). At the time this agreement was entered into it was within the contemplation of the parties that further territories within Greater New York would be separated from the Curtis wholesalers and returned to Interborough (528).

When Interborough resumed distribution for Macfadden in Manhattan it no longer exacted the 3½% discount that had previously been charged (996 and 1030).

Between January 12th and January 27, 1949, Macfadden returned to Interborough the territories previously serviced by the Curtis wholesalers Queensbrook, Seljan, Bay Ridge and Flushing (537) [plaintiff's 136 and 137].

In March of 1949, when Meyer, accompanied by Donnenfeld of Independent (590), unsuccessfully sought to get additional territory back from Macfadden, at a conference with Himmelman of Mac-

fadden, Himmelman stated that he had but recently made a trip to Philadelphia, where he saw McLarty of Curtis, who tried to get Himmelman to agree not to return any more territory to Interborough and in addition tried to get Himmelman to agree to take away the territory that had been returned and turn it back again to the Curtis wholesalers. Himmelman advised Meyer that his reply to McLarty was that Interborough was doing a splendid job in distributing Macfadden magazines in the territory returned to it (591).

Despite this Himmelman advised them that no further Macfadden territory would be returned to Interborough and when Meyer expressed surprise because of his recent assurances from Himmelman that there would be the return of additional territory, Himmelman responded that Meyer was right about his promises but that "certain things have happened which have made me revise my opinion." Himmelman advised them, however, that there was then no present plan for Macfadden to cancel the partial franchises that had, in the interim, been returned by Macfadden to Interborough. Himmelman did state, with respect to the return of additional territory, that if Hearst and Fawcett were disposed to return additional territory to Interborough, he might revise his opinion and do likewise and Himmelman agreed to consult with Haig of Hearst and Adams of Fawcett to ascertain their intentions (588). However, no other part of the Greater New York area was transferred back to Interborough (537).

Finally, on June 7, 1949, Macfadden again advised Interborough of its cancellation of its existing franchises with Interborough [plaintiff's 170].

G—Dealings Between Interborough and Hillman

Interborough commenced distributing for Hillman in the Metropolitan area in 1938 or 1939. Hillman's principal publication was Pageant Magazine.

By 1946 Interborough distributed approximately 195,000 magazines per month, of which Hillman was the national distributor (176).

In July of 1948 a conference was held between the representatives of Interborough and those of Hillman. Alex Hillman stated at that meeting that the situation had ripened into a fight between the independent national distributors rather than between Curtis and Interborough. He also suggested that wholesalers serving the so-called minority distributors could profitably operate as against wholesalers serving the so-called "big three," i. e., Curtis, S–M and Hearst and that the latter wholesalers could not profitably exist on these three lines alone. Hillman further predicted that the time was coming when Curtis would dominate all wholesale facilities and could then dictate to the wholesalers which independent national distributors to represent and could thereby curtail reading matter available generally to the buying public (480). Shortly thereafter, and on August 9, 1948, Hillman cancelled its franchise to Interborough in the Metropolitan area [plaintiff's 106]. Subsequently, and in 1949, Hillman returned its smallest area, i. e., that serviced by Queensbrook News Company in Flushing, Long Island, to Interborough (587), but thereafter, and on June 24, 1949, again cancelled that franchise [plaintiff's 174].

H—Dealings Between Interborough and Independent

Interborough commenced distributing for Independent about 1931 or 1932 (176). The bulk of the Independent franchise dealt with such comic magazines as Superman, Detective Comics, Action Comics, etc. (176 and 1601).

In 1946 Interborough's distribution for Independent ran approximately 875,000 periodicals per month (176), which accounted for approximately 8% of Independent's entire national distribution (164).

On August 9, 1948, Independent and certain of the other national distributors (some of whom are defendants herein and some of whom are not) entered into a written agreement [plaintiff's 111],

commencing October 1, 1948 and extending for six months until March 31, 1949, awarding to Interborough exclusive distribution in Greater New York of the magazines of the several independent national distributors signatory thereto, at an increase from the previously prevailing discount of 3½% on net billings to 7% on net billings (488, 490, 495, 496, 498 and 1001). The several independent national distributors therein involved reserved to themselves the right, prior to the expiration of the six month period, to cancel Interborough's franchise in some of the outlying suburbs. (See Appendix V–I infra "Dealings Between Interborough and PDC.") Pursuant to that reservation, Independent cancelled Interborough's franchise as to certain of those outlying territories, prior to or simultaneously with the execution of the agreement [plaintiff's 109].

Donnenfeld of Independent explained the withdrawal of the Westchester, Long Island and New Jersey territories from Interborough as necessary because he had been told that Curtis was instructing its wholesalers "to get tough with any distributor that had not yet come into the fold" and Donnenfeld felt he could then make a better deal than if he waited six months and attempted to transfer Independent's distribution in those localities (498). Independent cancelled another outlying territory on August 17, 1948 [plaintiff's 110]. In so doing, Independent was the first of these contracting independent national distributors to change its wholesalers in the suburban territory (1025).

Interborough took the 7% discount on net billings from Independent for the entire six month period terminating. March 31, 1949 (1029) despite the fact that other independent national distributors, not parties to the agreement of August 9, 1948, which returned to Interborough during that period, did not pay the increased percentage of discount on their net billings (1001), although Independent raised the question of this differential with Interborough (1030 and 1179).

The differential became the subject of discussion toward the end of the six month period in March of 1949 between Meyer of Interborough and Donnenfeld of Independent. At that discussion Donnenfeld advised Meyer that unless Interborough was successful in getting additional territory from certain of the independent national distributors, who had partially returned to Interborough during that six month period, Independent would find it necessary to cancel Interborough's franchise in all of the Metropolitan area, then being serviced by Interborough, except the Borough of Manhattan. Meyer replied that he was assured that at least Macfadden contemplated returning additional territory to Interborough. When Donnenfeld expressed doubt as to this assertion, Meyer and Donnenfeld immediately visited Himmelman of Macfadden to ascertain the status of the Macfadden-Interborough relations. (See Appendix V F supra—"Dealings Between Interborough and Macfadden" for the details of this conference.)

After Meyer's meeting with Haig and Marcum of Hearst (See Appendix V D supra—"Dealings Between Interborough and Hearst"), at which he succeeded in getting back some of the Hearst territory, he advised Donnenfeld of Independent thereof and the latter expressed great surprise at his having succeeded in doing it (594). An appointment was made between Donnenfeld and Meyer for the following day and it was at that conference that Haig telephoned Marcum, then at Donnenfeld's office, to advise that he would not go through with the return of the additional territory because of the embarrassment that had been caused him in the leak in the trade that he contemplated such return (594). Upon this disclosure that Haig had changed his intention of returning the additional Hearst franchises to Interborough, Donnenfeld of Independent then advised Meyer that he would adhere to his original viewpoint of cancelling all of Interborough's franchises with Independent except the Borough of Manhattan (596).

Accordingly, and on April 13, 1949, Independent advised Interborough of the cancellation of its franchise in certain of the outlying territory in Brooklyn, Queens and the Bronx [plaintiff's 167].

Subsequently, Interborough and Independent agreed on May 24, 1949 for Interborough to remain as the wholesaler in Manhattan and certain remaining portions of Brooklyn and Queens (997) [defendants' N33 and N33a]. This agreement was cancelled by Independent on June 10, 1949 [plaintiff's 171], effective July 1, 1949 [defendants' N38] to which Interborough acceded [defendants' N39].

### I—Dealings Between Interborough and PDC

Interborough became the wholesaler for PDC in the Greater New York area in 1940 (1013).

In 1946 Interborough's distribution in Greater New York for PDC of such magazines as Personal Romances, Movie Romances, Movie Stars Parade, Crime Does Not Pay and others averaged over 660,000 copies per month (176 and 177) representing between 6% and 8% of the total national distribution of PDC (165). Interborough did not distribute PDC publications in Peekskill or Yonkers, New York. These territories were handled by other wholesalers (1015 and 1016).

In the latter part of July PDC was one of the independent national distributors that conferred and undertook on August 9, 1948, to enter into an agreement (See Appendix V H supra—"Dealings Between Interborough and Independent") wherein exclusive distribution of the magazines distributed by said independent national distributors would be accorded Interborough in the Greater New York area. The original arrangement merely contemplated an irrevocable agreement for six months from October 1, 1948 and an increase of Interborough's discount on net billing from 3½% to 7%. Accordingly, and following a meeting of August 3, 1948, Interborough prepared an agreement along those lines to be executed by the several independent national distributors conferring thereon. It was only after Independent insisted that it be reserved the right to cancel in the suburbs, that all of the proposed agreements, including that of PDC, were amended to reserve that right to all of the independent national distributors involved in those conferences (1019).

Manheimer of PDC was one of the representatives of those independent national distributors who did much to bring about the arrangement for the six month contract at the 7% discount (1018). When Meyer of Interborough advised Manheimer of PDC about Independent's insistence on the right to cancel the suburbs, PDC returned the unexecuted agreement to Meyer for the subjoining of that exception [plaintiff's 112A]. Interborough amended the proposed agreement and returned it to PDC on August 11, 1948 [defendants' PDC 40] whereupon PDC executed the agreement [plaintiff's 112]. Prior to that agreement and until the effective date thereof, and from the inception of the dealings between PDC and Interborough, Interborough always received a 3½% discount on PDC's net billing to it (1018), which was, of course, increased to 7% by the agreement.

On September 14, 1948, effective October 1, 1948, PDC cancelled Interborough's franchise in the outlying territory of Staten Island, New York [plaintiff's 146]. However, in transferring this franchise, PDC transferred to Richmond County News, a competitor of Staten Island News, to whom Curtis, Triangle, and S-M had previously transferred in Staten Island (1026).

From October 1, 1948 through March 31, 1949, Interborough took the full 7% discount on all PDC's net billings (1029) and in addition thereto charged PDC for returned magazines in excess of an agreed number and also received from PDC guaranteed payments per month representing minimum profit on certain of the issues which PDC distributed through Interborough—where the draw by Interborough from PDC was 6,000 or more copies per issue, the guaranteed minimum profit was $150 per issue and

where the draw was less than 6,000 copies, the guarantee was $25 per thousand copies drawn (1290).

Early in September, 1948, at conferences between the representatives of PDC and those of Interborough, the former complained about inadequate promotion by the latter in one of PDC's publications entitled Our World (1296). Later, and on December 3, 1948, PDC exercised its right under the six month agreement to cancel Interborough's franchise in some of the outlying suburbs of the city, indicating as its reason the belief that Interborough would render better service to the independent national distributors remaining with it if it would confine its activities to a smaller area [plaintiff's 145], to which Meyer of Interborough expressed to Manheimer of PDC his regret at that decision (555). In thus exercising its right to cancel in the suburbs, PDC was the last of the independent national distributors to avail itself of that right (1168). Meyer of Interborough wrote Manheimer of PDC acknowledging the cancellation and advising PDC that Interborough intended to hold PDC strictly accountable for the distribution rights in the Borough of Queens under the six month contract. As the six month period drew to a close and in the month of February, 1949, representatives of Interborough and PDC commenced again negotiating about the franchises (1031). At these conversations, representatives of PDC pointed out the inadequacies, in their view, of the Interborough service and again brought up proper promotion by Interborough of the PDC publication Our World. Meyer made notes of all of these complaints, agreed to check into them and another meeting was agreed upon to be held shortly thereafter (1183). Subsequent meetings were held during the month of March (1185, 1294 and 1298) between the representatives of Interborough and those of PDC at which figures and facts previously prepared by Interborough were offered to dispute PDC's complaint about Interborough's service [plaintiff's 211, 212 and 214].

Although during the life of the six month contract, Manheimer of PDC brought up the question of PDC paying the full 7% discount on net billings, whereas Hearst, Fawcett and Macfadden, who had partially returned to Interborough in that period, were paying no discount at all, he did not complain about this differential but felt that it was in order so as to help Interborough remain in business (1032).

On March 7, 1949 PDC advised Interborough of the cancellation of Interborough's franchise in all of the territory then being serviced by the Interborough City Department [plaintiff's 160] to which Meyer of Interborough replied, summarizing the Interborough position and data in answer to PDC's complaints [defendants' PDC 43].

In reply thereto Manheimer acknowledged Meyer's letter setting forth the reasons for PDC's decision to discontinue the Interborough franchises [defendants' PDC 42].

J—Dealings Between Interborough and Pocket Books

In the middle 1930s Interborough undertook the distribution of Pocket Books at retail at its Subway Division newsstands (476).

In 1939 or 1940 Interborough commenced the distribution of Pocket Books on a wholesale basis in Greater New York through its City Department (174) and thus became the pioneer wholesaler in the distribution of pocket-size reprints (476).

The success of this type of publication was such that by 1946 Interborough was also distributing similar reprints for Fawcett, known as Penguin and Pelican Books, for Curtis, known as Bantam Books, and for Macfadden, known as Perma-Books (174).

In 1946 Interborough's distribution in Greater New York for Pocket Books amounted to about 100,000 paper bound reprints per month (175), representing between 4% and 6% of the total national distribution by Pocket Books (163).

In early June or July of 1948, Meyer of Interborough was telephoned by Salomon of Pocket Books, who advised Meyer that Howe of Pocket Books had been under constant pressure by McLarty of Curtis to leave the Interborough City Department and transfer the metropolitan distribution to the Curtis wholesalers and that Salomon, feeling that the best interests of Pocket Books would be served by its remaining with Interborough, urged Meyer to exert every pressure to that end upon Howe, with whom Meyer had a luncheon engagement the same day (478). In that telephone conversation Salomon indicated his preference for Interborough distribution because the Curtis distributors were then carrying the competing Fawcett line of Penguin and Pelican Books and the Curtis line of Bantam Books, which had been previously eliminated from Interborough distribution (479). When Meyer of Interborough met Howe of Pocket Books later that day he sought assurances that Pocket Books would remain with Interborough, having heard rumors of a proposed change. Howe assured Meyer that no such change was contemplated and that he was of the opinion that Pocket Books would not transfer away from Interborough. However, Howe declined to make any definite promise to remain with Interborough (479). Nevertheless, on July 30, 1948 Pocket Books advised Interborough of the cancellation of its franchise as wholesaler for metropolitan New York effective September 1, 1948 [plaintiff's 104].

After the termination of Interborough's wholesaler status by Pocket Books, Meyer of Interborough continued his attempts to get the line back and conversed with Howe from time to time with that in view (1040). A dispute arose between Interborough and Pocket Books as to the financial status of their accounts after the termination of the franchise (1052) [defendants' PB44]. This dispute ultimately resolved in a credit balance in favor of Interborough (1221).

In the latter part of November or the early part of December, 1948, Donnenfeld of Independent telephoned Meyer of Interborough from Chicago to congratulate Meyer upon his having recouped some of the Macfadden and Hearst metropolitan business. Howe of Pocket Books was with Donnenfeld at the time the call was made and finally took over the telephone conversation, after Donnenfeld advised Meyer that Howe had expressed to Donnenfeld his intention of returning the Pocket Books business to Interborough in the metropolitan area (534). Howe advised Meyer, in that phone call, that he contemplated the return of Pocket Books to Interborough in New York City (552).

On December 7, 1948, while Meyer was at the office of Himmelman of Macfadden seeking a restoration of the Macfadden franchises, he was advised that Salomon of Pocket Books was trying to reach him by telephone. Meyer called Salomon from Himmelman's office and when Salomon learned from whence Meyer was calling he requested Meyer to telephone him at his home that evening (531 and 1036). When Meyer telephoned Salomon that night, Salomon advised him that Howe of Pocket Books had gone to Chicago earlier in the month, convinced that the best interests of Pocket Books would be served by its return in the metropolitan New York area to Interborough, but while in Chicago, Howe met McLarty of Curtis, who had changed Howe's mind and Salomon wanted Meyer to know that it would be very difficult for Interborough to get back the Pocket Books line. Salomon also advised Meyer that Rogers of S-M had sought a pledge from Salomon that Pocket Books would not return any of the New York territory to Interborough (532). Salomon also quoted Rogers as having said to him that he, Rogers, and McLarty of Curtis, were calling publishers or independent national distributors endeavoring to persuade them to pledge not to return territory to Interborough (1036 and 1219) [plaintiff's 215].

K—Dealings Between Interborough and the Non-Defendants Kable, Popular and Leader

Interborough had, for some time, represented as wholesaler in the Greater

New York area Kable News Company, Popular Publications, Inc., and Leader News Company, none of which is a defendant in this suit. By June of 1948 Kable, Popular and Leader, together with the defendants Independent, PDC and Hillman, were the only independent national distributors remaining with Interborough, although later on Hearst, Macfadden and Fawcett returned a portion of each of their New York territories to Interborough. In June of 1948 representatives of Interborough met severally with representatives of Kable, Popular, Leader, Independent, PDC and Hillman and pointed out that with but these six franchises it could not continue to profitably operate the City Department (482–485 inclusive). Immediately after these meetings Interborough prepared figures indicating the minimum compensation that it would require to continue operating its City Department with only those six franchises (859). Representatives of all of those remaining independent national distributors (except Leader who was omitted by inadvertence and advised thereof subsequently and agreed with the decisions made at that meeting) foregathered at Interborough's office to discuss ways and means of keeping the Interborough City Department in existence (485). The representatives, at the meeting of July 29, 1948, subject to consultation with their associates, agreed that an increase in Interborough's discount of net billings would be necessary if the City Department were to survive and in addition that the independent national distributors involved in that meeting agree to remain with Interborough for at least six months (486 and 863).

In early August of 1948 representatives of Kable, Popular, Leader, Independent and PDC again met with those of Interborough and agreed that the 3½% discount allowed Interborough would be increased to 7% and that the parties would commit themselves to remaining with Interborough for a six month period commencing October 1, 1948 (488). Contracts accordingly were prepared by Interborough [plaintiff's 111 and 112] and were sent by Interborough to the several intended signatories. Before any of the contracts were signed, Independent's representatives communicated with Interborough and advised that Independent insisted upon an addenda reserving the right to the independent national distributors there involved to discontinue Interborough's franchise for the suburban areas at will within the six month period (496). The proposed agreements were accordingly amended and executed by the five independent national distributors involved (495 and 498). Notwithstanding this amendment, Interborough was permitted to continue to service Kable, Popular and Leader in the suburban areas until the expiration of the agreement in March of 1949, although Interborough advised Kable, Popular and Leader, in January of 1949, that it would discontinue its suburban service at the termination of the contract in March (1169).

It was stipulated by counsel that some time subsequent to August, 1948, Kable, Popular and Leader discontinued Interborough's franchises for Staten Island.

Interborough took the 7% discount on net billings of Kable, Popular and Leader from October 1, 1948 through March 31, 1949 (1029). During that period and in February of 1949, the representative of Popular raised the issue of the continuance of the 7% discount to Interborough in view of the fact that Hearst, Fawcett and Macfadden, who had in the meantime returned in part to Interborough, were allowing no discount whatsoever (1030) [defendants' N35, N36 and N37]. When Interborough advised Popular that the 7% discount would have to prevail until additional territory was returned by Hearst, Macfadden and Fawcett, Popular consented to the continuation of that discount (1178) and Kable also agreed to this course (1180).

At the end of February 1949, Kable arranged for certain of its suburban territory to be serviced by other wholesalers [plaintiff's 204]. By May of 1949, because certain territory in Brooklyn, Queens and the Bronx was being serv-

iced by Interborough for only Kable, Popular and Leader, Interborough decided to discontinue distribution in those areas and so notified those independent national distributors (1171) [plaintiff's 205]. On June 9, 1949 Interborough and Kable by mutual consent cancelled all franchises, effective July 6, 1949 [defendants' C27]. On June 13, 1949 Popular transferred certain of its territory in Long Island and Brooklyn and the entire Borough of Manhattan to another wholesaler [plaintiff's 210]. Finally, when on June 20, 1949 the Newspaper and Mail Deliverers Union struck against Interborough, its City Department business came to a halt and was never thereafter resumed.

## VI

### Dealings Between the Independent National Distributors and the So-called Curtis Wholesalers

### A—Dealings Between Curtis and the New Wholesalers

As above indicated, when Curtis left Interborough's City Department, it arranged for distribution in Metropolitan New York by 13 wholesalers. These wholesalers, the territories which they serviced and their ownership was:

| " Name | Territory | Operated by |
|---|---|---|
| Hudson County News Company | New Jersey | Ike Cohen |
| Rockaway News Company | Nassau County Suffolk County The Rockaways, L. I. | John Somyak |
| Staten Island News Company | Staten Island | M. G. A. McAloon (sic) |
| Gaynor News Company, Inc. | Part of Westchester County | Jimmy Gaynor |
| Novick News Company | Part of Queens, L. I. | Harry Novick |
| Bay Ridge Delivery Service | Part of Brooklyn | Mike Greenbaum |
| Flushing Delivery Service | Flushing Part of Queens, L. I. | Victor Pellegrino |
| Brooklyn News Company | Part of Brooklyn | Ben Friezner Lou Sorkin Shea Myers |
| Manhattan News Company, Inc. | Manhattan | Henry Garfinkle |
| Queenbrook (sic) Distributing Service | Part of Brooklyn Part of Queens, L. I. | Harry Leibowitz Lester Schwerin Hyman Goldwasser |
| Seljan News Company | Part of Queens, L. I. | Joe Weinstein Moe Cohen |
| Bukzin News Company | Part of Brooklyn | Jerry Bukzin Harold Bukzin Al Bukzin |
| Bronx County News Corporation | Bronx | Selig Goldberg" |

[plaintiff's 54].

Hudson County News Company prior to 1947 distributed newspapers in Hudson and possibly Bergan Counties, New Jersey. It was operated by Ike Cohen (269 and 1653) [plaintiff's 175].

Rockaway News Company, prior to 1947, distributed newspapers in Nassau, Suffolk and part of Queens Counties, New York. It was operated [plaintiff's 175] out of Valley Stream, Long Island, by John Somyak and his two sons Arthur and Bill (271, 758 and 1656).

Staten Island News Company, prior to 1947, distributed magazines for Interborough in Richmond County, New York for which Interborough paid it part of Interborough's profits on this business. It was operated by M. G. A. McAloon (324 and 1662) [plaintiff's 175].

Gaynor News Company, Inc., prior to 1947, distributed newspapers and magazines in Westchester County, New York (except in Yonkers) and up into Connecticut. It was operated by James B. Gaynor (269 and 1652) [plaintiff's 175].

Novick News Company was organized in 1947 to distribute in part of Queens County, New York. It was operated by Harry Novick [plaintiff's 175] who prior thereto and up until May 17, 1947 had been an Interborough route man on and off and part time (324, 1130 and 1655).

Bay Ridge Delivery Service prior to 1947 distributed newspapers and magazines in part of Kings County, New York. It was operated by Michael Greenbaum (270, 324, 1131 and 1649) [plaintiff's 175].

Flushing Delivery Service was organized in 1947 to distribute magazines in part of Queens County, New York. It was operated by Victor Pellegrino, a brother of the business agent for the Newspaper and Mail Deliveries Union. Prior to forming the Flushing Delivery Service Pellegrino was a route man for the New York Journal-American, a newspaper (324 and 1651). Flushing Delivery Service went out of business about December, 1948, and its accounts were transferred to Queensbrook [plaintiff's 164 and 169].

Brooklyn News Company was organized in 1947 to distribute magazines in part of Kings County, New York. It was operated by Ben Friezner, Lou Sorkin and Shea Myers [plaintiff's 175], all of whom prior thereto had been Interborough route men (325, 1134 and 1630). Another Interborough route man, Abe Katz, left Interborough in May, 1947, intending to work for another of the new wholesalers. This did not materialize and he thereafter joined Brooklyn News Company (328, 1127, 1128 and 1630).

Manhattan News Company, Inc., was organized in 1947 to distribute magazines in New York County, New York. It was operated by Henry Garfinkle [plaintiff's 175] who prior thereto operated a wholesale distributorship in Boston, Massachusetts, and various retail outlets in the New York metropolitan area (1654). In 1948 an Interborough employee, Deuchar, left Interborough and became employed by Manhattan News Company, Inc. (657).

Queensbrook Distributing Service was organized in 1947 to distribute magazines in part of Kings County and in part of Queens County, New York. It was operated by Harry Leibowitz, Lester Schwerin and Hyman Goldwasser [plaintiff's 175], all of whom prior thereto had been Interborough route men (331, 1129, 1631 and 1655).

Seljan News Company was organized in 1947 to distribute magazines in part of Queens County, New York. It was operated by Joe Weinstein, a former route man for American News Company, and Moe Cohen, a former route man for Interborough [plaintiff's 175] who, although he participated in the organization of Seljan in 1947 had left Interborough's employ in 1946. Another Interborough route man, Morris Cohen, father of said Moe Cohen, left Interborough's employ in July, 1947, but his subsequent employment does not appear (325, 1132, 1133, 1134, 1631 and 1662).

Bukzin News Company was organized in 1947 to distribute magazines in part of Kings County, New York. It was.

operated by Molly Bukzin and her three sons [plaintiff's 175], who prior thereto had distributed newspapers for the New York Daily Mirror and, at one time, magazines (1650).

Bronx County News Corporation was organized in 1947 to distribute magazines in Bronx County, New York. It was operated by two brothers Selig [plaintiff's 175] and Abe Goldberg, both of whom were previously employed by the Journal-American, a newspaper, where another brother was a circulation executive. Selig Goldberg was also an official of the Newspaper and Mail Deliverers Union (325 and 1649).

It will thus be seen that one of the 13 new wholesalers (Staten Island News Company) had previously been Interborough's agent and 5 of the 13 new wholesalers were organized by or employed 10 of Interborough's former route men (323).

Except for Deuchar (who left Interborough in 1948 to go with Manhattan) and Moe Cohen (who left Interborough in 1946, a year before he helped organize Seljan), the route men quit Interborough during May, 1947, without having given Interborough any advance notice thereof (327).

The new wholesaler arrangement not only enabled Curtis to adequately service the area, but stimulated the interest of the other independent distributors [plaintiff's 71]. Curtis was anxious that its new wholesalers get

"a shot in the arm by the acquisition of one or more franchises within the next two or three months * * * [to] enable all of the wholesalers not only to make more money, but also justify them in adding equipment, increasing their headquarters' space and in general, improving their individual setups. * * *"

To that end Curtis representatives had

"discussions with the executives of the desirable franchises * * * [to] influence them to discontinue

Interborough before the end of the year * * *" [plaintiff's 70].

By May of 1947 Curtis had

"a gentleman in a responsible position with Interborough * * * [keeping Curtis representatives] * * * very well informed on matters which he knew would be of interest to us concerning the Interborough News Company" [plaintiff's 87].

For the first year of operations under the new plan Curtis paid its 13 wholesalers $176,100 in subsidies which Curtis expected would ultimately be eliminated "if and when" these 13 wholesalers obtained franchises from other independent distributors [plaintiff's 87] and it expected that

"by 1955 we will have paid all of the expenses incurred in the reorganization and from that point on we will be effecting economies amounting to $50,000 a year as compared to our operating expenses in 1946" [plaintiff's 89, 134, 168 and 175]

when Interborough had the sole metropolitan franchise.

Pending the occurrence of that event, Curtis kept promising its wholesalers that other distributors would transfer their franchises (432) [plaintiff's 91]. By June 30, 1948 two did, whereupon Curtis cautioned its wholesalers not to permit this new business to impair their service to Curtis under penalty of losing the Curtis franchise (435) [plaintiff's 94].

The first anniversary of the new distribution setup in New York was celebrated by a dinner at which Curtis was the host and each of the 13 wholesalers received from Curtis a plaque. At this dinner representatives of S-M, Hearst, Triangle and Fawcett were introduced as

"important representatives of other publishers who were responsible for the decision to join us in the development of your operations

* * * after their investigations indicated your operations were sound * * * " (437) [plaintiff's 95 and 96].

Pocket Books transferred from Interborough to the so-called Curtis wholesalers on an

"agreement * * * to turn over all direct accounts to their New York"

wholesalers upon which agreement "Pocket Books reneged" [plaintiff's 175]. Curtis let it be known to the 13 wholesalers that unless they pressured Pocket Books into living up to the agreement to discontinue direct accounts, the wholesalers would have to meet that competition by price reductions to be borne by the wholesalers on Curtis' competitive Bantam Books or suffer the effect of Curtis going into direct solicitation against Pocket Books [plaintiff's 289]. Curtis also warned the 13 new wholesalers that additional franchises taken on by them should "be on a profitable basis only" and accession "to the unreasonable demands of a certain publisher" and the resulting impact on Curtis' service would subject the wholesaler to "the risk of losing our franchise" [plaintiff's 150 and 151].

Curtis expressed its confidence in the 13 wholesalers when some of the other independent national distributors returned to Interborough (577) [plaintiff's 152].

When Curtis ultimately reduced its subsidies to the 13 wholesalers it did so on a basis to equalize the wholesalers' earnings from other independent national distributors reckoned on a different basis [plaintiff's 148].

### B—Dealings Between the Other National Distributors and the New Wholesalers

After Curtis left Interborough's City Department on June 1, 1947 by notice of April 30, 1947, in Manhattan, Bronx, Brooklyn and Queens, and on June 24, 1947, by notice of April 28, 1947, in Staten Island, Westchester, Long Island and New Jersey, the other independent national distributors did likewise and transferred to the 13 new so-called Curtis wholesalers except as noted *infra*.

Defendant Triangle was the first to follow Curtis when it discontinued Interborough's franchise in all of the metropolitan area on November 24, 1947 by notice of October 10, 1947.

Hearst was the next when it too discontinued Interborough's franchise in all of the metropolitan area on July 21, 1948 by notice of May 27, 1948. However, five months thereafter Hearst returned to Interborough in Manhattan on December 17, 1948 and finally terminated its dealings with Interborough's City Department on August 19, 1949 by notice of June 15, 1949.

Next to leave the Interborough City Department was S-M News when on August 25, 1948, it discontinued Interborough's franchise in all of the metropolitan area by notice of June 10, 1948.

Pocket Books shortly thereafter also discontinued Interborough's franchise in all of the metropolitan area on September 1, 1948 by notice of July 30, 1948.

Next to do likewise was Macfadden which on October 1, 1948, cancelled the Interborough City Department franchise for the entire metropolitan area by notice of July 28, 1948. However, Macfadden also, between January and March, 1949, returned Manhattan and the parts of Queens and Brooklyn serviced by the new wholesalers Queensbrook, Bay Ridge Seljan and Flushing, until July of 1949 when it finally terminated its dealings with Interborough's City Department by notice of June 7, 1949.

On the same day, October 1, 1948, PDC cancelled the Interborough City Department franchise for Staten Island by notice of September 14, 1948 but it transferred the franchise to Richmond County News Company, a wholesaler in Richmond County who was not one of the 13 Curtis wholesalers (1026). It was not until January 1, 1949 that PDC discontinued Interborough's franchise in Westchester County, New Jersey and Long

Island by notice of December 3, 1948 and finally the balance of the metropolitan area was cancelled by it on March 31, 1949 by notice of March 7, 1949.

Fawcett, on October 5, 1948, next cancelled Interborough's City Department franchise in all of the metropolitan area by notice dated July 1, 1948 but on February 11, 1949 returned the territories of Manhattan, and the parts of Queens and Brooklyn serviced by the new wholesalers Seljan, Flushing and Bay Ridge until July 7, 1949 when it finally terminated its dealings with Interborough's City Department by notice of June 14, 1949.

Next to leave Interborough's City Department was Independent. It cancelled the Westchester County, New Jersey, Staten Island and Long Island franchises on November 1, 1948, by notice of August 9, 1948 and Bronx County and parts of Brooklyn and Queens on May 25, 1949 by notice of April 13, 1949 and the remainder of the metropolitan area on July 11, 1949 by notice of June 10, 1949.

Hillman also cancelled the Interborough franchise for the entire metropolitan area on November 1, 1948, by notice of August 9, 1948. While it returned that part of Queens serviced by Flushing News company one of the 13 wholesalers, in early 1949, it finally terminated the entire territory by notice of June 24, 1949.

Kable, Popular and Leader, the remaining independent national distributors, not defendants herein, all cancelled Staten Island on September 1, 1948, fifteen months after the Curtis defection and Westchester County, New Jersey and Long Island in March of 1949 and Bronx County and parts of Brooklyn and Queens in May and June 1949 and the balance of the territory in June or July, 1949.

In summary therefore we find the span between the Curtis cessation of business with the Interborough City Department on June 1, 1947 and that of the other corporate defendants to be [defendants' C 22A]:

| Distributor | Date of First Cancellation | Time Elapsed After Curtis Defection |
|---|---|---|
| Triangle | November 24, 1947 | 6 months |
| Hearst | July 21, 1948 | 14 " |
| S-M News | August 25, 1948 | 15 " |
| Pocket Books | September 1, 1948 | 15 " |
| Macfadden | October 1, 1948 | 16 " |
| PDC | October 1, 1948 | 16 " |
| Fawcett | October 5, 1948 | 16 " |
| Independent | November 1, 1948 | 17 " |
| Hillman | November 1, 1948 | 17 " |

The little that the record discloses about the relationship between the independent national distributors other than Curtis, and the 13 new wholesalers, supplies the reasons for Hearst, Fawcett and Macfadden returning to Interborough. It was their dissatisfaction with the service rendered them by Manhattan News Company, Inc. on checkups [plaintiff's 147, 169, 207, 208, 209 and 281]. Pocket Books voiced similar dissatisfaction [plaintiff's 149] whereas S-M was most complimentary of Manhattan's performance [plaintiff's 282].

Although Hearst originally relaxed its checkup requirements for 1948 it insisted on full conformance therewith, thereafter [plaintiff's 133 and 207].

Pocket Books threatened withdrawal of its franchise to Flushing Magazine Delivery Service within five months after it transferred [plaintiff's 284] and thereby incurred the displeasure of S-M News [plaintiff's 285]. As elsewhere indicated

Flushing went out of business shortly thereafter [plaintiff's 169].

In February of 1949 one of the 13 wholesalers, Seljan, conferred with Curtis and S-M News representatives at Curtis' offices regarding Seljan's absorption by another of the 13 wholesalers which plan was ultimately abandoned [plaintiff's 155].

## VII

### Meetings, etc., of Independent National Distributors

In addition to the meetings of the independent national distributors in connection with the development of the plan to change distribution from strict galley to reshipment and to truck delivery, herein elsewhere dealt with (See Appendix VIII "The Interborough Country Department, A—Generally") and, in addition to general trade conventions, attended by distributors and wholesalers alike, also herein elsewhere dealt with, where appropriate, under other headings, the record discloses some other meetings by defendants for both undisclosed and disclosed purposes.

### A—Meetings, etc., for Undisclosed Purposes

It appears that the defendants or some of them met for undisclosed purposes on January 13, 1947 [plaintiff's 40]; February 27, 1947 [plaintiff's 43]; March 5, 1947 [plaintiff's 44]; April 2, 1947 [plaintiff's 45]; April 14, 1947 (317) [plaintiff's 47]; April 16, 1947 [plaintiff's 51]; April 17, 1947 [plaintiff's 49]; May 15, 1947 [plaintiff's 57A, 58, 59 and 60]; May 21, 1947 [plaintiff's 61]; July 1, 1947 [plaintiff's 66 and 67]; October 29, 1947 [plaintiff's 77]; about November 24, 1947 [plaintiff's 78 and 278]; December 3, 1947, December 17, 1947, January 7, 1948 [plaintiff's 82]; January 4, 1948 [plaintiff's 156]; in June, 1948 (473) [plaintiff's 101]; March 4, 1949 (585, 1667 and 1671) [plaintiff's 161]; March 22, 1949 [plaintiff's 162 and 163]; and June, 1949 [plaintiff's 288].

On July 16, 1947 a meeting of an "organizational committee" (the composition and purpose of which remains undisclosed) of BIPAD (herein elsewhere explained) was held [plaintiff's 64 and 64A]. On July 29 and 30, 1947 BIPAD convened in Chicago [plaintiff's 65 and 65A]. BIPAD also convened in Chicago in February, 1948, at which convention Booth of Interborough was present (1325). BIPAD met in Biloxi, Mississippi, subsequent to January 21, 1949 in conjunction with the Wholesalers of the Deep South (1666) [plaintiff's 154].

### B—Meetings, etc., for Disclosed Purposes

Although exhibits disclose the announced purposes of these meetings, the record does not reveal what was said or done thereat unless noted.

For years prior to the spring of 1948 the independent national distributors were exchanging lists of changes in wholesalers, transfer of territories, etc. [plaintiff's 280].

On January 20, 1947 the independent national distributors met to consider drug store chains as retailer outlets [plaintiff's 48].

On April 3, 1947 representatives of Curtis told representatives of S-M the reasons for Curtis' contemplated change in "the New York situation" [plaintiff's 46].

In July of 1947 McLarty and Lance of Curtis and Rogers of S-M discussed "the New York situation" at a BIPAD convention in Chicago (1667 and 1670) [plaintiff's 69].

In September of 1947 some independent national distributors met to discuss "the syndicate stores situation" (362 and 365) [plaintiff's 72, 73, 74 and 75].

In December of 1947 McLarty of Curtis sent Haig of Hearst and Rogers of S-M copies of reports received by Curtis from the new wholesalers and Curtis personnel [plaintiff's 79 and 81].

In February of 1948 Lance of Curtis sent Mayer of S-M statistics on certain of Curtis' distribution in New York City [plaintiff's 84].

On July 27, 1948 representatives of Curtis, S-M, Hearst, and Triangle met

at luncheon at the New Yorker Hotel to discuss, regarding the 13 wholesalers, that price structures were each individual distributor's business except if they affected another distributor's operations, in which case a solution should be sought; that checkup requirements be pegged to volume; that service charges be uniform; and realignment of territories and "size of committee" (439) [plaintiff's 90 and 98].

In the summer of 1948 Curtis, Hearst, Triangle, S-M and Fawcett corresponded and conferred about boundary disputes between some of the wholesalers [plaintiff's 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128 and 130].

During 1948 Curtis supplied Triangle, Fawcett and Hillman with maps of each wholesaler's territory [plaintiff's 93, 107, 108, 114 and 129].

On July 26, 1948 Curtis' representatives met with Donnenfeld of Independent and Garfinkel of Manhattan to discuss Manhattan undertaking distribution for Independent (438) [plaintiff's 97].

On September 9, 1948, the independent national distributors met to discuss service charges to retailers by the so-called Curtis wholesalers and the performance of one of these wholesalers (1641 and 1665) [plaintiff's 113, 113A, 113B, 113C and 131].

On November 1, 1948 the distributors again met to discuss "the New York situation as a whole and the difficulties we are having with the service charge in particular" [plaintiff's 139] and again on December 16, 1948, for the same purpose [plaintiff's 140] although it would appear that these meetings had to do with the unsatisfactory service being rendered certain of the independent distributors by at least one of the so-called Curtis wholesalers resulting in the return of one distributor to Interborough's City Department [plaintiff's 142].

On December 21, 1948 Mayer of S-M sent McLarty of Curtis S-M's rating of the performance of the 13 wholesalers (1613) [plaintiff's 283].

On March 4, 1949 the independent national distributors met to discuss "the state of Independent Distribution, past —present—future" [plaintiff's 158 and 159].

On March 31, 1949 McLarty of Curtis sent Adams of Independent and Himmelman of Macfadden a copy of a bulletin sent by McLarty to Curtis personnel entitled "Let's Mind Our Own Business" presenting "clarification of the present situation" regarding relationships between the independent national distributors commonly using the facilities of the new wholesalers [plaintiff's 164, 165 and 166].

Some time prior to April 19, 1949 representatives of Curtis and of S-M met to bring their respective "extra payments" (Curtis' "subsidies" and S-M's "generous price structure") to the wholesalers "more in line with each other" [plaintiff's 168].

In the spring of 1950 Lance of Curtis "called Maurice Solomon [sic] of Pocket Books" to indicate Curtis' displeasure at a "Hate Curtis Movement" being fostered among the 13 wholesalers by Kurt of Pocket Books [plaintiff's 290A].

In June of 1950 Lance of Curtis sent Rogers of S-M that part of Lance's report to Curtis dealing with his proposals to regulate checkups by the wholesalers [plaintiff's 176].

VIII

The Interborough Country Department
A—Generally

For many years Interborough maintained a Country Department engaged in operating a "strict" galley business (1493). In the course of these years, Interborough had acquired some of this galley business from publishers who had previously run it directly without the use of wholesalers, i. e., Hearst. When Interborough took over the Hearst galley in the early 1930s, it paid Hearst nothing for that galley business (976). As the years went by, the independent national distributors who availed themselves of galley distribution found that method of distribution increasingly un-

satisfactory, and as time went on were importuned by wholesalers prepared to substitute truck delivery to transfer the galley operation to truck operation. Accordingly, and in October of 1945, all the independent national distributors using galley distribution convened except M. L. A. Publications (Triangle) to discuss the future of the galley business. It was there determined that as far as possible and without impinging upon the right of each independent national distributor to run his business as he pleased, there would be unanimity or at least majority action before a distributor would transfer from a galley distribution to a truck distribution [plaintiff's 277].

In 1946 Interborough's Country Department ran a galley distribution for the independent national distributors in the states of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Maryland, Delaware and Ohio (118 and 121). Interborough was then one of seven galley operators covering the entire country. Some years earlier Interborough had also covered the states of Virginia and West Virginia by galley but had sold this segment of its galley business to Southland News Company at the request of the independent national distributors (684).

Interborough's galley operation would operate somewhat in this manner: Interborough would make up a sheet known as a galley which would indicate to each independent national distributor how many of that distributor's magazines were to be sent to retailers in small towns and rural areas in the territory covered by the operation. The regular draw of each of these retailers would be indicated on the galley. The galley would be seasonably sent to the independent national distributor in advance of the expected issuance of that distributor's publications together with shipping labels addressed to the individual retailers. The independent national distributor would forward these labels through its publisher to the publisher's bindery. When the periodicals were ready for distribution, the publishers' bindery, using the shipping labels, on the draw or count indicated by the galley, would directly ship by mail or express to the retailer the number of periodicals called for by Interborough. The independent national distributor would bill Interborough for these periodicals just as it billed for those which it sent directly to Interborough's City Department for city distribution. Interborough in turn would bill the retailer and give due allowance for the return by the retailer of unused copies of earlier issues or the covers thereof. From that point on Interborough would handle the retailer's account in the same manner as it handled the accounts of its retailers in the City Department, i. e., collecting and corresponding with the retailer in connection with their mutual business (685). Interborough would also perform certain promotional work in connection with galley retailers. There being no route men to contact these retailers as in the City Department distribution, Interborough would send men into the galley area, who would consult with the retailers in connection with the promotion of the sales of the periodicals of the independent national distributors. In essence, the function of Interborough in its galley department was substantially similar to that of its function in its City Department except that the periodicals were distributed directly to the retailers by express or mail rather than by wholesaler's truck delivery (118 and 119).

The galley operation in Interborough's Country Department had remained substantially the same for a decade and a half subsequent to the employment by Interborough of George P. Booth (1493), who subsequently was put in charge of the Country Department.

S-M News Company never availed itself of the Interborough's strict galley operation nor of Interborough's "reshipping operation" (896).

Even before the independent national distributors met in 1945 to try and improve galley distribution, Interborough, recognizing some of its inadequacies,

had in certain of the areas covered by it modernized the strict galley operation into a "re-shipping operation." These changes began about 1940 (685).

The only other wholesaler in the United States conducting a similar reshipping operation was Publishers Distributing Company of Chicago (121 and 1592).

A reshipping operation differed from strict galley in this respect: Instead of the independent national distributors, upon receipt of the galley and labels from Interborough, sending the periodicals directly to the retailer, they would send these periodicals in the aggregate to Interborough's main plant at 52nd Street (1592). There the various shipments received by Interborough from the independent national distributors or their publishers would be broken down, grouped and repackaged according to retailers. These retailers' bundles, containing the periodicals of a number of independent national distributors, would then be shipped to the retailers, in some instances by mail and express and in some instances by truck (1246). The obvious advantages of this operation over strict galley were that it reduced substantially the number of bundles which the retailer would receive and it also substantially reduced the postal or express charges involved (121). It was not long before Interborough began to set up depots throughout the territory (1449 and 1493) where the packaging would be done in proximity to the location of the retailers thus to be serviced. In those cases, the independent national distributor would continue to send his periodicals to 52nd Street (1495), but they in turn would be sent to the depots for distribution (691).

In due course and in some of the territories, the depots ripened into subsidiaries, which were organized by Interborough, and though wholly owned by Interborough, functioned as independent reshipping wholesalers in their given territories. The promotional work continued, but instead of the employees being those of Interborough, as previously, they worked out of subsidiary offices and were employees of the subsidiaries (123 and 693).

Reshipping further was an advantage over strict galley distribution because it provided the retailer with a larger number of magazines all delivered in one bundle from a number of different publishers, accompanied by an invoice for the entire shipment (121). This method of delivery increased the retailer's interest in selling the magazines, because they were delivered to his place of business and he did not have to go to the post office to pick them up. To the independent national distributors it served as a method for distribution of those magazines that might not have mail entry and over all represented a saving in postal expense (1494).

When Interborough would convert from a strict galley to a reshipping operation, it continued distribution under the newer method for the same independent national distributors for whom it distributed under the older method (976 and 1493).

It later developed that ultimately the Country Department distribution functioned under one or more of a variety of ways, i. e., either as a strict galley operation or as a reshipping operation or as a trucking operation, or by a combination of these manners in a given territory. In any event, all of the subsidiaries were wholly owned by Interborough (131). Among such subsidiaries engaged in reshipping distribution, as distinguished from the strict galley distribution, and wholly owned by Interborough, were Galley News Company at West Lebanon, New Hampshire, Interurban Company in Cazenovia, New York, Maryland Magazine Company at Havre de Gras, Maryland, Northeast News Company at Farmington, Maine, and Pennsylvania Periodicals Distributors at Williamsport, Pennsylvania (123, 131 and 1495).

There came about also the establishment of two subsidiaries, i. e., Pilgrim News Company in Massachusetts and Long Island News Company on Long Island in New York. Inasmuch as these

two companies pose specific problems in this litigation, they will be separately dealt with elsewhere herein.

Some of the other subsidiaries, because they did their reshipping by truck, rather than mail and express, became known as trucking subsidiaries. Among these were Verham News Co. in West Lebanon, New Hampshire (1138), Mountain News Company in Liberty, New York (695), Oswego News Company in Oswego, New York, (695), Tri County News Company in Dubois, Pennsylvania (696), and Chesapeake News Company in Dover, Delaware (1138 and 1526). They were nonetheless considered by Interborough to be reshipping subsidiaries emanating from Interborough's Country Department (685 and 1598).

Occasionally, a hybrid situation would develop. For example, in West Lebanon, New Hampshire, operating at the same location and under the same supervisor, there was the aforesaid Galley News Company, a reshipping subsidiary distributing by mail and express in that territory, and also the aforesaid Verham News Company, a trucking subsidiary, operating by truck in distribution to other retailers in that area (686, 697 and 700). Where a trucking subsidiary had been set up to take over part of strict galley distribution in a given territory, if other parts of that territory were subsequently put on reshipping instead of strict galley, there would be no disturbance of the truck operation in that area (700).

The preference of the independent national distributors for truck coverage was based upon advantages of dealer good will, checkup and recovery and over-all improved operation because of the regularity of contact with the retailers (1412). The transition from strict galley to reshipping galley to truck delivery brought about a decentralization of Interborough's Country Department (1593).

George P. Booth took over supervision of Interborough's Country Department, including its subsidiaries, strict galley, reshipping and trucking in 1944 (1324

and 1564) and in that capacity attended a convention of galley operators and independent national distributors (1500) in Chicago in December, 1944 (1499), where plans to improve strict galley distribution (1593) and to meet the threat of truck wholesalers were considered and where at least one independent national distributor (Independent) committed itself to offer any strict galley wholesaler a chance to establish a competing truck run where one was offered by a truck wholesaler before transferring from strict galley to truck distribution [plaintiff's 277]. Subsequent to the Chicago meeting of 1944, the southern galley operators formalized their group to publicize and advertise the modernization of galley distribution to publishers and national distributors. The new group became known as "Southern Gallies" and was made up of Interborough, Leo Adler, Publishers News Company of Chicago, Southland News Company, Mid-Continent News Company and Newsstand Distributors. This group met again in 1945 in New York (1505).

On February 4, 1946, Curtis transferred certain towns in Maine from Interborough's strict galley to another wholesaler [plaintiff's 33] and closed the towns therein mentioned to Interborough's strict galley service. On March 26, 1946 Curtis also transferred a town in Pennsylvania from Interborough's strict galley to a competing wholesaler [plaintiff's 35] upon the approval of that change "by all of the publishers at the meeting held in New York on February 7th." On July 2, 1946 Curtis transferred from the Interborough strict galley to a competing wholesaler a number of towns in upper New York State pursuant to a decision made "at the meeting of all the publishers held in New York City on May 29th," but first requested Interborough's approval to the transfer. Again on August 1, 1946, Curtis asked Interborough's approval to a transfer of certain towns in Maine and New Hampshire to a Dover, New Hampshire, wholesaler because "on July 26th the application was approved" at a publishers' meeting in New York City [plaintiff's

34]. On November 27, 1946 Curtis advised Interborough of the transfer of a town in Maine from the Interborough strict galley to a competing wholesaler in accordance with an approval agreed upon by "all of the publishers" at a meeting "held in New York City on October 30th" [plaintiff's 38].

From the foregoing events, it is obvious that the independent national distributors using the Interborough strict galley service were at that time conferring. At these meetings they discussed the shifting of territories from galley to truck operation and any matters of mutual interest pertaining to the industry as a whole (1667 and 1672).

In 1946 Interborough moved its bookkeeping department in connection with its Country Department to Mount Vernon, New York (695, 1209 and 1497) although the actual galley and reshipping continued out of the 52nd Street plant and the depots and/or subsidiaries. This Mt. Vernon operation in connection with the billing of Country Department business had no connection with the Westchester branch of Interborough's City Department (694 and 1209).

In April of 1947, due to a change in postal zones, postal rates for mailing periodicals increased slightly (1598). This increase came at a time when, according to George P. Booth, the officer in Interborough in charge of the Country Department, strict galley distribution was "on its last legs" (1567).

In 1948 Interborough moved its Country Department office facilities and staff back to the 52nd Street plant from the Mount Vernon location (695). Although some persons in the industry anticipated that, as a result of the Curtis discontinuance of the City Department franchise of Interborough, a similar break would occur between Curtis and Interborough in the Country Department [plaintiff's 201 and 202], the Country Department relationship between Interborough and Curtis survived the City Department cancellation of franchise. In fact as late as February 27, 1948, Interborough was proposing to Curtis a revision of the re-

shipping operation in Maryland to set up a truck delivery operation similar to the "Ohio plan" (see Appendix VIII D *infra* "The Interborough Ohio Galley") [defendants' C56].

Some six months later Interborough changed the Maryland operation from the "Ohio plan" to a reshipment distribution, effective November 1, 1948, and simultaneously Interborough installed a reshipping operation in Pennsylvania, New York and New England exclusive of Maine, similar to one that had been operating successfully at the Northeast News Company at Farmington, Maine, which had been organized in May of 1948 (691) [defendants' C57]. When the reshipping operation by subsidiaries was set up as aforesaid in August, 1948, the remaining territory previously served on galley by Interborough went into a reshipping operation from the 52nd Street plant of Interborough (687). The establishment of the reshipping operations in August, 1948, as aforesaid, brought to an end, for all practical purposes, the strict galley operation of Interborough (1498).

Interurban News Company, a reshipping operation, which was established at Cazenovia, New York, took over distribution of the galley previously handled from Interborough's 52nd Street plant for that territory in November of 1949 (690).

In 1950 Interborough sold its truck operating subsidiaries, Verham, Mountain, Chesapeake, Delaware, Oswego and Tri-County. The independent national distributors had continued to do business with these truck subsidiaries of Interborough right up until the time that Interborough sold them (1564).

The reshipping subsidiaries continued to do business with the independent national distributors until 1953 (1486) when Interborough sold these also (1486 and 1592).

As earlier indicated, the trucking subsidiaries known as Pilgrim News Company and Long Island News Company must be considered separately from the consideration of the Interborough Coun-

try Department generally, even though they were part thereof because the first claim of the complaint herein, in paragraph 34, charges that

"[b]etween May 1947 and May 1948 certain of the corporate defendants withdrew their business from and they thereafter refused to deal with Pilgrim News Company, a subsidiary of Interborough incorporated and operated in Massachusetts for the purpose of extending truck distribution to and in areas in that Commonwealth theretofore served by Interborough's galley distribution"

and in paragraph 33 charges that

"[i]n the summer of 1948 certain of the corporate defendants withdrew their business from and they thereafter refused to deal with Long Island News Company, a subsidiary of Interborough incorporated for the purpose of extending truck distribution to and in places in Suffolk County, New York, theretofore served by Interborough's galley distribution."

### B—Pilgrim News Company

At the end of World War II Pilgrim News Company was set up at North Wilberham, Massachusetts, to service outlets within a radius of twenty miles surrounding Palmer, Massachusetts. Prior to the Pilgrim truck operation, the retailers in that area had been serviced by Interborough on a strict galley operation (700) out of the 52nd Street New York plant. Only two of the independent national distributors had not used Interborough's strict galley service in that area, i. e., S-M and Macfadden, who serviced retailers in that territory by direct mail (698, 1330 and 1412). Although S-M had never given its strict galley distribution to Interborough in the Palmer area, Macfadden permitted what was known as a "pick-up" galley; namely, it permitted Interborough to service by strict galley those of the retailers in the area that Macfadden did not care to service by mail or express directly (1332).

Interborough's competition in that area was Atlas News Company, owned by one Katze operating out of Worcester, Massachusetts, and an American News Company agency, known as Springfield News Company operating out of Springfield, Massachusetts. American served by truck the entire territory subsequently covered by Pilgrim. Atlas was a large company covering many territories in Massachusetts and while Interborough was serving by strict galley what subsequently became the Pilgrim truck operation territory, Atlas merely had a small portion thereof, possibly 7 or 8 towns, which it served by truck in connection with delivering Sunday newspapers to certain dealers therein (1413, 1414, 1416 and 1527).

Shortly before the advent of Pilgrim, Interborough received an inquiry from Independent, whom it was servicing in that territory by strict galley, advising Interborough that Independent's wholesaler in Worcester (Max Katze) was asking for a franchise to truck service Palmer and certain of the towns surrounding it. Independent inquired, before entertaining Katze's application, whether Interborough was prepared to initiate a comparable truck service in the territory [defendants' C62]. Katze's application for a trucking franchise in the Palmer area was not the determining factor in influencing Interborough to set up the Pilgrim operation because, in December of 1945, Interborough at a meeting of galley wholesalers and distributors had decided that there was enough gross billing in the area and that the factors of the area to be covered, the number of trucks and employees necessary and the number of independent national distributors who would give franchises to a trucking subsidiary, most of whom were on Interborough's strict galley service for that area, were favorable to the establishment of a truck run in that territory (1525).

Thereupon, the new Pilgrim operation was put under the supervision of Philip A. Hintz, who, although he had had no previous experience in this field, was..

trained by Interborough for that position for three months at its subsidiary in Dover, Delaware (1337, 1386, 1410 and 1411). Hintz's superior in the Interborough organization was George P. Booth, who visited Palmer regularly and conferred with Hintz on policies in connection with the operation (1337) and to whom Hintz regularly reported (1386).

Hintz's first job was to set up the routes, taking the dealers off Interborough's strict galley service and putting them on truck distribution, building and supplying racks and arranging for checkup and recovery schedules (1411). Hintz also took charge of the bookkeeping and the office (1422). The territory serviced by the Pilgrim operation included approximately thirty towns (1412) numbering originally 40 and later 53 retailers, all of whom Hintz knew personally and contacted at least once a week (1386). The original operation required two employees and later grew to five (1386).

Curtis was the first independent national distributor to avail itself of the new Pilgrim truck service in that area [plaintiff's 224] after commending Interborough on this "progressive step" and indicating its willingness to transfer to the new truck operation in that territory [plaintiff's 223].

Within the next 60 days PDC, Independent and Hillman came in (1411), and soon thereafter all of the remaining independent national distributors, except S-M and Macfadden (1342), had changed from the strict galley service of Interborough to the truck service of Pilgrim in that area (1387).

In fact, all of those who had gone into the truck service had evidenced their desire for it prior to the actual commencement of the Pilgrim operation (1529). Shortly after the operation commenced, Curtis' sales manager in that area expressed his approval of the venture and voiced his belief that it was an improvement over the galley distribution (1336). He particularly approved Hintz's management (1341).

The transfer resulted from Interborough's having written each distributor on December 26, 1945 inviting participation in a trucking service to be substituted in the Palmer, Massachusetts, area (1524) [defendants' C63].

Macfadden replied on January 10, 1946, advising Interborough that it had committed itself on December 6, 1945 to turn over its business in Palmer and environs to Max Katze of Atlas News in Worcester, Massachusetts (1348 and 1528) [plaintiff's 227]. Notwithstanding this advice, Pilgrim unsuccessfully continued to solicit Macfadden's account (1346), as a result of which Macfadden's territorial supervisor would regularly stop in at the Pilgrim office and, while he exhibited interest in the operation, made no commitment about giving the Macfadden franchise to Pilgrim (1387).

Similarly, S-M's representatives would visit Pilgrim occasionally and were solicited, but did no more than promise to survey the matter and give it consideration (1353 and 1387).

Notwithstanding these efforts (896 and 1352), S-M never gave its franchise to Pilgrim and used Atlas for its distribution in that territory (1416). Macfadden, to a more limited extent, allowed Atlas to make its truck deliveries in seven or eight towns in that area (1416).

In May of 1947, while Brown, an employee of Curtis, was at the Interborough office in New York conferring with Stolz, an Interborough officer, in connection with the break between Curtis and Interborough in the City Department, Brown advised Booth, another officer of Interborough, who had charge of the Interborough Country Department and Pilgrim News Company, that he had been instructed by Curtis to cancel the Pilgrim franchise. Booth remonstrated, pointing out that Pilgrim's service to Curtis in the Palmer area had been satisfactory and he considered the disenfranchisement of Pilgrim unfair. Booth reiterated his position to Brown on May 15, 1947 [plaintiff's 225]. Notwithstanding these protestations Curtis transfer-

red its franchise in the Palmer, Massachusetts, area from Pilgrim to Atlas on May 19, 1947 (1346 and 1388) [plaintiff's 226 and 251].

A few months after the severance of Curtis from the Pilgrim operation, Curtis representatives in that territory stated to Hintz of Pilgrim that the operation had been satisfactory and that Curtis' defection might well be expected to bring about cancellation of Pilgrim's franchises with the other independent national distributors (1389 and 1390).

During Pilgrim's efforts to get the Macfadden franchise, Hintz of Pilgrim pointed out to Macfadden's representative in the territory that, of the 32 towns serviced by Pilgrim's truck delivery, 25 were receiving publications on strict galley and said retailers were either refusing the magazines or sending them back unopened, whereas the Pilgrim personal contact could assure a much better reception of Macfadden publications by the retailers (1393). Accordingly, a few weeks prior to Curtis' cancellation of the Pilgrim franchise, and on May 2, 1947, Macfadden advised Pilgrim that it had finally decided to allow Pilgrim to service by truck that part of the area not then being serviced by Atlas [plaintiff's 228]. Notwithstanding that advice, one week after Curtis cancelled Pilgrim's franchise and on May 23, 1947, Macfadden advised Pilgrim that it would not grant the Palmer franchise and was making other arrangements (1394) [plaintiff's 229].

Booth of Interborough upon being advised by Hintz of Pilgrim that Macfadden had changed its intention of giving the truck delivery franchise to Pilgrim, sought orally and by letter (1350) [plaintiff's 230] to persuade Macfadden to adhere to its original expressed intention of giving the franchise to Pilgrim, but to no avail. After Hintz of Pilgrim advised Booth of Interborough of the reversal by Macfadden, Macfadden explained that the reversal was due to a misunderstanding in its organization [plaintiff's 230 and 231]. Booth then asked Meyer of Interborough to request Macfadden to reconsider and Meyer did so (1351) but without success [plaintiff's 233]. Interborough again asked Macfadden to reconsider [plaintiff's 232] but apparently to no avail.

In July of 1947 Booth of Interborough had a conference with Chamberlain of Independent at the latter's office in New York City regarding Independent's complaints about Pilgrim service. At that conference Chamberlain displayed to Booth a report by Thaylor, an independent road man, which preferred the Katze (Atlas) operation over Pilgrim mainly because Katze did not handle as many competing comics as did Pilgrim. This, notwithstanding that Thaylor of Independent had told Hintz of Pilgrim that he considered Pilgrim's service better than that of Atlas and, further notwithstanding that, when Thaylor had pointed out certain of Pilgrim's deficiencies in service for Independent, Thaylor and Hintz went around and visited some of the retailers and corrected the things that Thaylor had criticized (1394 and 1418). Booth characterized the objections to Pilgrim's service, set forth in Thaylor's report, as unfounded and as criticism of minor failings on the part of Pilgrim (1355, 1568, 1572 and 1602) [plaintiff's 235].

Atlas' inroads on Pilgrim's business prompted Hintz on August 7, 1947 to suggest to Booth that Pilgrim "fight fire with fire by trying to get some of his (Atlas') business" and that Pilgrim "start gunning for Atlas news accounts" in part of their mutual territory (1417 and 1425) [defendants' N55]. Booth instructed Hintz not to do anything that might antagonize any of the remaining independent national distributors or retailers being serviced by Pilgrim (1427). Booth also warned Hintz of the impending transfer of the Independent franchise from Pilgrim to Atlas, but attributed it to politics involved with the Curtis withdrawal (1417). On August 18, 1947 Independent cancelled its franchise with Pilgrim, effective September 3rd [plaintiff's 234].

In August of 1947 Booth of Interborough called upon Haig of Hearst at the latter's office to check rumors that Hearst was about to leave Pilgrim. Haig told Booth at that conference that the pressure upon him to make the change was considerable and that he was afraid that he could not stop a move of this kind (1360). On September 30, 1947 Haig advised Pilgrim of the transfer of its franchise in that territory from it to Atlas [plaintiff's 236]. Shortly thereafter, when Booth was unsuccessful in a telephone conversation in his attempt to get Haig to change his mind about the transfer of the Hearst franchise from Pilgrim to Atlas, Booth asked Haig's permission to take the matter up with Haig's supervisor Bachman, which was granted. On October 23rd Booth wrote Bachman of the transfer and attributed the transfer to "pressure * * * exerted through * * * the Boston Hearst papers and Max Katze to the extent that your company is now pulling away to go to Katze" (1522) [plaintiff's 237]. Booth did not receive a written reply to his letter to Bachman, but he was invited by telephone to visit Bachman, which he subsequently did (1362). When Booth tried to persuade Bachman to instruct Haig to return the Hearst business to Pilgrim, Bachman advised Booth to forget about the subject because Haig was under pressure to make the change and Bachman would not interfere (1361). Shortly thereafter and about October 5, 1947, when Hayes and Faherty of Hearst came to the Pilgrim office to arrange the details of the transfer of the franchise from Pilgrim to Atlas, Hayes said that the transfer was a matter of policy upon orders of his superior and that he could do nothing about it although he had always been pleased with the Pilgrim service (1392 and 1396). Pilgrim, through Interborough, received notice of the date of suspension of distribution on October 24, 1947 [plaintiff's 238].

At about this time (October, 1947) Hintz spoke with Hubbart of Curtis in an attempt to get Curtis back to Pilgrim. Hubbart assured Hintz that he, Hubbart, had no fault to find with Pilgrim's operation, but that the transfer by Curtis from Pilgrim to Atlas was determined by his superiors and further that Atlas had advised Hubbart that it was just a question of time before Atlas would have all of the independent national distributors' franchises in that territory (1391).

About November 20, 1947 when Hintz spoke with Hayes of the Hearst organization, the latter attributed the transfer to Booth's having "fumbled the ball" in going over Haig's head. Hayes also stated that his reports on the Pilgrim operation were always good (1396).

On December 3, 1947 Pilgrim was advised by Pocket Books that Pilgrim's franchise in certain towns in the territory was being transferred to Atlas [plaintiff's 254]. When Booth was advised of the receipt of this letter by Hintz, Booth went to see Salomon of Pocket Books at the latter's office and was advised that the letter was sent by mistake by a new girl in the office; that it resulted from a meeting of the publishers, which Salomon had not attended; that the letter would be withdrawn (1381). On December 8, 1947, Salomon wrote Pilgrim that the earlier letter was a mistake, that Atlas had been so advised and that Pocket Books was continuing with Pilgrim [plaintiff's 239]. This was followed the next day by another letter from Salomon to Pilgrim specifically advising that the cancellation of December 3rd be disregarded as having been sent in error [plaintiff's 240]. At that time territorial representatives of Pocket Books, when in the Pilgrim office, made no mention of any cancellation of the franchise with Pilgrim (1398), although the talk in the trade was that because of S-M, Curtis and Macfadden pressure, the other independent national distributors would go over to Atlas at their monthly meeting (1403 and 1424). Notwithstanding Pocket Books' advices of December 8th and 9th to ignore its cancellation of the Pilgrim franchise, dated December 3, 1947, on February 2, 1948 Pocket Books advised Booth of In-

terborough that they were cancelling the Pilgrim franchise and "incorporating it into the run of the Atlas News Company of Worcester, Mass." because a survey had indicated inadequate service by Pilgrim [plaintiff's 250] in that inadequate racks had been supplied the retailers and only half of the books in the racks were found to be their products. At a conference attended by Hintz and Booth for Pilgrim and Salomon and Howe for Pocket Books, Salomon referred to a report of a survey made by Pocket Books' representative in the Pilgrim area. When the report was produced, it appeared to be one that was over a year old. Salomon then invited Hintz and Booth to return the following day when he would have a more current report available. When they returned they were advised that the road man could not be located and the matter was abandoned (1384 and 1400).

On December 9, 1947, Keenan of Hillman wrote Young, Hillman's representative in the Pilgrim territory, to make a survey and recommendation as to whether Hillman should stay with Pilgrim or go over to Atlas because "Max Katze and his two sons were in our office and made a terrific pitch for the business now handled by the Pilgrim News Co." and was importuning Hillman for a decision on that application [defendants' HP78]. Keenan sent a copy of his letter to Booth of Interborough (1370) and Booth, on December 10, 1947, in acknowledging that copy, wrote Keenan the reason why he, Booth, felt that Hillman should remain with Pilgrim [plaintiff's 244]. Young, who was Hillman's road man (1584) made his survey of Pilgrim and Atlas and at the conclusion thereof told Hintz of Pilgrim that he favored the Pilgrim operation, but that his report would not have much effect on the outcome (1407).

On March 12th Hillman advised Booth of the transfer of its franchise from Pilgrim because "you have so little to distribute having lost so many of your franchises to your competitor."

In January of 1948, Miller of Fawcett made a survey of the Pilgrim territory, visiting some of the retailers and also Hintz at the Pilgrim office (1405 and 1421) and on January 19, 1948 advised Booth at Interborough of the cancellation of Fawcett's franchise to Pilgrim because the "survey of the dealers indicated considerable inattention to our franchise in the area," and that the franchise would be transferred to another wholesaler [plaintiff's 241].

On February 10 of 1948 Fawcett gave Booth final instructions as to the transfer of the Pilgrim franchise (1364) [plaintiff's 242]. Later when Fawcett's representative came to work out the actual details of the transfer, he told Hintz that the decision to withdraw Fawcett's franchise to Pilgrim had been made even before Miller's survey (1406).

In February of 1949 at another one of Interborough's subsidiaries, a Fawcett road man attributed the cancellation of Fawcett's franchise to Pilgrim for reasons other than inadequate service (1364 and 1381).

On March 9, 1948 M. L. A. (Triangle) advised Booth that as a result of a survey in the Pilgrim area, the Triangle franchise would be turned over to their Worcester, Massachusetts, wholesaler. This transfer was limited to only the truck deliveries in the Pilgrim area and did not affect the reshipping operation by mail and express, conducted out of North Wilberham for Triangle [plaintiff's 243].

By that time, all that Pilgrim had left of the independent national distributors, who had originally given it business, were the defendant PDC and the non-defendants Kable, Popular and Leader and these were shortly terminated by Pilgrim (1404). PDC acknowledged this termination on May 12, 1948 when it advised Booth that it would turn over the territory to Atlas [plaintiff's 247]. In July of 1948 Pilgrim discontinued its truck deliveries for Kable, Popular and Leader. For a few months thereafter it continued to operate on a galley basis

as a reshipping operation for Interborough out of the Palmer plant and engaged in handling and counting returns of periodicals (1372 and 1408). By the end of 1948, the agency was closed (1408), and Hintz went elsewhere for employment (1385 and 1409).

### C—Long Island News Company, Inc.

The best that I can make out of the garbled and contradictory testimony dealing with the history of Interborough's servicing of the extreme eastern portion of Long Island, until the establishment of its wholly owned subsidiary, Long Island News Co., Inc., is that prior to the early summer of 1947, Interborough ran truck delivery from its Jamaica branch to retailers as far east into Suffolk County on Long Island as Southampton on the south shore and Riverhead on the north shore. East of these two points the retailers were serviced by Interborough by galley, for all independent distributors except S-M and Macfadden. This being a resort area, in the days before and immediately after World War II, two truck runs were conducted by Interborough during the summer months by means of a depot or drop-off station at Riverhead (646, 647, 698, 700, 1429, 1530, 1546, 1548, 1550, 1552, 1554, 1557, 1563).

About June 1, 1947 Interborough undertook to service this eastern extremity of Long Island by truck operation (1553) [defendants' C65]. This operation was the immediate forerunner of Long Island News Co., Inc. (1546) which took over the operation about a month later [defendants' C64]. Between then and November of 1947, all independent national distributors except S-M, Macfadden and Curtis granted franchises to Long Island News Co., Inc., for the territory (896, 1430, 1555, 1556, 1558, 1559 and 1561). All of these franchises were given to Long Island News Co., Inc., after Curtis had left Interborough's City Department (1555) and Independent and Hearst gave franchises to Long Island News Co., Inc., after they had left Pilgrim News Co. (1563).

The relationship was short lived for in November, 1947, Triangle cancelled its franchise to Long Island News Co., Inc. [plaintiff's 256]. Others followed suit: International (Hearst) in June, 1948 [plaintiff's 257]; Independent in August, 1948 [plaintiff's 258]; Pocket Books in August, 1948 [plaintiff's 259]; Fawcett in September, 1948 (1432) [plaintiff's 260 and 261]. Shortly thereafter Kable, Popular, PDC, Leader and Hillman also cancelled and Long Island News Co., Inc. went out of business (1433).

### D—The Interborough Ohio Galley

The second separate claim of the complaint, as finally amended and as limited by Interborough's counsel's concession as to the extent of proof thereon, poses the issues partially formulated in the pre-trial order as finally amended to be

"1. Whether, during the period 1946 through 1949, any of the defendants (other than S-M News Company, Inc., McCall Corporation, Popular Science Publishing Company, Inc., Reader's Digest Association, Inc., Meredith Publishing Company, Marvin Pierce and William Rogers), or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to withdraw from plaintiff the galley distribution of magazines and reprints in Ohio * * *.

"2. Whether, in or about 1947, defendants, or any of them, entered into and carried out, by the means alleged, a combination or conspiracy to monopolize, or monopolized, or attempted to monopolize, the galley distribution of magazines, periodicals and reprints in Ohio * * *."

As part of its Country Department functions, Interborough served the State of Ohio on galley.

Interborough originally purchased its Ohio galley accounts (1565) [plaintiff's 263] in the early 1920's and thereafter conducted that service for all 13 independent national distributors except S-M

and Macfadden except that to a limited extent it conducted a partial galley service for Macfadden (1442 and 1447). When George P. Booth, who was familiar with galley operations (1467), took over supervision of Interborough's galley or Country Department in 1944 (1565) Interborough was servicing about 300 retailers in Ohio on galley (1566). Interborough never operated a truck distribution in Ohio (1522) even though at least one distributor requested it to do so (1577) [defendants' C59]. The Ohio galley was conducted substantially the same as other Interborough Country Department operations, i. e., strict galley or reshipment.

Under the strict galley system Interborough's representatives would periodically visit retailers in Ohio for promotional work (1448) and to ascertain their magazine needs. Based on these orders, Interborough would notify each distributor the number of its several publications to be sent directly by the distributor or publisher, by mail or express, to the given retailer. The list of retailers and their needs, received by each distributor from Interborough was known as a "galley." After the distributor or publisher had sent the appropriate magazines to the retailer, pursuant to the galley advice, it would bill Interborough therefor and thereafter Interborough would assume full responsibility for the retailer's account in billing, collection and credit (1448).

Reshipment was a later developed improvement upon strict galley undertaken by Interborough without any distributor requesting it (1598). Under the reshipment system Interborough would receive the magazines instead of their being sent directly by each distributor to each retailer. Interborough would extract the required number of each distributor's magazines destined for a given retailer and combine them with that retailer's allocation of magazines from other distributors and forward them by mail or express, in one package to the retailer. Thus, the retailer would receive one instead of a number of deliveries (1446).

Interborough's checkup in galley service consisted of a return postal card inquiry addressed by it to the retailer upon which in part the succeeding galley was based (1446) and upon which retailers in short supply were "recovered" (1448). Retailers' returns for credit were accomplished by the retailers sending Interborough merely the removed covers of unsold magazines (1446).

Interborough would also seek out new dealers; mail promotion materials to retailers and supply them with magazine racks most of which were supplied at Interborough's cost, although on occasions, retailers and distributors shared this expense (1448).

Interborough serviced the State of Ohio half on strict galley and half on reshipment until it discontinued all Ohio service in October, 1947 (1444). Some of the independent national distributors were hybrids in that their publications were sent into Ohio by Interborough under both methods (1464). Interborough's Ohio galley business for the distributors which it represented there (1535) in the final year (November 1, 1946–October 31, 1947) represented gross billings of $189,417 (1472) which was reduced by an estimated 33% returns, to net billings of $126,909 (1476, 1533, 1538).

As above indicated, at least one distributor (Fawcett) requested Interborough to meet a competitor's offer of truck delivery in part of Ohio (1577) defendants' C59], as early as December, 1945, but Interborough declined, urging Fawcett not to revoke its galley franchise [defendants' C60]. Fawcett, in March, 1946, transferred that territory to a local truck operation (1511). In May of 1946, almost a year before Curtis broke with Interborough's City Department in New York, it too transferred the same territory in Ohio away from Interborough galley to a local truck delivery (1511). This was a result of approval at a "meeting of all the publishers in New York City held on February 28" [plaintiff's 36]. In October, 1947, Fawcett transferred another part

of Ohio from Interborough galley to local truck service, but not until it first gave Interborough the opportunity of establishing truck service in that area (1578) [defendants' F76]. By that time, the only distributors left on Interborough galley in that part of Ohio were Pocket Books and Independent [defendants' F77] and the latter left Interborough shortly thereafter (1514). About a year later Independent transferred another part of Ohio from Interborough galley to local truck delivery (1514).

In an attempt to meet the inroads of truck delivery in Ohio and the anticipated increased cost of strict galley distribution due to possible increased postal rates, Interborough was considering the establishment of reshipping facilities (1596) [plaintiff's 263] when Hearst experimentally transferred all of its Ohio strict galley franchises with Interborough to four competitive reshippers in that state (1452) [plaintiff's 262]. Interborough's protest at not having been given an opportunity to establish its reshipping facilities in Ohio, as planned [plaintiff's 263] was ignored by Hearst (1450).

Other independent national distributors, after joint study, quickly fell in line and transferred Interborough's remaining Ohio strict galley franchises to the four new reshipping wholesalers in that experiment (1521) [plaintiff's 265]. When Interborough protested the Fawcett cancellation (1575) [plaintiff's 264] it was met with the reply that this move by distributors was necessitated by the strict galley wholesalers' refusal to meet the economic need for decentralization; that Interborough's proposed solutions were unacceptable; that the Ohio test was only an experiment, the failure of which, if it occurred, would necessitate return to strict galley and that Fawcett solicited Interborough's proposals for improved service in other strict galley areas [defendants' F75].

During this transfer by the independent national distributors from Interborough strict galley in parts of Ohio to the experimental competing reshipping technique (1455) [plaintiff's 268, 270, 271], parallel transfers from Interborough reshipping in other parts of Ohio to competing local truck operations took place (1459, 1462, 1515, 1518 and 1584) [plaintiff's 265, 267, 269, 272, 275 and 276]. Interborough was powerless to stop this trend [plaintiff's 266] and offered, should the experiment fail, to welcome back the distributors [defendants' PDC 74].

When Interborough lost the galley accounts, it received no compensation therefor nor for the promotional materials and racks it had supplied to the Ohio retailers (1452).

Once Interborough had lost its entire Ohio galley business (1443), it never thereafter resumed distribution in Ohio (1453) even though the Ohio plan did not prove to be all that the distributors had hoped for (1456) [plaintiff's 274]. Nevertheless, even Interborough management recognized the advantages of reshipping over strict galley (1567) and ultimately Interborough adopted reshipping elsewhere (1510).

### Supplemental Opinion

SUGARMAN, District Judge.

In the last paragraph of the court's opinion granting defendants' motions to dismiss the complaint herein, it was stated that

> "[t]he court will notify counsel when they will convene for the purpose of fixing time and place for the trial of the remaining counterclaims."

Such conference was held on October 26, 1954 at which all parties were represented. It was indicated by counsel for all parties that an agreement had been reached that the trial of the remaining counterclaims of the defendants Curtis and Fawcett be deferred until the Court of Appeals had passed upon the order to be entered granting the defendants' motions to dismiss the complaint. This would be accomplished by the certificate of the trial judge, pur-

suant to F.R.Civ.P. 54(b), there being no just reason for delay, expressly directing the entry of judgment.

Were it not for the fact that, in addition to money damages, the plaintiff seeks "a permanent injunction against the continuance, maintenance, or renewal of the agreement and concert of action, and acts done and means employed pursuant thereto," I would be disposed to deny the certificate and judgment suggested by counsel. Even though all defendants, except those two whose counterclaims still survive, are no longer affected by additional trial proceedings herein and it might be convenient to counsel to have the main issue finally disposed of before trial of the counterclaims, I fail to recognize therein any unusual circumstances that should prompt not treating this case in its entirety as the single judicial unit contemplated by the 1946 amendment of F.R.Civ.P. 54(b). I view the intention of that amendment as suggesting that district judges sparingly exercise their discretion thereunder to certify and thereby minimize piecemeal appeals.

However, the prayer for injunctive relief in the complaint would seem to place this case, at least in part, outside of the effect of F.R.Civ.P. 54(b) by virtue of 28 U.S.C.A. § 1292(1). Accordingly, the order to be entered herein will contain an express determination that there is no just reason for delay and an express direction for the entry of judgment dismissing the complaint. If the plaintiff's right to appeal is absolute under 28 U.S.C.A. § 1292(1), the needless exercise of this discretion under F.R.Civ.P. 54(b) can do no harm.[1]

At the conference of October 26, 1954 plaintiff's counsel, notwithstanding that "[r]equests for findings are not necessary for purposes of review,"[2] asked the court's permission to submit proposed findings of fact and conclusions of law. It was agreed that that be done by a certain date and that defendants' counsel be given an additional period to comment thereon or submit counterfindings and conclusions.

In due course the court received from plaintiff's counsel, in the guise of proposed findings and conclusions, what was tantamount to a motion to reargue the dismissal of the plaintiff's complaint. Contrary to the court's decision in disposing of the defendants' motions to dismiss, the plaintiff's proposed findings and conclusions ran to an ultimate denial of said motions. I do not conceive the function of findings and conclusions offered by an unsuccessful party, upon request or permission by the court, to be other than a formalization of the judge's decision. While some of the plaintiff's proposed findings and conclusions do not run contrary to the court's decision, the overall tenor of the total of same being to induce the court to reverse itself, which it declines to do, said findings and conclusions are *in toto* refused.

There can be no doubt that in view of the requirement of F.R.Civ.P. 41(b) as amended, the court is required to make findings upon rendering judgment on the merits against the plaintiff and that these findings shall be as provided in F.R.Civ.P. 52(a). In view of the above ruling that such judgment be entered without awaiting the conclusion of the trial, the provision in the next to the last paragraph of the original opinion—" * * * unless the parties desire more formal findings and conclusions in which event the settlement of same will await the conclusion of the trial * * " is withdrawn. However, the earlier provision of said paragraph—"[p]ursuant to F.R.Civ.P. 52 this decision and the appendix hereto shall constitute the court's findings of fact and conclusions of law" is retained because, in the court's opinion, the decision heretofore filed herein sufficiently sets forth the findings of fact and conclusions of law upon which the complaint was dismissed. It has been said that

---

1. 6 Moore's Fed.Prac., 2d Ed., para. 54.41 [3], n. 10, p. 264.

2. F.R.Civ.P. 52(a).

"The purpose of findings of fact and conclusions of law is to aid the trial court in making a correct factual decision and a reasoned application of the law to the facts; to define for purpose of res judicata and estoppel by judgment the issues then adjudicated; and to aid the appellate court * * * ".3

The decision heretofore filed herein adequately meets these tests.

Concern is felt, however, that said findings and conclusions may exceed the "brief, definite, pertinent findings and conclusions upon the contested matters" without "over-elaboration of detail or particularization of facts" called for in the committee notes to the 1946 amendment to F.R.Civ.P. 52(a).4 In view of the nature of the issue posed herein, i. e., whether, from the testimony and exhibits there could be a fair inference of a conspiracy in violation of the anti-trust laws, the degree of detail manifested by the court's opinion seems inescapable. Prolixity in a case such as this may be excused to meet the test that

"[w]hile the degree of particularity must necessarily be gauged to the case at hand, it should be sufficient to indicate the factual basis for the ultimate conclusion * * * ".5

It seems that had anything less been employed it would have constituted merely "the most general conclusions of ultimate fact" making it impossible for the appellate court "to tell from them upon what underlying facts the court relied, and whether proper statutory standards were observed." 6 The decision herein, under all the circumstances presented in this case, complies with the standards established by the 2nd Circuit.7

▮ Accordingly, the decision heretofore filed herein, including the appendix therein contained, will constitute the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a) without further findings of fact or conclusions of law being submitted by any of the parties.

Proceed with the settlement of the order and judgment hereinabove first mentioned.

---

3. 5 Moore's Fed.Prac., 2d Ed., para. 52.03 [3], p. 2632.

4. 5 Moore's Fed.Prac., 2d Ed., para. 52.01 [5], p. 2606.

5. 5 Moore's Fed.Prac., 2d Ed., para. 52.05 [1], p. 2644.

6. Schneiderman v. United States, 1943, 320 U.S. 118, 129–130, 63 S.Ct. 1333, 1339, 87 L.Ed. 1796.

7. Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992, 996, 997.